UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
GALVESTON DIVISION

Aaron Booth,
on behalf of himself and all others similarly
situated,

                                  Plaintiff,

       v.

Galveston County;

Hon. Kerry L. Neves,
Hon. Lonnie Cox,
Hon. John Ellisor,
Hon. Patricia Grady,
Hon. Anne B. Darring,
Hon. Michelle M. Slaughter,
    Galveston County District Court Judges;

Hon. John Grady,
Hon. Barbara Roberts,
Hon. Jack Ewing,
    Galveston County Court at Law Judges;

Hon. Mark Baker,
Hon. Kerri Foley,
Hon. James Woltz,
    Galveston County Magistrates;

Hon. Jack Roady,
    Galveston County District Attorney,

                           Defendants.

Civil Action No. 18-cv-
Class Action

## COMPLAINT

1.      Instead of administering equal justice in criminal cases, Galveston County locks the accused who cannot afford a payment in jail, while allowing those who can afford a payment to go free. The County sets these payment amounts without any meaningful hearing. The result is a jail filled with hundreds of people who are incarcerated simply because they are cannot afford to purchase their release.

2.      Named Plaintiff Aaron Booth is currently imprisoned at the Galveston County Jail because he cannot afford to pay his bail. His bail amounts was set according to a fixed schedule. The County did not appoint him an attorney before his bail was set. No official has even asked whether he can afford his bail, and he will not have an opportunity to explain his inability to pay for days or weeks. Outside experts—including county-funded experts—have confirmed that this is standard operating procedure in Galveston County.

3.      Being incarcerated for days or weeks is a dramatic deprivation of liberty. The consequences extend beyond the harm of jail time itself. A person who is detained for even a few days may lose income or even employment from missing work; she may miss rent payments and get evicted; she may miss school; she may even lose custody of her children because of her inability to arrange for child care.

4.      Because of the substantial and well-recognized liberty interests at stake, federal courts have not hesitated to enjoin strikingly similar bail practices in Texas and elsewhere in the United States. The County's practices in this case violate the Plaintiff's

substantive and procedural due process rights, infringe Equal Protection guarantees, and undermine the constitutional right to counsel.

5.    Galveston County policymakers have refused to correct these practices despite considerable public pressure.  In the absence of injunctive relief, the County will continue locking away hundreds of people because they cannot make a payment, and depriving them of any meaningful way to seek release.

6.    The named Plaintiff brings this action for injunctive relief on behalf of himself and all similarly situated people imprisoned in Galveston County Jail.

## JURISDICTION AND VENUE

7.    This is a civil rights action arising under 42 U.S.C. § 1983 and the Sixth and Fourteenth Amendments to the United States Constitution. This Court has jurisdiction under 28 U.S.C. § 1331 (federal question jurisdiction) and § 1343 (civil rights jurisdiction).

8.    Venue in this district is proper under 28 U.S.C. § 1391(b)(1), because Galveston County is located in this district, and under § 1391(b)(2), because a substantial part of the events giving rise to the Plaintiff's claims occurred in this district.

## PARTIES

9.    Plaintiff Aaron Booth is currently imprisoned at Galveston County Jail solely because he cannot afford to pay his bail. He also cannot afford to retain private counsel.

10.     Defendant Galveston County is a county organized under the laws of the State of Texas. The Galveston County Commissioners' Court is the final County policymaker for funding and operating a personal bond office.

11.     **Felony Judges.** Defendants Kerry L. Neves, Lonnie Cox, John Ellisor, Patricia Grady, Anne B. Darring, and Michelle M. Slaughter are District Judges in Galveston County ("Felony Judges"). They vote en banc as an administrative body to pass local rules of administration for felony cases in Galveston County. Lonnie Cox is the Local Administrative District Judge for Galveston County. In areas where the Felony Judges fail to promulgate rules, he is the final Galveston County policymaker for post-arrest procedures in Galveston County. He is also the final Galveston County policymaker for enforcing local rules of administration for felony cases. The Felony Judges are sued in their individual and official capacities for declaratory and injunctive relief.

12.     **Misdemeanor Judges.** Defendants John Grady, Barbara Roberts, and Jack Ewing are County Court at Law Judges in Galveston County ("Misdemeanor Judges"). They vote en banc as an administrative body to pass local rules of administration for felony cases in Galveston County. Jack Ewing is the Local Administrative Statutory County Court Judge for Galveston County. In areas where the Misdemeanor Judges fail to promulgate rules, he is the final Galveston County policymaker for post-arrest procedures in Galveston County. He is also the final Galveston County policymaker for enforcing local rules of administration for misdemeanor cases. The Misdemeanor Judges are sued in their individual and official capacities for declaratory and injunctive relief.

4

13. **Magistrates.** Defendants Mark Baker, Kerri Foley, and James Woltz are Magistrates in Galveston County. They carry out Felony and Misdemeanor Judges' pretrial release procedures at the first proceeding after booking into Galveston County Jail, commonly referred to as magistration. They are sued in their individual and official capacities for declaratory relief only.

14. **District Attorney.** Defendant Jack Roady is the Galveston County District Attorney. He is the final Galveston County policymaker for bail-setting policies that govern his prosecutors. He is sued in his official capacity for declaratory and injunctive relief.

## FACTS

**I.    Galveston County Jailed the Named Plaintiff Solely Because He Could Not Afford a Payment**

15.    Plaintiff Aaron Booth is a thirty-six-year-old man who lives in Galveston County. He and his mother live near the poverty line. Aaron was arrested on April 8, 2018, for a felony drug possession charge.

16.    Aaron's arresting officer consulted with a prosecutor who set his bail at $20,000, the minimum amount permitted under Galveston County's felony bail schedule. The felony bail schedule is a predetermined list of minimum bail amounts that correspond to different felony charges. The officer booked Aaron into Galveston County Jail in the early morning hours of April 8, 2018.

17.    Aaron saw a magistrate who automatically adopted his bail amount the morning of April 8, 2018. The magistrate did not ask about his ability to pay the $20,000

5

bail set under the minimum bail schedule. The magistrate did not ask about any facts or make any findings concerning whether Aaron is a flight risk or a danger to the community.

18.     Aaron asked the magistrate for a court-appointed attorney, and completed a "pauper's oath" form to demonstrate that he is too poor to hire his own attorney. The County has not yet appointed an attorney to represent him.

19.     Aaron remains locked in jail because he cannot afford his bail.

## II.     Galveston County Jails People Who Cannot Afford a Payment While Allowing People Who Are Similar, But Wealthier, to Go Free

20.     It is Galveston County policy to set secured bail according to a bail schedule. "Secured bail" is an order to pay a bail amount in full up front, as a condition of release from jail.[1] By contrast, "unsecured bail" or "personal bond" is a promise to pay the bail amount later, if you fail to appear in court.

21.     It is Galveston County policy to impose secured bail under a minimum bail schedule without any inquiry into ability to pay bail, and the potential flight risk or danger posed by each individual person. This policy applies in both misdemeanor and felony cases: wealthier people can purchase their release, while similarly situated, but less wealthy people accused of the same crimes are locked in jail. The practices that comprise this **Bail Schedule Policy** are detailed below.

---

[1] Generic references to "bail" throughout the complaint mean "secured bail" unless otherwise specified.

**A.      Arresting Officers Set Bail Amounts Under a Minimum Bail Schedule Without Asking About Ability to Pay**

22.      In order to book anyone into Galveston County Jail, the arresting officer must complete a preprinted bail order for the Magistrate to sign. It is written County policy to refuse to accept a person into the jail unless the arresting officer completes a preprinted bail order listing each of that person's charges and a bail amount for each charge.

23.      To set a bail amount for felony charges, the arresting officer calls the Galveston County prosecutor on duty. The officer describes the allegations and the duty prosecutor makes a charging decision. If the duty prosecutor decides to file charges, the District Attorney requires the duty prosecutor to set bail on each charge by referring to the felony bail schedule. The felony bail schedule specifies that it is a "minimum schedule": the District Attorney's policy permits the duty prosecutor to set bail amounts that deviate upward from this schedule, but not down. The arresting officer lists the bail amounts set by the duty prosecutor on the arrestee's preprinted bail order. Throughout this process, neither the arresting officer nor the duty prosecutor makes any inquiry into whether the person arrested can afford the bail amount set.

24.      To set bail for misdemeanor charges, the arresting officer simply sets bail according to a predetermined misdemeanor bail schedule. There is no pre-booking prosecutorial screening for misdemeanor charges. The arresting officer makes no inquiry into whether the person arrested can afford the bail amounts listed in the schedule.

7

25.     After completing a preprinted bail order with bail amounts for each charge, the arresting officer books the person arrested into the Galveston County Jail.

**B.     Magistrates Automatically Adopt Bail Determinations at a Process Called "Magistration," Without Inquiry Into Ability to Pay**

26.     A Galveston County Magistrate conducts a proceeding at the jail every morning around 8:00 AM for all people who were booked into the jail in the last 24 hours, regardless of their charge. This proceeding is referred to as "magistration."

27.     The County does not interview arrestees, or otherwise determine their ability to afford bail, before magistration. Although the County has established a personal bond office, the office does no more than inform magistrates whether or not Texas law permits release of each arrestee on personal bond. The personal bond office does not make any recommendations about whether or not to release arrestees on personal bond.

28.     To conduct magistration, Sheriff's deputies bring people who have been arrested, mostly clad in jail-issued jumpsuits, into a cinder-block room at the jail with rows of bare metal benches. Typically, about twenty people are brought into the room and magistrated simultaneously. The Magistrates stand in another room, visible to the arrestees through a plexiglass window, and conduct the proceeding.

29.     Before bringing arrestees into magistration, Sheriff's deputies instruct the arrestees to be quiet and speak only when they are spoken to.

30.     County officials have used the threat of higher bail to deter people from speaking. For example, during a recent magistration when someone commented on

investigation by the ACLU of Texas, a Sheriff's deputy raised his voice and warned the man that the Magistrate might raise his bail if the man kept upsetting the Magistrate.

31.     The Magistrates themselves also make it clear that people are not welcome to speak other than to answer questions with a "yes" or "no." Unsurprisingly, few do. On the rare occasion when someone does ask a question, it is common for the Magistrates to raise their voices in frustration. The Magistrates also frequently respond to questions by stating that they cannot give "legal advice," and the question is best answered by an attorney. But there are no defense attorneys appointed for these proceedings.

32.     The Magistrates begin proceedings by stating "I'm going to give you your magistrate warning and read you your rights."

33.     The Magistrates then read each person's name, the charges against them, and the bail amount the arresting officer wrote on their preprinted bail order.

34.     Finally, the Magistrates read a list of rights as required by the Texas Code of Criminal Procedure—none of which concern pretrial release.

35.     The presiding Magistrate and a clerk then call people forward to answer three yes-or-no questions: Are you a United States citizen? Have you served in the armed forces? Are you out on bail for another offense? The presiding Magistrate and the clerk call people forward simultaneously and record their answers. The arrestees called forward by the clerk do not ever speak to a Magistrate.

36.     After these three questions, the proceeding is over. The Magistrates automatically adopt the preprinted bail amount.

37.     Magistration typically takes less than sixty seconds for each person, consisting solely of the foregoing three questions. The Magistrates do not allow argument to revisit the preprinted bail amount, nor as a matter of practice do they revisit bail *sua sponte*. The Magistrates do not ask questions about ability to pay bail, the potential flight risk or danger posed by each individual person, or the availability of less restrictive conditions of pretrial release. There is simply no individualized determination of appropriate bail amounts.

38.     After magistration ends, the presiding Magistrate or the clerk hands a form to anyone who requests appointed counsel. The form is called a "pauper's oath." The Magistrates instruct people to complete the form to demonstrate their inability to pay for a lawyer and request appointed counsel.

39.     Most people request appointed counsel. 57.1% of people arrested for misdemeanors and 67.9% of people arrested for felonies complete a pauper's oath.

40.     Despite the strong implication that many people who complete a pauper's oath also cannot afford their bail, the Magistrates do not reconsider bail amounts set under the bail schedule. In fact, the Magistrates and their clerks typically leave the room before each person has completed their pauper's oath.

41.     The Magistrates have the authority to grant personal bond, which is release based on a promise to pay bail if the arrestee later fails to appear in court, but the Magistrates refuse to grant personal bond in the majority of cases. The Magistrates do not ask any questions about ability to pay bail, or the potential flight risk or danger posed by each individual person, before deciding whether to grant personal bond. Instead, they

10

refer at the outset of Magistration only to those arrestees who are eligible for a personal

bond as "eligible for pretrial release." The implication is that people who are not released

on personal bond will not be released at all, because they likely cannot afford their bail

under the bail schedule.

42.     Neither the Judges, nor the Magistrates, or the District Attorney requires

the attendance of prosecutors, who are ethically obligated to protect people who are

innocent until proven guilty, cooperate with pretrial release arrangements, avoid

illegitimate delay, and above all ensure that defendants' rights are protected.[2]

43.     People who cannot afford to purchase their freedom—more than a quarter

of people arrested for misdemeanors, and more than half of people arrested for felonies—

remain imprisoned at Galveston County Jail.

### C.   People Who Cannot Pay for Their Release Are Imprisoned for More Than a Week Before a Judge Will Consider Lowering Bail

44.     After magistration, Galveston County arrestees wait in jail for more than a

week, often much longer, before holding a meaningful bail hearing.

45.     Sitting in jail for more than a week is an inherently harmful deprivation of

liberty. And beyond the jail time itself, a person who is detained for even a few days can

face serious collateral consequences. She may lose income from missing work or even

---

[2] *See* ABA Prosecution Function Standard 3-1.2(b) ("The prosecutor should seek to protect the innocent and convict the guilty, consider the interests of victims and witnesses, and respect the constitutional and legal rights of all persons, including suspects and defendants."); Standard 3-2.9(b) ("A prosecutor should not intentionally use procedural devices for delay for which there is no legitimate basis."); Standard 3-3.10 ("The prosecutor should cooperate in good faith in arrangements for release under the prevailing system for pretrial release.").

get fired altogether. She may miss rent payments and get evicted. She may suffer setbacks in an educational program. She may even lose custody of her children because of her inability to arrange for child care. For example, Plaintiff Aaron Booth is concerned about losing his new job and missing child support payments because he is incarcerated.

46.     Rather than face an extended delay before a bail hearing, many people charged with low-level crimes plead guilty rather than spending weeks sitting in jail in order to assert their innocence.

### 1. Misdemeanor Judges Require "Jail Docket" Appearances for the Sole Purpose of Eliciting Guilty Pleas

47.     Once a day, generally five hours after their magistration, the misdemeanor arrestees who cannot afford to pay their bail are brought to the "jail docket," conducted by a Misdemeanor Judge.[3] The Judge presiding over the jail docket does not consider lowering bail or release on personal bond. The sole purpose of the proceeding is to elicit a guilty plea.

48.     Jail docket takes place in the jail in the same room as magistration. The Misdemeanor Judges assign two defense attorneys who attempt to represent everyone on the jail docket over the course of a week, typically about ten people per day.

49.     The attorneys meet with each of their new clients shortly before the proceeding to communicate the prosecution's plea offer. These attorney/client meetings

---

[3] There is no jail docket on weekends—misdemeanor arrestees magistrated on Saturdays and Sundays are brought to jail docket on Monday afternoon.

take place in a hallway area outside the magistration room, where conversations are audible to other defendants and jail staff.

50.     An arrestee who rejects the prosecution's offer is reset for another appearance by court staff. Arrestees do not actually appear before the judge unless they agree to plead guilty. Those who maintain their innocence are ordered back to their cells.

51.     The Misdemeanor Judge does not begin proceedings until after plea negotiations have concluded. When the Misdemeanor Judge begins proceedings, she is not physically present at the jail. She appears on a television monitor in the magistration room to accept guilty pleas.

52.      Guilty pleas are the only matter the jail docket judge will consider. The jail docket judge and court staff make it clear that defense attorneys should not bother raising other matters, including reconsideration of an arrestee's bail.

53.     Prosecutors appear at the jail docket, but they take no action to raise the possibility of personal bond or affordable bail for arrestees who, in virtue of their appearance at jail docket, plainly cannot afford the bail set under the misdemeanor bail schedule.

54.     For people who are steadfast enough to maintain their innocence, Misdemeanor Judges maintain policies that require arrestees to wait about a week after jail docket before their first status conference before the judge assigned to their case.

**2.      Felony Judges Require People to Wait Weeks for Their First Appearance**

55.      People charged with felonies do not appear on a "jail docket." However, their first appearance before the Felony Judge assigned to their case is for the sole purpose of appointing defense counsel and eliciting guilty pleas. This first appearance typically takes days after arrest, or in some cases, more than a month.

56.      The Felony Judges have not set any rules governing how quickly a case must be set for a first appearance.

57.      Thus, whether someone faces misdemeanor or felony charges, the Judges force them to wait in jail for a few days, at a minimum, before their scheduling their first appearance before the judge assigned to their case.

**3.      Judges Refuse to Expedite Hearings on Bail Reduction Motions**

58.      Judges do not appoint defense counsel immediately upon magistration. The appointment process typically takes two to four days, and sometimes longer, in felony cases.

59.      But regardless of when the Judges appoint defense counsel, the Misdemeanor and Felony Judges enforce procedures that prevent a defense attorney from securing a prompt and meaningful bail reduction hearing for her client.

60.      Texas law permits defense attorneys to make a written or oral motion for bail reduction. But even if a defense attorney tried to get her client out as expeditiously as possible by filing a written motion on the same day she was appointed, both Misdemeanor and Felony Judges refuse to schedule prompt hearings on bail reduction

14

applications. Judges instead delay hearing bail reduction applications for at least a week, but most often two to three weeks, after the written application is filed.

61.     Because the Judges do not schedule prompt bail reduction hearings as a matter of practice, even arrestees represented by the most zealous and well-resourced defense counsel face a week or more of wealth-based detention under a bail schedule.

## III.   Galveston County's Bail Schedule Policy Violates Plaintiff's Constitutional Rights

62.     Galveston County's pretrial detention practices described above constitute the **Bail Schedule Policy.** Under this policy, the County jails the vast majority of people booked into Galveston County Jail for more than a week unless they plead guilty or pay the secured bail listed in the applicable bail schedule. Of course, every one of these people is presumed to be innocent.

### A.     The Bail Schedule Policy Unjustifiably Treats Poorer People Differently

63.     Galveston County keeps anyone who cannot afford a predetermined payment locked in jail, while allowing similarly situated people who can afford that payment to go free. The County jails people under a bail schedule without any inquiry into ability to pay or consideration of less restrictive alternatives.

64.     The County lacks any legitimate justification for refusing to release people who cannot make a payment. Research shows, and a federal court in neighboring Harris

15

County recently found, that secured bail is no more effective at securing court appearances than personal bond.[4]

65.     As for public safety, secured bail is demonstrably *harmful.* Requiring people to pay for their release means that people with low incomes spend more time in jail. And after just brief periods of detention, each additional day a person spends locked in jail increases the likelihood that she will be rearrested after she is released.[5]

66.     More fundamentally, people who are rearrested or commit a new crime don't lose their bail money. Texas law does not permit courts to keep an arrestee's bail money because she is rearrested or charged with a new crime. In fact, getting rearrested is a *defense* to bail forfeiture. Paying bail does not even give an arrestee a theoretical incentive to avoid committing a new crime or getting rearrested.

67.     The use of secured bail has a severely disparate impact on Black and Latino arrestees.  African-Americans are five times more likely to be detained than their white

---

[4] *ODonnell v. Harris Cnty.*, 882 F.3d 528, 545 (5th Cir. 2018) (upholding the district court's "thorough review of empirical data and studies [finding] that the County had failed to establish any 'link between financial conditions of release and appearance at trial or law-abiding behavior before trial.'"). *E.g.*, Arpit Gupta, Christopher Hansman, & Ethan Frenchman, *The Heavy Costs of High Bail: Evidence from Judge Randomization* 21 (May 2, 2016) ("Our results suggest that money bail has a negligible effect or, if anything, increases failures to appear."); Michael R. Jones, *Unsecured Bonds: The As Effective and Most Efficient Pretrial Release Option* 11 (October 2013) ("Whether released defendants are higher or lower risk or in-between, unsecured bonds offer the same likelihood of court appearance as do secured bonds.").

[5] Paul Heaton, Sandra Mayson & Megan Stevenson, *The Downstream Consequences of Misdemeanor Pretrial Detention*, 69 Stan. L. Rev. 711, 762 (2017) ("by one month after the hearing the average number of new charges for detainees has exceeded that of their similarly situated counterparts who were released. To the extent that the rich set of controls allows one to construe these differences as causal, they suggest that pretrial detention has a greater criminogenic than deterrent effect."); Christopher T. Lowenkamp, Marie VanNostrand & Alexander Holsinger, *The Hidden Costs of Pretrial Detention* 19–20 (November 2013) ("Defendants detained pretrial were 1.3 times more likely to recidivate compared to defendants who were released at some point pending trial.").

counterparts, and three times more likely to be detained than their Latino counterparts.[6]

African-Americans and Latinos are more likely than whites to be detained because they

cannot afford their bail.[7] People who cannot afford to pay for their release—

disproportionately African-American and Latinos—are significantly more likely to

abandon valid defenses and plead guilty just to get out of jail. They are also more likely

to receive longer jail sentences.

68.     An audit by the Texas Indigent Defense Commission showed that, in

Galveston County, misdemeanor arrestees who can afford to pay bail and fight their cases

from the outside are six times likelier to have their charges fully dismissed.[8] Felony cases

show similar patterns in case outcomes: for example, a felony arrestee who cannot afford

to pay bail is four times likelier to be sentenced to more than a year in prison, and is half

as likely to be sentenced to probation or deferred adjudication.[9]

69.     Galveston County has other, more effective and less harmful, release

conditions available. Recognizing the limitations and dangers of secured bail, other

jurisdictions rely on alternative measures to ensure that people show up for court. The

simplest of these measures is a personal bond, which means a person is released in

---

[6] *See, e.g.*, *Bail Fail: Why the U.S. Should End the Practice of Using Money for Bail*, Justice Policy Inst. 15 (2012).

[7] *See* Stephen Demuth, *Racial and Ethnic Differences in Pretrial Release Decisions and Outcomes: A Comparison of Hispanic, Black and White Felony Arrestees*, 41 Criminology 873, 899 n. 89 (2003).

[8] Texas Indigent Defense Commission, *Limited Scope Policy Monitoring Review: Galveston County* 22–23 (June 2017).

[9] *Id.* at 25–26.

exchange for her promise to pay money if she actually fails to appear in court. Personal

bond is equally as effective at securing court appearances as secured bail.[10]

70. Other alternatives range from simple interventions to help people appear in

court,[11] such as reminders of court dates and transportation to court, to more intensive

supervision,[12] such as required reporting or electronic monitoring. The key to effective

implementation of these alternatives is to tailor conditions of release or detention

according to the needs of each individual.

71. This approach works. For example, Washington, D.C., has relied heavily on

alternatives to prepaid bail for more than twenty years. They enjoy a reappearance rate of

90%, with no rearrest for violent crime for over 98% of people. The cost of release is

approximately $18 per person per day (at Washington, D.C., salary rates), compared with

the cost of approximately $59 per person per day to lock someone in Galveston County

Jail.

72. Galveston County does not consider any of these alternatives. Instead, the

County chooses to jail thousands of people on the basis of their relative wealth, without

---

[10] *ODonnell*, 882 F.3d at 545 (upholding the district court's "thorough review of empirical data and studies [finding] that the County had failed to establish any 'link between financial conditions of release and appearance at trial or law-abiding behavior before trial.'"). *E.g.*, Gupta, Hansman, & Frenchman at 21 ("Our results suggest that money bail has a negligible effect or, if anything, increases failures to appear."); Jones at 11 ("Whether released defendants are higher or lower risk or in-between, unsecured bonds offer the same likelihood of court appearance as do secured bonds.").

[11] *E.g.*, Brice Cooke *et al.*, *Using Behavioral Science to Improve Criminal Justice Outcomes: Preventing Failures to Appear in Court* 15–18 (Jan. 2018).

[12] *E.g.*, Christopher Lowenkamp & Marie VanNostrand, *Exploring the Impact of Supervision on Pretrial Outcomes* 17 (Nov. 2013).

offering them an individualized hearing about their ability to pay bail and without consideration of less restrictive alternatives to pretrial detention.

**B.      The Bail Schedule Policy Deprives People of Liberty Without Adequate Procedural Protections**

73.      The Bail Schedule Policy also violates procedural due process by depriving people of their liberty without adequate procedural protections.

74.      As described above, bail is initially set ex-parte, either by the arresting officer for misdemeanor arrestees, or by the duty prosecutor for felony arrestees.  At magistration, the County deprives arrestees of advance notice of the basis for the predetermined bail amount, and an opportunity to be heard on why the Magistrate should lower bail or grant personal bond.

75.      The County does not admit any attorneys to magistration. The proceedings take place in the absence of a prosecutor to present the Magistrates with individualized evidence demonstrating flight risk or dangerousness (despite the prosecutors' ethical obligations noted above), or a defense attorney to argue that the prosecution has failed to meet its burden.

76.      Instead of holding a meaningful hearing, Magistrates automatically adopt bail amounts that keep less-wealthy arrestees behind bars. Magistrates issues these de facto pretrial detention orders without satisfying the heightened procedural requirements for a pretrial detention order: a counseled hearing where the arrestee can present and rebut evidence concerning flight risk or danger; advance notice of the hearing; and individualized, reasoned findings, by clear and convincing evidence, that no other

condition or combination of conditions of release could address the arrestee's risk of flight or danger.

77.      After magistration, people are jailed under the bail schedule for more than a week—often much more than a week—before the County offers a bail hearing with any of the required procedural protections. County policymakers could mandate constitutionally adequate pretrial detention proceedings consistent with Texas law, but instead, they have chosen a pretrial detention system based on wealth.

**C.     Galveston County's Bail Schedule Policy Deprives People of Defense Counsel at a Critical Stage of Prosecution**

78.      Refusing to conduct a procedurally proper bail hearing before ordering pretrial detention, and denying counsel for such a bail hearing, have a devastating effect on the fairness of plea bargaining and trial. The outcome of magistration—pretrial detention or release—has the power to settle the fate of the person accused and render subsequent proceedings a mere formality.

79.      If the Magistrate orders pretrial detention, the person accused is likelier to abandon a valid defense and plead guilty in order to get out of jail. People stuck in jail are likelier to plead guilty, not based on the merits of their cases, but instead to avoid interruptions in housing, employment, education, and child care. Convictions based on these coerced guilty pleas are inherently unreliable. By the time counsel can secure a meaningful bail hearing (at least a week and often much longer), the accused will have been detained long enough to coerce a guilty plea.

20

80.     If the Magistrate orders pretrial detention, the person accused is less able to help her attorney gather evidence and mount a defense. The person accused can do little to help her attorney prepare a bail reduction application or motion to dismiss from jail. In addition, critical evidence (including witness memory) may fade or disappear during the weeks immediately following arrest, when the person accused is detained and less able to assist with investigation.

81.     For these reasons, controlling for other factors, pretrial detention is the single greatest predictor of a conviction and a sentence to jail or prison time.[13]

82.     Galveston County data are consistent with this finding. Misdemeanor arrestees who can afford to pay bail and fight their cases from the outside are six times likelier to have their charges fully dismissed. Felony arrestees who are released pretrial are nearly twice as likely to receive probation or deferred adjudication as their counterparts who are detained.[14]

83.     Conducting a procedurally proper bail hearing before detaining an arrestee, and appointing defense counsel for the bail hearing, is necessary to avoid this prejudice and protect the fairness of criminal proceedings in Galveston County. Appointment of a

_____

[13] *See* Christopher T. Lowenkamp, Marie VanNostrand & Alexander Holsinger, *Investigating the Impact of Pretrial Detention on Sentencing Outcomes* 10–11 (2013) (finding that people detained until case disposition are 4.44 times more likely to be sentenced to jail and 3.32 times more likely to be sentenced to prison); Mary T. Philips, New York City Crim. Justice Agency, Inc., *Pretrial Detention and Case Outcomes, Part 1: Nonfelony Cases* 25–29 (2007) (finding conviction rate jumps from 50% for people released immediately pretrial, to 92% for people detained until case disposition).

[14] Texas Indigent Defense Commission, *Limited Scope Policy Monitoring Review: Galveston County* 22–26 (June 2017).

defense attorney more than doubles the chance that a judge will release the accused on her own recognizance. In cases where judges do choose to order bail, appointment of a defense attorney can more than double the chance that the judge would lower the bail amount to an affordable amount.[15]

84.     Denying counsel at magistration causes substantial prejudice to the fairness of criminal proceedings in Galveston County.

**IV.     Galveston County is Liable for the Bail Schedule Policy**

85.     Galveston County is liable for the Bail Schedule Policy. County policymakers know about—and share responsibility for creating and maintaining—the Bail Schedule Policy. Galveston County officials also have the power to correct the Bail Schedule Policy, yet have failed to do so.

86.     The Misdemeanor Judges, the Felony Judges, the District Attorney, and the Commissioners' Court are all Galveston County policymakers who know about and perpetuate the Bail Schedule Policy.

87.     The District Attorney has issued formal written instructions to prosecutors to "use the following revised bond schedule when you are called on for bond recommendations," specifying that "this is a minimum schedule and may be increased." The Judges and the Commissioners' Court know about these instructions. The District Attorney also affirmatively moved to expand a list of blanket "Reasons for Rejection" for

---

[15] Douglas L. Colbert *et al.*, *Do Attorneys Really Matter? The Empirical and Legal Case for the Right of Counsel at Bail*, 23 Cardozo L. Rev. 1719, 1720 (2002).

personal bond, also referred to as a list of "non-bailable offenses." (The list has since been rescinded by the Commissioners' Court). The District Attorney is well aware that, for people who are denied personal bond, the minimum bail schedules function as de facto orders of pretrial detention for those who cannot afford the required amounts.

88.     The Commissioners' Court has established a personal bond office as authorized by state law, but has instructed the employees of that office to refrain from making individualized pretrial release recommendations to Magistrates. The personal bond office does not interview arrestees or offer meaningful interventions to facilitate appearances in court for people who are released.

89.     The Misdemeanor Judges, the Felony Judges, the District Attorney, and the Commissioners' Court know that the Magistrates have a widespread, well-settled practice of automatically adopting bail amounts set by prosecutors and arresting officers under the minimum bail schedules. They know that these bail amounts are set without any inquiry into ability to pay or consideration of less restrictive alternatives, without adequate procedural protections, and without appointment of counsel. And they also know that the bail amounts result in pretrial detention of people who are too poor to pay.

90.     The Bail Schedule Policy is imposed frequently, flagrantly, and routinely. It results in severe and obvious constitutional violations, to which, as explained below, the Judges', the District Attorney's, and the Commissioners' Court's attention has been called, and which have been the subject of considerable public debate.

91.     Prosecutors and arresting officers set secured bail amounts under the minimum bail schedules, and magistrates automatically adopt these bail amounts, without

any individualized determination of ability to pay or the need for particular conditions of release, in dozens of cases every week.

92.     Magistrates issue these orders openly, by reading a script and signing preprinted bail orders, in proceedings that last less than a minute, without any inquiry into ability to pay, flight risk, or dangerousness. These proceedings are broadcast into the lobby of the jail every single day.

93.     The Judges, the District Attorney, and the Commissioners' Court have received formal reports from the Texas Indigent Defense Commission and the Council on State Governments detailing the Bail Schedule Policy.

94.     The reports conclude that:

a.     Magistrates do not set individualized bail amounts, and instead set bail based on a bail schedule.

b.     Magistrates set bail under the bail schedule without any individualized inquiry into ability to pay, flight risk, or danger.

c.     Magistrates do not make bail decisions from a presumption of release on recognizance or personal bond.

d.     Neither the Magistrates nor the Judges have implemented any meaningful alternatives to pretrial detention, other than trying to collect money from people who are released.

e.     No County official has electronically aggregated data on rates of failure to appear in court, prohibiting the County from tailoring pretrial release practices to evidence of failure to appear.

f.     The proportion of people locked in Galveston County Jail awaiting trial (71%) is a much higher proportion than in similar counties.

g.     There is no jail diversion program or pre-booking screening for people charged with misdemeanors, meaning that everyone charged with a Class A or B misdemeanor is arrested and booked into jail.

Nearly half of all misdemeanor charges are dismissed upon review by the prosecutor. This outcome persists because County policymakers rejected a 2016 proposal from an outside contractor that would have implemented pre-booking screening for misdemeanors and eliminated approximately 1,850 misdemeanor jail bookings per year. Chacour Koop, *Galveston County Contemplates Idea to cut Costs in Criminal Justice System*, Galveston County Daily News (Feb. 4, 2016), http://www.galvnews.com/news/article_35cacafe-6806-5398-a9ac-0ead7b0d221c.html (describing rejected proposal that would "strengthen cases against the guilty and keep innocent people out of jail").

h.      The average length of stay in Galveston County Jail has been trending upward, increasing by 27% in 2016 and costing the County an additional $7.3 million in jail costs. The Sheriff's budget has also increased at a rate that significantly outpaces increases to the overall County budget, and now consumes about 30% of the overall County budget.

95.      The Judges, the District Attorney, and the Commissioners' Court have also received written correspondence from the ACLU of Texas detailing substantially similar findings about the Bail Schedule Policy.

96.      The Judges and the Commissioners' Court received an earlier audit from the consulting firm Griffith, Mosely, Johnson & Associates in 2014, summarizing interviews with over 65 stakeholders in the justice system and analyzing ways to modernize the County's justice system and reduce the jail population. Though the Commissioners' Court declined to release that audit to the public, Defendant Judge Cox suggested in an opinion piece that the audit described the County's bail practices in great

detail, suggesting solutions such as remote bonding and nonfinancial conditions of release for people charged with minor crimes.[16]

97.    There has been significant public discussion about Galveston's Bail Schedule Policy. For over three years, local news outlets have repeatedly reported that a significant number of people locked in Galveston County Jail are there only because they cannot afford to pay for their release.[17]

98.    The Judges, the District Attorney, and members of the Commissioners' Court themselves are quoted in many of these articles. In fact, in one recent article, Defendant Judge Cox was quoted as saying that the "standard bond amounts have not

---

[16] *See* Lonnie Cox, *Commissioners Continue Meddling and Wasting Taxpayer Money*, Galveston County Daily News (Feb. 28, 2017), http://www.galvnews.com/opinion/guest_columns/article_9e1ed632-e26c-532b-87b1-fac70e887102.html.

[17] *See, e.g.*, Marissa Barnett, *County Returns to Jail Reforms With New To-Do List*, Galveston County Daily News (Oct. 3, 2017), http://www.galvnews.com/news/article_bfdd5ccc-2af9-5e4b-857e-872287400a5b.html (describing bail schedule investigation as "one of the latest pieces in a yearslong discussion among officials about the county's criminal justice system, particularly the system for assigning bail bond and other pretrial practices"); Laura Elder, *Justice Isn't Just for Those Who Can Afford It*, Galveston County Daily News (Dec. 2, 2017), http://www.galvnews.com/opinion/editorials/article_83e4545c-c966-5fec-bb98-64f139a56ba2.html ("Judges need enough discretion to keep truly dangerous people locked up, but those decisions should be made on factors other than the accused's ability to raise money . . . ."); Marissa Barnett, *Myriad Factors Blamed for County Jail Crowding*, Galveston County Daily News (Jan. 14, 2017), http://www.galvnews.com/news/article_f7bfaf7a-081a-58c5-bf52-28d1cf71a298.html ("Local defense attorneys and civil rights groups, along with some inmates' relatives, largely attribute the crowding to a requirement that inmates post monetary bonds for release."); Meagan Flynn, *In Galveston County, Even Personal Bonds Keep Defendants in Jail*, Houston Press (Nov. 22, 2016), http://www.houstonpress.com/news/ingalvestoncountyevenpersonalbondskeepdefendantsinjail8966521 (quoting former County Commissioner Ryan Dennard: "We're currently going through some heightened incarceration rates that are not based upon anything other than internal management, in terms of how folks in the justice system are administering the bail process."); Erin Heffernan, *As Pretrial Jail Population Grows, County Officials Act*, Galveston County Daily News (Mar. 9, 2015), http://www.galvnews.com/news/article_1e44ff44-c61b-11e4-9e8f-3f6d4e542c2d.html ("To qualify [for personal bond], defendants must prove they are low-risk by providing proof of things such as employment, a permanent residence and community support.").

changed in pretty close to 20 years." Barnett, *Myriad Factors Blamed for County Jail Crowding*.

99.     In response to this public debate, the Commissioners' Court issued a resolution promising a minimum of $2 million to modernize the County's pretrial release system, and calling for a prompt end to pretrial detention for people charged with misdemeanors and state jail felonies. Though the Commissioners' Court has not actually budgeted or spent this money, the County appears to have resources available to end unnecessary wealth-based detention.

100.     The Misdemeanor and Felony Judges could act to correct the Bail Schedule Policy. They have the authority to set policy for magistration procedures and pretrial release. They have repeatedly exercised this authority by voting, en banc as an administrative body, to issue standing orders governing magistration procedures and pretrial release. But the Judges have not taken any action to require individualized bail hearings in Galveston County.

101.     The Local Administrative Judges, who are elected to set administrative policies for Galveston County courts, could unilaterally correct the Bail Schedule Policy. They have the administrative authority to promulgate local rules of administration where the other judges fail to do so, supervise cases to ensure timely settings in court, set the hours and places for holding court, and supervise the performance of nonjudicial personnel. The Local Administrative Judges have repeatedly exercised this authority by issuing standing administrative orders to set County policy, including policies concerning post-arrest practices at Galveston County Jail. But the Local Administrative Judges have

27

not issued administrative orders requiring, or even facilitating, individualized bail hearings in Galveston County.

102.    The District Attorney could also correct the Bail Schedule Policy. He has the authority to rescind the felony bail schedule and instruct prosecutors to stop setting minimum bail amounts, which, the District Attorney knows, are later automatically adopted by Magistrates and transformed into de facto pretrial detention orders for those who cannot afford the required amounts. But the District Attorney has not taken any action to attend magistrations, rescind the bail schedule, or otherwise stop prosecutors from recommending minimum bail amounts.

103.    The Commissioners' Court could correct the Bail Schedule Policy. The Commissioners' Court has the authority under state law to hire staff for the personal bond office and instruct them to interview arrestees; produce informed, individualized pretrial release recommendations; provide Magistrates with those recommendations to facilitate individualized pretrial release decisions; and make themselves available for pretrial interventions and supervision to facilitate pretrial release. But the Commissioners' Court has not funded, staffed, or instructed the personal bond office to do so.

## CLASS ACTION ALLEGATIONS

104.    Plaintiff seeks injunctive relief, on behalf of himself and all others similarly situated, under Rule 23(b)(2) of the Federal Rules of Civil Procedure. Plaintiff seeks to represent the class of all people who are or will be detained in Galveston County Jail because they are unable to pay secured bail set at magistration.

## I.    It is Impracticable to Join Every Member of the Class, Which Numbers Well Over 100 People

105.    Galveston County operates one of the largest jails in the State of Texas, with capacity to lock up more than 1,000 people. Typically, more than 700 of these people are pretrial detainees who have not been convicted of a crime. The vast majority of pretrial detainees are jailed because they cannot afford bail set at magistration. As a result, the number of current and future arrestees subjected to Galveston County's Bail Schedule Policy easily numbers in the thousands.

106.    The population of people detained pretrial is constantly changing. Approximately 20 people are booked into jail and magistrated every day.

107.    Joinder is impracticable because the class is both too numerous and too fluid for the Court to feasibly hear their independent claims.

108.    Joinder is also impracticable because the members of the class are too poor to hire lawyers to bring independent claims.

## II.    The Class's Claims Raise Common Questions of Law and Fact That Will Generate Common Answers

109.    The named Plaintiff's claims raise common legal and factual questions arising from one central set of policies and practices: the Bail Schedule Policy.  The Policy applies openly and in materially the same manner every day with respect to all people booked into jail. Resolution of these legal and factual issues will determine whether all of the members of the class are entitled to the constitutional relief that they seek.

110.    Among the most important common questions of fact for the class are:

29

- Whether Magistrates have a widespread, well-settled practice of setting secured bail without inquiry into ability to pay or consideration of alternatives less restrictive than unaffordable secured bail, without the presence of counsel;

- Whether Magistrates have a widespread, well-settled practice of setting secured bail without adequate procedural protections including notice, an opportunity to present and contest evidence, appointment of counsel, reasoned findings based on clear and convincing evidence on the record that unaffordable secured bail is the least restrictive means of mitigating an individual's flight risk or danger;

- Whether Magistrates conduct bail hearings without the presence of counsel for the defendant;

- Whether Magistrates' secured bail orders result in pretrial detention;

- Whether unaffordable secured bail undermines the fairness of plea bargaining or trial; and

- How long class members must wait in jail after arrest before they have an opportunity to raise their inability to pay for their release or to request alternative, non-financial conditions.

Among the most common questions of law with respect to the classes are:

- Whether imposing unaffordable secured bail without an ability to pay hearing violates the Fourteenth Amendment Due Process and Equal Protection Clauses;

- Whether imposing unaffordable secured bail without adequate procedural protections including notice, an opportunity to present and contest evidence, appointment of counsel, and reasoned findings on the record that unaffordable secured bail is the least restrictive means of mitigating an individual's flight risk or danger violates the Fourteenth Amendment's Due Process Clause; and

- Whether denying counsel at a bail hearing violates the Sixth Amendment's Right to Counsel Clause.

### III.    The Named Plaintiff's Claims Are Typical of The Class

111.    The Named Plaintiff's claims are typical of the claims of the other members of the class. Each class member suffers, or suffered, the same injury because Defendants refused to comply with basic constitutional requirements: class members are confined in jail because they could not afford to pay secured money bail set under the Bail Schedule Policy. The answer to whether the Bail Schedule Policy is constitutional will determine the claims of the Named Plaintiff and every other class member.

### IV.    The Named Plaintiff Will Fairly and Adequately Represent The Class

112.    The Named Plaintiff is an adequate representative of the class because his interests in the vindication of the legal claims he raises are entirely aligned with the interests of the other class members, each of whom has the same basic constitutional claims.  The Named Plaintiff is a member of the class, and his interests do not conflict with those of the other class members.

113.    There are no known conflicts of interest among class members. All of the members of the respective class have a similar interest in vindicating their constitutional rights against pretrial detention the Bail Schedule Policy.

114.    Plaintiff is represented by attorneys from the American Civil Liberties Union, the American Civil Liberties Union of Texas, and Arnold & Porter Kaye Scholer LLP, each of whom has experience litigating class actions and complex civil rights matters in federal court and extensive knowledge of both the details of Defendants' scheme and the relevant constitutional and statutory law. Counsels' relevant qualifications are set forth in the pending Motion for Class Certification.

115.     The combined efforts of counsel have so far included extensive investigation into the Bail Schedule Policy over a period of months, including interviews with witnesses, court employees, jail inmates, Judges, attorneys practicing in courts throughout the region, community members, statewide experts in the functioning of state and local courts, empirical researchers, and national experts in constitutional law, post-arrest procedure, pretrial services, and jails.

116.     Counsel have a detailed understanding of state law and practices as they relate to federal constitutional requirements. Counsel have studied the way that these systems function in other cities and counties in order to investigate the wide array of lawful options in practice for municipalities.

117.     Counsel have devoted significant time and resources to becoming intimately familiar with Galveston County's pretrial detention practices and with all of the relevant state and federal laws and procedures that can and should govern them. The interests of the members of the class will be fairly and adequately protected by the Plaintiff and his attorneys.

## V.     Defendants Have Acted on Grounds That Apply Generally to the Injunctive Relief Class, Meriting Final Injunctive and Declaratory Relief

118.     Class-action status under Rule 23(b)(2) is appropriate because the Defendants, through the Bail Schedule Policy, have acted in the same unconstitutional manner with respect to all class members.

119.    Plaintiff seeks declaratory and injunctive relief requiring adequate procedures and appointment of counsel before imposition of unaffordable secured bail. The relief sought is appropriate for the class as a whole.

## CLAIMS FOR RELIEF
### Count One: Wealth-Based Imprisonment
### Fourteenth Amendment Due Process & Equal Protection Clauses
### Against All Defendants

120.    Plaintiff incorporates allegations in the foregoing paragraphs.

121.    Under the Bail Schedule Policy, Defendants lock Plaintiff and other members of the class in jail because they are unable to pay secured bail set under a bail schedule, while releasing other, similarly-situated people who are able to pay. Galveston County's wealth-based system of imprisonment locks poorer—and presumptively innocent—people in jail while allowing wealthier individuals accused of the same crimes to go free until trial.

122.    Defendants set these unaffordable secured bail amounts without any inquiry into or findings concerning an arrestee's ability to pay or the propriety of less restrictive, alternate means of achieving a compelling government interest, and without determining that detention is necessary notwithstanding an arrestee's inability to pay.

123.    Galveston County's wealth-based Bail Schedule Policy violates Plaintiff's rights to equal protection and due process under the Fourteenth Amendment to the United States Constitution.

## Count Two: Procedural Due Process
## Fourteenth Amendment Due Process Clause
## Against Galveston County, Felony Judges, Misdemeanor Judges, and Magistrates

124.    Plaintiff incorporates allegations in the foregoing paragraphs.

125.    Under the Bail Schedule Policy, Defendants set unaffordable secured bail under a bail schedule in magistrations lasting less than a minute for each person. Defendants then lock Plaintiff and other members of the class in jail because they are unable to pay their bail.

126.     These unaffordable bail amounts function as de facto pretrial detention orders. Defendants set these unaffordable bail amounts at magistration without advance notice of the rights at stake, appointment of defense counsel, the opportunity to present or contest evidence, or a written record of reasoned findings by clear and convincing evidence that secured bail in the amount set is the least restrictive means of achieving the a compelling government interest.

## Count Three: Right to Counsel
## Sixth Amendment Right to Counsel Clause
## Against the Misdemeanor and Felony Judges

127.    Plaintiff incorporates allegations in the foregoing paragraphs.

128.    Under the Bail Schedule Policy, Defendants set unaffordable secured bail in magistrations without defense counsel present. Defendants then lock Plaintiff and other members of the class in jail because they are unable to pay their bail.

129.    The Sixth Amendment to the United States Constitution guarantees criminal defendants the right to counsel at each critical stage of the criminal process.

Critical stages include all pretrial hearings that may prejudice the fairness of subsequent criminal proceedings.

130.    Bail-setting hearings have the power to severely prejudice the fairness of subsequent criminal proceedings. These hearings can settle the fate of the person accused and render subsequent proceedings a mere formality. Bail setting is a critical stage of prosecution, and the Sixth Amendment requires that arrestees have the benefit of counsel at such proceedings. By setting the Plaintiff's bail without first appointing defense counsel to represent and assist them, Defendants denied Plaintiff his constitutional right to counsel and thereby materially prejudiced the fairness of their subsequent trials.

## REQUEST FOR RELIEF

Plaintiff requests that this Court issue the following relief:

1.    An order certifying the class defined above;

2.    An injunction against Galveston County requiring, as a precondition to issuance of an unaffordable secured money bail order:

  a.    A prompt hearing inquiring into ability to pay, and permitting the arrestee to present and rebut evidence concerning flight risk or dangerousness,

  b.    Appointment of defense counsel for the hearing, for anyone who cannot afford to retain counsel,

  c.    Advance written notice of the critical questions in the hearing,

  d.    Reasoned written findings of the arrestee's ability to pay, and

      e.      Reasoned written findings, by clear and convincing evidence, that secured money bail in the amount set is the least restrictive means of achieving the government's interest in mitigating the arrestee's risk of flight or danger to the community.

3.      A declaration against all Defendants that issuance of an unaffordable secured money bail order without meeting the above preconditions violates the Plaintiff's rights to equal protection and due process;

4.      A declaration against the Misdemeanor and Felony Judges that a bail hearing is a critical stage of prosecution for purposes of the Sixth Amendment right to counsel;

5.      An order granting reasonable attorneys' fees and costs under 42 U.S.C. § 1988; and

6.      Any other relief this Court deems just and proper.

Respectfully Submitted,

   /s/ Trisha Trigilio
Trisha Trigilio (*Attorney-in-Charge*)
Texas Bar No. 24065179
S.D. Tex. Bar No. 2461809
Adriana Piñon
Texas Bar No. 24089768
S.D. Tex. Bar. No. 1829959
Andre Segura (*Pro Hac Vice* pending)
Texas Bar No. 24107112
American Civil Liberties Union Foundation of Texas
1500 McGowen Street, Suite 250
Houston, Texas 77004
Tel: 713-942-8146
Fax: 713-942-8966
ttrigilio@aclutx.org
apinon@aclutx.org
asegura@aclutx.org

_/s/ Kali Cohn_

Kali Cohn

Texas Bar. No. 24092265

S.D. Tex. Bar No. 3053958

American Civil Liberties Union Foundation of Texas

6440 N. Central Expressway

Dallas, TX 75206

Tel: 214-346-6575

Fax: 713-942-8966

kcohn@aclutx.org

_/s/Brandon J. Buskey*_

Brandon J. Buskey (_Pro Hac Vice_ pending)

Alabama Bar Number: ASB-2753-A50B

American Civil Liberties Union Foundation

Criminal Law Reform Project

125 Broad Street, 18th Floor

New York, NY 10004

Tel: 212-284-7364

Fax: 212-549-2654

bbuskey@aclu.org

_/s/Christopher M. Odell_

Christopher M. Odell

Texas Bar No. 24037205

S. D. Tex. Bar No. 33677

christopher.odell@arnoldporter.com

Hannah Sibiski

Texas Bar No. 24041373

S.D. Tex. Bar No. 559957

hannah.sibiski@arnoldporter.com

ARNOLD & PORTER KAYE SCHOLER LLP

700 Louisiana Street, Suite 4000

Houston, TX 77002-2755

Telephone: 713-576-2400

Facsimile: 713-576-2499

_Attorneys for Plaintiff_