UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
GALVESTON DIVISION

| | |
|---|---|
| Aaron Booth,<br>on behalf of himself and all others similarly<br>situated,<br><br>    Plaintiff,<br><br>    v.<br><br>Galveston County *et al.*,<br><br><br>    Defendants. | Civil Action No. 18-cv-00104 |

## MOTION FOR PRELIMINARY INJUNCTION

## TABLE OF CONTENTS

**NATURE AND STAGE OF THE PROCEEDING** ....................................................1

**SUMMARY OF ISSUES** ................................................................................1

**SUMMARY OF ARGUMENT** ......................................................................2

**BACKGROUND** ........................................................................................2

   I.  Galveston County Jailed The Named Plaintiff Solely Because He Could Not Afford a Payment ....................................................................................3

   II.  Galveston County Jails People Who Cannot Afford a Payment While Allowing People Who Are Similar, But Wealthier, to Go Free ................................. 3

      A.  Arresting Officers Set Bail Amounts Under a Minimum Bail Schedule Without Asking About Ability to Pay ...........................................................4

      B.  Magistrates Automatically Adopt Bail Determinations at a Process Called "Magistration," Without Inquiry Into Ability to Pay.......................................... 5

      C.  People Who Cannot Pay For Their Release Are Imprisoned for More Than a Week Before a Judge Will Consider Lowering Bail ......................................10

         1.  Misdemeanor Judges Require "Jail Docket" Appearances for the Sole Purpose of Eliciting Guilty Pleas ...............................................11

         2.  Felony Judges Require People to Wait Weeks for Their First Appearance ....................................................................................12

         3.  Judges Refuse to Expedite Hearings on Bail Reduction Motions .............. 12

   III. Galveston County Policymakers Acquiesce in the Bail Schedule Policy ............ 13

**ARGUMENT** .........................................................................................17

   I.  Plaintiff is Substantially Likely to Succeed on His Claims That Galveston County's Bail Schedule Policy Violates Due Process and Equal Protection ........17

      A.  Jailing People Under a Bail Schedule Is Wealth-Based Detention in Violation of Equal Protection and Due Process ...............................................17

         1.  Galveston County's Bail Schedule Policy Violates Equal Protection and Due Process Under Binding Circuit Precedent ...........................................17

2.  Wealth-Based Pretrial Detention Triggers Strict Scrutiny ........................ 18

3.  Galveston County's Bail Schedule Policy Fails Intermediate Scrutiny ..... 20

a.  Galveston County's Bail Schedule Policy is Not Narrowly Tailored .. 20

b.  Galveston County's Bail Schedule Policy Does Not Further Its Interest in Future Appearance or Public Safety ................................................. 21

B.  Ordering Pretrial Detention Without Robust Procedural Protections Violates Procedural Due Process .................................................................................... 23

C.  Galveston County Is Liable for its Bail Schedule Policy ............................... 30

1.  Galveston County's Bail Schedule Policy Consists of Widespread and Well-Settled Practices, and the Local Administrative Judges Have Acquiesced in These Practices .................................................................. 31

2.  The Local Administrative Judges Are Galveston County Policymakers 34

II. Galveston County Is Substantially Likely to Continue Causing Class Members Irreparable Harm By Locking Them in Jail Cells ................................................. 39

III. The Harm of Being Unlawfully Locked in Jail Outweighs the Cost of Individualized Hearings, and Ending Such Harm is in the Public Interest 40

**CONCLUSION** .......................................................................................................... **42**

## NATURE AND STAGE OF THE PROCEEDING

Galveston County maintains a two-tiered justice system based on wealth. Before holding any meaningful hearing, Galveston County automatically imposes bail under a bail schedule, without making an individual determination that the person arrested can pay it. Those who can afford to post bail are permitted to go free while awaiting trial, while those who cannot remain locked up and away from their families and livelihoods. As a result, Galveston County jails hundreds of people who cannot afford bail—like the named Plaintiff, who is currently locked in Galveston County Jail. Plaintiff seeks preliminary injunctive relief for himself and the class of all people locked in Galveston County Jail because they cannot purchase their freedom.

## SUMMARY OF ISSUES

Plaintiff seeks a preliminary injunction preventing Galveston County from detaining any arrestee unless the County complies with due process and equal protection. Specifically, Plaintiff seeks an order requiring, as a precondition to issuing an unaffordable secured money bail order:

a. A prompt hearing inquiring into ability to pay, and permitting the arrestee to present and rebut evidence concerning flight risk or dangerousness,

b. Advance written notice of the critical questions in the hearing,

c. Reasoned written findings of the arrestee's ability to pay, and

d. Reasoned written findings, by clear and convincing evidence, that secured money bail in the amount set is the least restrictive means of achieving the government's interest in mitigating the arrestee's risk of flight or danger to the community.

Plaintiff's application merits a preliminary injunction because he has demonstrated "(1) a substantial likelihood of success on the merits, (2) a substantial threat of irreparable injury if the injunction is not issued, (3) that the threatened injury if the injunction is denied outweighs any harm that will result if the injunction is granted, and (4) that the grant of an injunction will not disserve the public interest." *Janvey v. Alguire*, 647 F.3d 585, 595 (5th Cir. 2011).

## SUMMARY OF ARGUMENT

Galveston County's policy is to set bail according to a predetermined minimum bail schedule, and jail arrestees who cannot afford to pay their bail for a week or more before a meaningful bail hearing. This policy mirrors, in all material respects, a practice the Fifth Circuit condemned thirty years ago in *Pugh v. Rainwater*, 572 F.2d 1053, 1057 (5th Cir. 1978), and again this year in *ODonnell v. Harris County*, 882 F.3d 528, 541, 543 (5th Cir. 2018): Galveston County imposes bail "almost automatically," "almost always set[s] a bail amount that detains the indigent," and "treat[s] otherwise similarly-situated [] arrestees differently based solely on their relative wealth." *Id.* at 541, 543. Under these Fifth Circuit precedents, Plaintiff's application merits preliminary injunctive relief.

## BACKGROUND

This is a case about Galveston County's two-tiered criminal justice system, which locks arrestees who cannot afford a payment in jail, while allowing those who can afford a payment to go free. Galveston County has jailed the named Plaintiff and class members under County policy, solely because they cannot afford to pay for their release.

2

I.      **Galveston County Jailed The Named Plaintiff Solely Because He Could Not Afford a Payment**

Plaintiff Aaron Booth is a thirty-six-year-old man who lives in Galveston County. Galveston County Jail Inmate Detail, Ex. B. He and his mother live near the poverty line. Declaration of Aaron Booth, Ex. A ¶¶ 8–9. Aaron was arrested on April 8, 2018, for a felony drug possession charge. Ex. B. Aaron's arresting officer consulted with a prosecutor who set his bail at $20,000, the minimum amount permitted under Galveston County's felony bail schedule. *Id.* The felony bail schedule is a predetermined list of minimum bail amounts that correspond to different felony charges. The officer booked Aaron into Galveston County Jail in the early morning hours of April 8. Ex. A ¶ 3.

Aaron saw a magistrate who automatically adopted his bail amount the morning of April 8. *Id.* ¶¶ 4–5. The magistrate did not ask about his ability to pay the $20,000 bail set under the minimum bail schedule. *Id.* ¶ 5. The magistrate did not ask about any facts or make any findings concerning whether Aaron is a flight risk or a danger to the community. *See id.* Aaron asked the magistrate for a court-appointed attorney, and completed a "pauper's oath" form to demonstrate that he is too poor to hire his own attorney. *Id.* ¶ 7. The County has not yet appointed an attorney to represent him. Aaron remains locked in jail because he cannot afford his bail.

II.     **Galveston County Jails People Who Cannot Afford a Payment While Allowing People Who Are Similar, But Wealthier, to Go Free**

The experience of the named Plaintiff is representative of Galveston County policy, which is to set secured bail according to a bail schedule. "Secured bail" is an

3

order to pay bail in full up front, as a condition of release from jail.[1] By contrast, "unsecured bail" or "personal bond" is a promise to pay bail later, if you fail to appear in court. It is Galveston County policy to impose secured bail under a minimum bail schedule without any inquiry into ability to pay bail, and without inquiring into the potential flight risk or danger posed by each individual person. This policy applies in both misdemeanor and felony cases: wealthier people can purchase their release, while similarly situated —but less wealthy —people accused of the same crimes are locked in jail.

### A.   Arresting Officers Set Bail Amounts Under a Minimum Bail Schedule Without Asking About Ability to Pay

In order to book anyone into Galveston County Jail, the arresting officer must complete a preprinted bail order for the Magistrate to sign. *E.g.*, Sample Statutory Warnings by Magistrate, Ex. L; Statutory Warnings by Magistrate Form, Ex. T. It is written County policy to refuse to accept a person into the Jail unless the arresting officer completes a preprinted bail order listing each of that person's charges and a bail amount for each charge. Galveston County Indigent Defense Plan, Ex. J at 4 (requiring arresting agency to provide a "completed 'STATUTORY WARNING BY MAGISTRATE' form," which is a preprinted bail order); *see also* Walsdorf Decl., Ex. D ¶ 7 (explaining the policy).

To set a bail amount for felony charges, the arresting officer calls the Galveston County prosecutor on duty to describe the charges, and the prosecutor sets bail by

---

[1] Generic references to "bail" throughout this motion mean "secured bail" unless otherwise specified.

referring to the felony bail schedule. Ex. D ¶¶ 6, 9. The felony bail schedule specifies that it is a "minimum schedule": the District Attorney permits the duty prosecutor to set bail amounts that deviate upward from this schedule, but not down. Felony Bail Schedule, Ex. E at 5; Ex. D ¶ 9. To set bail for misdemeanor charges, the arresting officer simply sets bail according to a predetermined misdemeanor bail schedule. Misdemeanor Bail Schedule, Ex. M, Attach. 6 at 3; Ex. D ¶ 8. There is no pre-booking prosecutorial screening for misdemeanor charges. County System Review: Findings and Recommendations, Ex. M, Attach. 9 at 7.

Neither the arresting officer nor the duty prosecutor makes any inquiry into whether the person arrested can afford the bail amounts listed in the schedule. Ex. D ¶¶ 8, 9. The arresting officer simply completes a preprinted bail order with predetermined bail amounts and books the person arrested into Galveston County Jail. *Id.* ¶ 10.

### B. Magistrates Automatically Adopt Bail Determinations at a Process Called "Magistration," Without Inquiry Into Ability to Pay

Galveston County Magistrates conduct a proceeding at the jail every morning around 8:00 AM for people who were booked into the jail in the last 24 hours. Ex. A ¶ 4; Ex. D ¶ 11; Ex. J at 4–5; March Letter from Galveston County Legal Department, Ex. F at 1. This proceeding is referred to as "magistration." Ex. D ¶ 11; Ex. F at 1. Although the County maintains a Personal Bond Office, that office does not assess an arrestee's ability to afford bail or recommend any individualized conditions of release before magistration. Ex. M, Attach. 9 at 7, 13.

5

Typically, about twenty people are brought into the room and magistrated simultaneously, in a cinder-block room visible to the Magistrates through a plexiglass window. Ex. A ¶ 4; Ex. D ¶ 13; May 2017 Magistration Recordings, Ex. M, Attachs. 1-5.[2] Before bringing arrestees into magistration, Sheriff's deputies commonly instruct the arrestees to speak only when they are spoken to. *E.g.*, Ex. M, Attach. 5.[3] On the rare occasion when someone does speak, it is common for the Magistrates to ignore them, or even raise their voices in frustration. *E.g.*, Ex. M, Attachs. 4–5.[4] An arrestee who spoke out of turn was also threatened with a higher bond by a Sheriff's deputy, without any correction by the Magistrate. *E.g.* Ex. M, Attach. 2 at 15:28–51 ("Would you shut up? You're fixing to get your bond raised. You understand that? Because you're doing nothing but upsetting that man in there [the Magistrate]. You keep your mouth shut."). More commonly, the Magistrates respond to questions by stating that they cannot give "legal advice," and the question is best answered by an attorney. *E.g.*, Ex. M, Attachs. 2, 4–5.[5] But there are no defense attorneys appointed for these proceedings.

---

[2] May 1 Magistration Recording, Attach. 1 at 8:34–10:31 (reading 11 names); May 2 Magistration Recording, Attach. 2 at 8:35–12:35 (reading 21 names); May 3 Magistration Recording, Attach. 3 at 17:44–21:13 (reading 18 names); May 4 Magistration Recording, Attach. 4 at 20:12–24:04 (reading 21 names); May 5 Magistration Recording, Attach. 5 at 12:30–17:30 (reading 26 names).

[3] Attach. 5 at 11:55–12:00.

[4] Attach. 4 at 36:44–37:25; Attach. 5 at 16:16–30.

[5] Attach. 2 at 21:32–22:43, 27:55–28:29; Attach. 4 at 30:34–30:50; Attach. 5 at 27:05–27:38, 41:53–42:05.

The Magistrates begin proceedings by telling arrestees that they will be informed of their charges and their rights.  *E.g.*, Ex. M, Atts 1–5.[6] The Magistrates then read each person's name, the charges against them, and the bail amount the arresting officer wrote on their preprinted bail order. Ex. A ¶ 5; Ex. J at 5; *e.g.*, Ex. M, Attachs. 1–5.[7] Finally, the Magistrates read a list of rights as required by the Texas Code of Criminal Procedure— none of which concern pretrial release. Ex. A ¶ 6; Ex. J at 5; Ex. L; Ex. T; *e.g.*, Ex. M, Attachs. 1–5.[8] The presiding Magistrate and a clerk then call people forward to answer three yes-or-no questions: Are you a United States citizen? Have you served in the armed forces? Are you out on bail for another offense? Ex. A ¶ 6; Ex. L; Ex. T; *e.g.*, Ex. M, Attachs. 1–5.[9] The presiding Magistrate and the clerk each call people forward simultaneously and record their answers simultaneously. *E.g.*, Ex. M, Attachs. 1–5.[10] The arrestees called forward by the clerk never speak to the Magistrate. *E.g.*, *id.*

After these three questions, the proceeding is over. The Magistrates automatically adopt the preprinted bail amount. *See* Ex. M, Attach. 9 at 13, 17. Magistration typically takes less than sixty seconds for each person, consisting solely of the foregoing three

---

[6] Attach. 1 at 8:26–8:30; Attach. 2 at 8:27–8:30; Attach. 3 at 17:35–17:39; Attach. 4 at 20:00–20:03; Attach. 5 at 12:25.

[7] Attach. 1 at 8:34–10:31; Attach. 2 at 8:35–12:35; Attach. 3 at 17:44–21:13; Attach. 4 at 20:12–24:04; Attach. 5 at 12:30–17:30.

[8] Attach. 1 at 10:32–11:05; Attach. 2 at 13:01–13:35; Attach. 3 at 21:13–21:45; Attach. 4 at 24:08–24:52; Attach. 5 at 17:30–18:10.

[9] Attach. 1 at 11:05–12:15; Attach. 2 at 13:35–14:45; Attach. 3 at 21:45–23:00; Attach. 4 at 24:52–26:00; Attach. 5 at 18:10–19:20.

[10] Attach. 1 at 12:20–19:55; Attach. 2 at 14:45–36:38; Attach. 3 at 23:05–36:08; Attach. 4 at 26:00–43:15; Attach. 5 at 19:20–42:55.

questions. *E.g.*, Ex. M, Attachs. 1–5.[11] The Magistrates do not allow argument to revisit the preprinted bail amount, nor as a matter of practice do they revisit bail *sua sponte*. Ex. A ¶ 6; *e.g.*, Ex. M, Attach. 3 at 25:40–25:44 (Arrestee: "Did the officer request for the bond request?" Magistrate: "Yes, ma'am. It's customary."); Ex. M, Attach. 5 at 39:35–39:55 (Arrestee: "Can I also ask for a bond reduction?" Magistrate: "You can ask for one, but no sir, I won't grant one. You can talk to your attorney about that. You can file one with the court as soon as the case is filed."), 41:53–58 (Arrestee: "Why is the bond so high on that?" Clerk: "That I can't say, sir."); *see* Ex. M, Attach. 9 at 13, 17. The Magistrates do not ask questions about ability to pay bail, the potential flight risk or danger posed by each individual person, or the availability of less restrictive conditions of pretrial release. *See* Ex. A ¶¶ 5–6; Ex. D ¶ 15; Ex. M, Attach. 9 at 13, 17. There is simply no individualized determination of appropriate bail amounts.

After magistration ends, the presiding Magistrate or the clerk hands a form to anyone who requests appointed counsel. Ex. A ¶ 7. The form is called a "pauper's oath." Ex. D ¶ 17; Pauper's Oath Form, Ex. S. The Magistrates instruct people to complete the form to demonstrate their inability to pay for a lawyer and request appointed counsel. Ex. D ¶ 17; Ex. J at 6; Ex. J at 5; *e.g.*, Ex. M, Attachs. 1–5.[12] Despite the strong implication that many people who cannot afford an attorney also cannot afford their bail, the Magistrates do not reconsider bail amounts set under the bail schedule. *E.g.*, Ex. M,

---

[11] Attach. 1 at 12:20–19:55; Attach. 2 at 14:45–36:38; Attach. 3 at 23:05–36:08; Attach. 4 at 26:00–43:15; Attach. 5 at 19:20–42:55.

[12] Attach. 1 at 11:40–12:15; Attach. 2 at 14:08–14:45; Attach. 3 at 22:22–23:00; Attach. 4 at 25:25–26:00; Attach. 5 at 19:00–19:20.

Attachs. 2–5.[13] In fact, the Magistrates typically announce that the proceedings are over leave the room before each person has completed their pauper's oath. *E.g.*, Ex. M, Attachs. 1–5.[14]

The Magistrates have the authority to grant personal bond, but they refuse to grant it in the great majority of cases, and treat the matter as one that is out of their hands. Ex. D ¶ 16; Ex. M, Attach. 2 (declining to grant any personal bonds because the Magistrate lacked "clearance to authorize it."[15] The Magistrates do not ask any questions about ability to pay bail, or the potential flight risk or danger posed by each individual person, before deciding whether to grant personal bond. Ex. D ¶ 15. *E.g.* Ex. M Attachs. 1–5. Instead, at the outset of magistration, they refer to only those arrestees who are eligible for personal bond as "eligible for pretrial release."  Ex. M, Attachs. 1–2, 4–5.[16]

---

[13] Attach. 2 at 19:28–34 (acknowledging that someone had a court appointed attorney already), 28:25–29:01 (same); Attach. 3 at 30:20–30:41 (same), 33:24–33:38 (same); Attach. 4 at 37:32–38:37 (same); Attach. 5 at 35:08–35:37 (same).

[14] Attach. 1 at 19:50–20:24 (saying "that's a wrap" and leaving room while arrestees are completing pauper's oaths); Attach. 2 at 36:37–37:30 (same); Attach. 3 at 36:05–37:00 (same); Attach. 4 at 43:15–43:57 (same); Attach. 5 at 42:43–43:30 (same).

[15] *See also* Attach. 2 at 27:43–56 ("You may be eligible for pretrial release. We're waiting for the list. Once we get that list I'll announce those of you who are eligible for pretrial release."), 31:28–34 (Arrestee: "Will I get to pretrial out?" Clerk: "We're still waiting on that list."); 35:38–36:39 "Some of you are going to be eligible for pretrial release. I normally have that list . . . but for some reason . . . I haven't received the list from pretrial to get clearance to authorize it. . . . [O]nce you get into the pods, call pretrial. . . . They'll let you know if you're eligible for pretrial release . . . . That'll be some of y'all charged with misdemeanors, but most of y'all charged with felonies, or failure to appear, et cetera won't be eligible."

[16] Attach. 1 at 8:39–9:12, 10:05–10:18; Attach. 2 at 18:34–18:38, 19:00–19:13, 20:28–20:38; Attach. 4 at 30:34–30:50; Attach. 5 at 14:37–14:49, 16:04–16:15. In addition, the Personal Bond Office formerly used a list of "Reasons for Rejection" to deem people ineligible for personal bond. The Judges referred to this list as a list of "non-bailable offenses"—again, the implication being that people who were not released on personal bond would not be released at all.

The implication is that people who are not released on personal bond will not be released at all, because they likely cannot afford their bail under the bail schedule.

People who cannot afford to purchase their freedom—more than a quarter of people arrested for misdemeanors, and more than half of people arrested for felonies—remain imprisoned at Galveston County Jail. Texas Indigent Defense Commission Audit, Ex. I at 21.

### C.   People Who Cannot Pay For Their Release Are Imprisoned for More Than a Week Before a Judge Will Consider Lowering Bail

After magistration, Galveston County arrestees wait in jail for more than a week, often much longer, before judges will even consider holding a bail hearing. Willey Decl., Ex. C ¶ 14; Ex. D ¶¶ 24, 25. Sitting in jail for more than a week is an inherently harmful deprivation of liberty. And beyond the jail time itself, a person who is detained for even a few days can face serious collateral consequences. She may lose income from missing work or even get fired altogether. Ex. C at ¶ 17; Ex. D ¶ 32. She may miss rent payments and get evicted. Ex. C ¶ 17; Ex. D ¶ 32. She may suffer setbacks in an educational program. Ex. C ¶ 17; Ex. D ¶ 32. She may even lose custody of her children because of her inability to arrange for child care. Ex. C ¶ 17; Ex. D ¶ 32. Rather than face an extended delay before a bail hearing, many people charged with low-level crimes plead guilty simply to end the ordeal of sitting in jail. Ex. C ¶ 16; Ex. D ¶ 34. For example, Plaintiff Aaron Booth is concerned about losing his new job and missing child support payments because he is incarcerated. Ex. A ¶ 9.

### 1.    Misdemeanor Judges Require "Jail Docket" Appearances for the Sole Purpose of Eliciting Guilty Pleas

Five hours after magistration, the misdemeanor arrestees who cannot afford to pay their bail are brought to the "jail docket," conducted by a Misdemeanor Judge.[17] Ex. C ¶ 8; Ex. D ¶ 21; Ex. I at 10. The Judge presiding over the jail docket does not consider lowering bail or release on personal bond. Ex. C ¶¶ 13, 15; Ex. D ¶ 22. The sole purpose of the proceeding is to elicit a guilty plea. Ex. D ¶ 22.

Shortly before jail docket, court-appointed attorneys meet with each of their new clients to communicate the prosecution's plea offer. Ex. C ¶ 10; Ex. D ¶ 23. These attorney/client meetings take place in a hallway outside the magistration room, where conversations are audible to passersby. Ex. C ¶ 11; Ex. D ¶ 23. Arrestees do not actually appear before the judge unless they agree to plead guilty— these pleas are the only matters the judge will consider. Ex. C ¶¶ 9, 13; Ex. D ¶¶ 22, 24. Those who maintain their innocence are ordered back to their cells. *See* Ex. C ¶ 14; Ex. D ¶ 24. Misdemeanor Judges maintain policies requiring arrestees to wait about a week after jail docket before their first court date. Ex. C ¶ 14; Ex. D ¶ 24.

---

[17] On weekdays, magistration is held at 8:00 AM, and jail docket is held the same day at 1:00 PM. On weekends, magistration is not held at consistent times (it is typically between 8:00 AM and noon), and there are no jail docket appearances scheduled until the following Monday at 1:00 PM.

### 2. Felony Judges Require People to Wait Weeks for Their First Appearance

People charged with felonies do not appear on a "jail docket,"[18] Ex. D ¶ 25, though the first time they are brought before the Felony Judge assigned to their case, the appearance is for the sole purpose of appointing defense counsel and eliciting guilty pleas. This first appearance typically takes days after arrest, or in some cases, more than a month. *Id.*

Thus, whether someone faces misdemeanor or felony charges, the Judges force them to wait in jail for a few days, at a minimum, before their scheduling their first appearance before the judge assigned to their case.

### 3. Judges Refuse to Expedite Hearings on Bail Reduction Motions

Judges do not appoint defense counsel immediately upon magistration. The appointment process often takes two to four days, sometimes longer, in felony cases. Ex. D ¶ 26; Ex. I at 8. But regardless of when the Judges appoint defense counsel, a defense attorney is not capable of securing a prompt and meaningful bail reduction hearing for her client.

Texas law permits defense attorneys to make a written or oral motion for bail reduction. But even if a defense attorney tried to get her client out as expeditiously as possible by moving for bail reduction on the same day she was appointed—which would be very difficult, if not impossible, for an overworked court-appointed defender to do for each of her detained clients—that motion would not be enough to vindicate her client's

---

[18] This is a new policy as of January 2018.

rights. Ex. D ¶¶ 28–30. Both Misdemeanor and Felony Judges refuse to schedule prompt hearings on bail reduction applications. Judges typically delay hearing bail reduction applications for a week or more after the written application is filed. Ex. D ¶¶ 29, 30.

Because the Judges do not schedule prompt bail reduction hearings as a matter of practice, even arrestees represented by the most zealous and well-resourced defense counsel face a week or more of wealth-based detention under a bail schedule.

## III.     Galveston County Policymakers Acquiesce in the Bail Schedule Policy

Galveston County's pretrial detention practices described above constitute the "**Bail Schedule Policy.**" As final policymakers for post-arrest practices in Galveston County, the Local Administrative Judges[19] know about—and share responsibility for creating and maintaining—the Bail Schedule Policy.

The Bail Schedule Policy is widespread, well-settled practice. Bail is set in the same manner in every case, according to minimum bail schedules. Ex. E; Ex. M, Attach. 6. The County has a written policy requiring booking officers to record bail amounts on preprinted bail orders. Ex. J at 4. And Magistrates read the same script, which entails rote recitation of preset bail amounts, to conduct every magistration. Ex. A ¶¶ 5–6; *supra* Background Section II.B.

County officials implement the Bail Schedule Policy flagrantly. The County has tailor-made forms for arresting officers to preprint bail orders. *E.g.*, Ex. L; Ex. T.

---

[19] A local administrative judge is similar to a chief judge in federal court. She is elected by her colleagues on the bench, who sit in the same county, to set court administration policies for that county. Tex. Gov't Code §§ 74.091–92.

Magistrations are broadcast into the lobby of the jail. And there has even been a public, political fight over bail reform in Galveston County, in which officials have acknowledged the Bail Schedule Policy, acknowledged that its purpose is to detain less-wealthy arrestees, and yet defended the policy. *E.g.*, Ex. P at 7 (quoting Judge Ewing: "I don't believe it's reasonable to say let everyone out on a personal bond that has a state jail felony or below."), 11 (quoting Judge Cox: "The standard bond amounts have not changed in pretty close to 20 years"), 25 (quoting Judge Ewing: "The truth is the judges have been more than accommodating . . . ."); *see also id.* at 2 (quoting an attorney for Galveston County: "We see that there's a problem"; "[I]t has to be set up in a way that gives poor and rich people the same access"), 14–15 (quoting Commissioner Dennard: "It doesn't make very much sense to be housing people in jail just because they don't have access to funds to pay for a personal bond . . . . We clearly have people in the Galveston County Jail who should not be there . . . . We're currently going through some heightened incarceration rates that are not based upon anything other than internal management, in terms of how folks in the justice system are administering the jail process."), 17 (quoting Judge Henry: "There is no one who works in the system whose job it is to think, 'Let's move this person out' . . . . So people are staying in jail. No one is there to catch the people that don't need to be there."), 23 (quoting Judge Henry: "We've been trying to be proactive in getting ahead of [a legal challenge] and make the changes [advocates] know they're going to get either by us voluntarily complying or by court order"). In their statements, the Local Administrative Judges acknowledge that the County orders preset bail amounts as a matter of practice, that the purpose of this practice is to detain less-

wealthy arrestees, and that they do not intend to be any more "accommodating" to people who cannot afford their preset bail.

Most importantly, the Local Administrative Judges are in possession of multiple reports demonstrating the constitutional deficiencies and dramatic consequences of these widespread practices. The reports conclude, among other findings:

1. Magistrates do not set individualized bail amounts, and instead set bail based on a bail schedule. Ex. M, Attach. 9 at 13.

2. Magistrates set bail under the bail schedule without any individualized inquiry into ability to pay, flight risk, or danger. *See id.* at 13, 17.

3. Magistrates do not make bail decisions from a presumption of release on recognizance or personal bond. *See id.* at 13, 17.

4. Magistrates refuse to grant personal bond in the majority of cases, resulting in detention under the bail schedule for anyone who cannot afford their preset bail amount. Ex. I at 21.

5. Neither the Magistrates nor the Judges have implemented any meaningful alternatives to pretrial detention, other than trying to collect money from people who are released. Ex. M, Attach. 9 at 10, 13, 14

6. No County official has electronically aggregated data on rates of failure to appear in court, prohibiting the County from tailoring pretrial release practices to evidence of failure to appear. *Id.* at 13, 14

7. The proportion of people locked in Galveston County Jail awaiting trial (71%) is a much higher proportion than in similar counties. *Id.* at 5.

The Local Administrative Judges have also received written correspondence from the ACLU of Texas detailing substantially similar findings about the Bail Schedule Policy, as well as an earlier audit from a consulting firm summarizing interviews with over 65 stakeholders in the justice system about matters including pretrial release. Correspondence from ACLU of Texas, Ex. M, Attachs. 7, 8, 10; Ex. P at 20 (describing

the results of the study, but noting that it is not available for public release) and 1, 23 (detailing correspondence between the County and the ACLU of Texas).

In response to these reports and public debate, the Commissioners' Court passed a resolution in September 2017 promising a minimum of $2 million to modernize the County's pretrial release system, and calling for a prompt end to pretrial detention for people charged with misdemeanors and state jail felonies. Pretrial Release Resolution, Ex. Q. Although the Commissioners' Court has not yet budgeted or spent this money, *see* Galveston County Budget Excerpt, Ex. K at 9, the County appears to have resources available to end unnecessary wealth-based detention. And the Local Administrative Judges have the power to do so—they have repeatedly issued standing administrative orders to set County policy, including policies concerning post-arrest practices at Galveston County Jail. Administrative Orders by Local Administrative Judges, Ex. H at 1 (forbidding unconstitutional pretrial detention for failure to pay fees), 2 (delegating authority to set cases for jail docket), 3 (denying pretrial release before magistration for all felony arrestees and some misdemeanor arrestees).

In short, the Local Administrative Judges know about the Bail Schedule Policy, and they have the power to correct the Bail Schedule Policy, but they have failed to do so.

## ARGUMENT

### I. Plaintiff is Substantially Likely to Succeed on His Claims That Galveston County's Bail Schedule Policy Violates Due Process and Equal Protection

Plaintiff seeks preliminary relief from Galveston County's Bail Schedule Policy on the first two counts of his complaint: wealth-based pretrial detention, and pretrial detention without adequate procedural protections. Plaintiff is overwhelmingly likely to succeed on these claims. Galveston County's Bail Schedule Policy is, in all material respects, a practice the Fifth Circuit condemned forty years ago: incarceration of people who cannot afford bail under a bail schedule, "without meaningful consideration of other possible alternatives, infringes on both due process and equal protection requirements." *Rainwater*, 572 F.2d at 1057; *accord ODonnell*, 882 F.3d at 541, 543.

#### A. Jailing People Under a Bail Schedule Is Wealth-Based Detention in Violation of Equal Protection and Due Process

Galveston County's Bail Schedule Policy violates the absolute prohibition on "imprisonment solely because of indigent status," which is forbidden under both the Equal Protection and Due Process Clauses. *Rainwater*, 572 F.2d at 1056. The County automatically jails poor people based on their lack of wealth, which comes nowhere near satisfying the strict scrutiny the Constitution requires for depriving a person of the fundamental right to liberty.

##### 1. Galveston County's Bail Schedule Policy Violates Equal Protection and Due Process Under Binding Circuit Precedent

Galveston County's policy explicitly discriminates on the basis of wealth and wealth alone: When two people are arrested on the same charges, with the same criminal

history, only the one who lacks immediate access to money will face the inside of a jail cell. The other will go free until trial. County practice is to order bail under a predetermined minimum bail schedule without a hearing, and without any "meaningful consideration of other possible alternatives." *ODonnell*, 882 F.3d at 543 (quoting *Rainwater*, 572 F.2d at 1057). The Fifth Circuit has twice held that jailing people solely because they cannot afford the bail listed in a bail schedule categorically violates due process and equal protection. *Id.* at 543–44; *Rainwater*, 572 F.2d at 1057. Galveston County's Bail Schedule Policy is materially indistinguishable from the practices condemned in *ODonnell* and *Rainwater*. Under binding circuit precedent, Galveston County's Policy is invidious wealth-based discrimination that violates the Constitution. *ODonnell*, 882 F.3d at 543–44 (quoting *Rainwater*, 572 F.2d at 1056–57); *accord Barnett v. Hopper*, 548 F.2d 550, 554 (5th Cir. 1977) ("To imprison an indigent when in the same circumstances an individual of financial means would remain free constitutes a denial of equal protection of the laws."), vacated as moot, 439 U.S. 1041 (1978).

### 2.    Wealth-Based Pretrial Detention Triggers Strict Scrutiny

Even if Galveston County's automatic wealth-based detention were somehow distinguishable from the bail practices forbidden under *Rainwater* and *ODonnell*, the County could not satisfy the strict scrutiny necessary to justify jailing people before trial. The Supreme Court has repeatedly held that the Constitution prohibits "imprisoning a defendant solely because of his lack of financial resources." *Bearden v. Georgia*, 461 U.S. 660 (1983); *see Tate v. Short*, 401 U.S. 395, 397–98 (1971); *Williams v. Illinois*, 399 U.S. 235, 244 (1970). While the Court has recognized that "[d]ue process and equal

18

protection principles converge . . . in these cases," *Bearden*, 461 U.S. at 665, most

analyses rest on an equal protection framework, as does the Fifth Circuit's recent

guidance in *ODonnell*. *See M.L.B. v. S.L.J.*, 519 U.S. 102, 120 (1996); *Bearden*, 461 U.S.

at 665; *ODonnell*, 882 F.3d at 543. These cases apply heightened scrutiny to

classifications mandating "absolute deprivation" of a benefit, such as freedom from

incarceration, for anyone who cannot pay for that benefit. *ODonnell*, 882 F.3d at 544

(citing *San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 20 (1973)); *accord*

*Frazier v. Jordan*, 457 F.2d 726, 728 (5th Cir. 1972) (asking whether jailing someone

who cannot afford a fine is "necessary to promote a compelling governmental interest")

(citing *Shapiro v. Thompson*, 394 U.S. 618, 634 (1969)).

 The "benefit" at issue here is pretrial liberty. Pretrial liberty is both a fundamental

right, as well as the benefit absolutely deprived by wealth-based pretrial detention. *United

States v. Salerno*, 481 U.S. 739, 750 (1987) (describing pretrial liberty as a fundamental

right).  As such, to deprive arrestees of their right to pretrial liberty and their right against

wealth-based detention, Galveston County must satisfy strict scrutiny. *Id.* at 749–51

(permitting pretrial detention that "narrowly focuses" on a "compelling" government

interest); *see Reno v. Flores*, 507 U.S. 292, 302 (1993) (interpreting and applying *Salerno*

as requiring strict scrutiny); *Lopez-Valenzuela v. Arpaio*, 770 F.3d 772, 780–81 (9th Cir.

2014) (en banc) (recognizing pretrial freedom as "fundamental liberty interest," and

applying strict scrutiny). Galveston County cannot come close to meeting that burden.

### 3.   Galveston County's Bail Schedule Policy Fails Intermediate Scrutiny

Galveston County's policy fails even the less-exacting test of intermediate scrutiny. The *ODonnell* court characterized intermediate scrutiny,[20] in the context of wealth-based pretrial detention, as requiring a county to demonstrate that its policies are "narrowly tailored" to assure each individual's "future appearance and lawful behavior." *ODonnell*, 882 F.3d at 544–45. The Fifth Circuit has spelled out the absolute minimum that such narrow tailoring entails: a court must engage in "meaningful consideration of other possible alternatives" to determine whether each individual's compliance "could reasonably be assured by one of the alternate forms of release." *Rainwater*, 572 F.2d at 1058, 1060. *Accord* Brief for United States as Amicus Curiae at 18–20, *Walker v. Calhoun*, 682 F. App'x 721 (2017) (No. 16-10521), Ex. O.

### a.   Galveston County's Bail Schedule Policy is Not Narrowly Tailored

Galveston County's Bail Schedule Policy cannot meet this high standard. The most glaring deficiency in the County's practices is the lack of any individualized bail determinations. Galveston County detains anyone who cannot pay prescheduled bail amounts—amounts literally preprinted on each person's detention order before their hearing and automatically adopted by magistrates in nearly every case. Ex. D ¶ 7; Ex. J at

---

[20] The *ODonnell* trial court did not determine the appropriate level of scrutiny, and instead applied intermediate scrutiny as the most conservative approach to resolving a preliminary injunction application, finding that Harris County's pretrial detention policy failed even intermediate scrutiny. *ODonnell v. Harris Cnty.*, 251 F. Supp. 3d 1052, 1138–39 (S.D. Tex. 2017), *aff'd as modified*, 882 F.3d 528 (5th Cir. 2018). The Fifth Circuit affirmed this approach without explicitly determining what level of scrutiny applies.

4; Ex. L, Ex. T. Release decisions are dictated by the bail schedules: magistration for each person lasts a minute or less, with no individualized inquiry into each person's risk of flight or possible dangerousness. Ex. A ¶¶ 5–6; Ex. D ¶ 15; Ex. E; Ex. M, Attach. 6; Ex. M, Attach. 9 at 13, 17. Instead, County policy is to refuse to consider, in the large majority of cases, any conditions of release other than paying prescheduled bail amounts. Ex. A ¶ 6; Ex. M, Attach. 9, at 13, 17; Ex. I at 21. The result is that the County assumes pretrial detention is necessary for anyone who cannot afford a prescheduled bail amount, without any "meaningful consideration of other possible alternatives" to determine whether each individual's compliance "could reasonably be assured by one of the alternate forms of release." *Rainwater*, 572 F.2d at 1058, 1060; *see ODonnell*, 882 F.3d at 539.

An independent audit commissioned by the County itself reached this very conclusion, explaining that "release decisions are generally not individualized and are based on a bond schedule." Ex. M, Attach. 9 at 13.  This type of blanket, wealth-based detention is not narrowly tailored and cannot satisfy heightened scrutiny. *Bearden*, 461 U.S. at 672; *Rainwater*, 572 F.2d at 1058, 1060. *Cf.* Ex. O at 18–20.

> **b.** **Galveston County's Bail Schedule Policy Does Not Further Its Interest in Future Appearance or Public Safety**

Nor can Galveston County justify its practices by appealing to its compelling interest in public safety or securing appearances in court. As the trial court found in *ODonnell*: "Recent rigorous, peer-reviewed studies have found no link between financial conditions of release and appearance at trial or law-abiding behavior before trial."

*ODonnell v. Harris Cnty.*, 251 F. Supp. 3d 1052, 1152 (S.D. Tex. 2017). *Cf.* Ex. O at

21-23. In fact, the district court credited studies showing that wealth-based pretrial

detention, even for brief periods, correlates with an increased likelihood of failure to

appear and recidivism. *Id.* at 1121–22.[21] Judge Rosenthal also credited testimony from

the Harris County Sheriff himself that these studies square with his experience as a law

enforcement official. *Id.* at 1122. And the Fifth Circuit upheld this "thorough review of

empirical data and studies" as an adequate basis for enjoining Harris County's strikingly

similar bail practices as failing heightened scrutiny. *ODonnell*, 882 F.3d at 545.

    Galveston County's practices share the same deficiencies as Harris County's

practices. Like Harris County, Galveston County does not even collect data electronically

to analyze appearance rates in court. Ex. M, Attach. 9 at 13–14; *id.*; *see ODonnell*, 251 F.

Supp. 3d at 1118. This body of evidence (or lack thereof) demonstrates that the County

has no justification for automatically imposing bail while denying equally prompt release

on personal bond.

    In short, while Plaintiff has presented evidence casting serious doubt on the

efficacy of Galveston County's policy, Galveston County cannot present any persuasive

evidence that the Bail Schedule Policy bears a positive connection to public safety or

court appearances. Without a demonstrable connection to "future appearance and lawful

---

[21] Crediting Paul Heaton, Sandra Mayson & Megan Stevenson, *The Downstream Consequences of Pretrial Detention*, 69 Stanford L. Rev. 711 (2017); Arpit Gupta *et al.*, *The Heavy Costs of High Bail: Evidence from Judge Randomization*, 45 J. Leg. Studies 471, 473 (2016); Megan Stevenson, *Distortion of Justice: How the Inability to Pay Bail Affects Case Outcomes* (Working Paper, University of Pennsylvania, Nov. 2016); Christopher T. Lowenkamp *et al.*, *The Hidden Costs of Pretrial Detention* (2013).

behavior,"—much less a "narrowly tailored" one—Galveston County's Bail Schedule Policy fails intermediate scrutiny.  *ODonnell*, 882 F.3d at 544–45.

### B.   Ordering Pretrial Detention Without Robust Procedural Protections Violates Procedural Due Process

Even when the government is permitted to deprive people of their constitutional rights—when the government satisfies strict scrutiny—these deprivations "must be implemented in a fair manner." *United States v. Salerno*, 481 U.S. 739, 746 (1987). As discussed above, Galveston County's Bail Schedule Policy deprives class members of two constitutional rights: the right against wealth-based detention, and the right to pretrial liberty. To avoid wrongful deprivation of these rights, the Due Process Clause requires that Galveston County provide class members with adequate procedural protections before jailing them. Courts determine what specific procedural protections are due under the *Mathews v. Eldridge* balancing test, which balances the private interest at stake, together with the risk of a wrongful deprivation without a given procedural protection, against the government's interest in a rights deprivation without that procedure. 424 U.S. 319, 335 (1972).

In this case, the class members' private interest is in their fundamental right to the presumption of innocence and physical liberty. *Salerno*, 481 U.S. at 749–51; *Stack v. Boyle*, 342 U.S. 1, 4 (1952); *Rainwater*, 572 F.2d at 1056–57. This interest is weighty: sitting in jail for a week is an inherently harmful deprivation of liberty. Beyond the jail time itself, a person who is detained for even a few days suffers prejudice to the fairness of her criminal defense—and she can face serious collateral consequences. Ex. I at 21-26.

23

*ODonnell*, 251 F. Supp. 3d at 1105–07 (crediting conclusions drawn by Heaton, *et al.*, *supra* note 21). Galveston County arrestees who are detained before trial are significantly likelier to be convicted and face harsher sentences. Ex. I at 21–26. Misdemeanor arrestees who can afford to pay bail and fight their cases from the outside are six times likelier to have their charges fully dismissed, and felony arrestees who are released pretrial are nearly twice as likely to receive probation or deferred adjudication as their counterparts who are detained. *Id.*; *see also* Ex. D ¶¶ 33–34. Arrestees who are detained also face a higher risk of losing income from missing work, or getting fired altogether; missing rent payments and getting evicted; experiencing setbacks in an educational program; or even losing custody of their children because of inability to arrange for child care. Ex. C ¶ 17; Ex. D ¶ 32; Ex. P at 19.

As for the risk of being wrongfully detained, that risk is a near certainty for someone who cannot afford their bail. *ODonnell*, 251 F. Supp. 3d at 1144. There is no evidence that secured bail is any more effective than personal bond. So if the magistrate is satisfied that paying, say, $500 bail is enough to ensure an arrestee's appearance in court, there is no basis for the magistrate to conclude that a secured, upfront payment is more appropriate than the arrestee's promise to pay $500 if she fails to appear in court. This is particularly true considering that the arrestee stands to lose $500 under either arrangement if she does not return to court. Thus, any period of detention for inability to afford secured bail is a wrongful deprivation.

This Court must balance the class members' substantial interest in protecting their fundamental rights, and the near-certainty of wrongful deprivation of their rights, against

24

Galveston County's interest in continuing its Bail Schedule Policy. The Court will not be writing on a clean slate. In *United States v. Salerno*, , the Supreme Court upheld a specific set of procedures as sufficient for deprivation of pretrial liberty. 481 U.S. 739, 741 (1987). In *Bearden v. Georgia*, the Court described minimum procedures necessary before imposing wealth-based detention in a criminal case. 461 U.S. 660, 672–75 (1983). And in various other contexts where even incarceration is at stake—civil contempt, civil commitment, and revocation of probation, parole, and good time credits—the Court has identified minimal procedural protections that will necessarily apply to pretrial detainees, whose liberty interest is the same or even stronger. *Turner v. Rogers*, 564 U.S. 431, 442 (2011) (imprisonment for civil contempt); *Foucha v. Louisiana*, 504 U.S. 71, 86 (1992) (imprisonment of insanity acquitee); *Bearden*, 461 U.S. at 672 (probation revocation for failure to pay; noting probationer's "conditional freedom"); *Addington v. Texas*, 441 U.S. 418, 432–33 (1979) (civil commitment); *Wolff v. McDonnell*, 418 U.S. 539, 556 (1974) (revocation of prisoners' good time credits; noting prisoners' liberty interest "subject to restrictions" of a prison regime); *Gagnon v. Scarpelli*, 411 U.S. 778, 789 (1973) (probation revocation; noting probationer's private interest is merely a "limited due process right" in conditional liberty); *Morrissey v. Brewer*, 408 U.S. 471, 484 (1972) (parole revocation; noting parolee's "conditional liberty"). These protections include:

- **Advance written notice.** At its core, due process requires "clear notice" of the "critical question[s]" at the bail hearing—ability to pay bail, risk of flight or dangerousness, and the least restrictive conditions that will address that risk.

*Turner*, 564 U.S. at 449; *see Wolff*, 418 U.S. at 563–64 (discussing importance of written notice); *Gagnon*, 411 U.S. at 786; *Morrissey*, 408 U.S. at 489.

- **A prompt hearing.** The Supreme Court has upheld pretrial detention only where there is a robust detention hearing "immediately upon the person's first appearance." 18 U.S.C. § 3142(f); *Salerno*, 481 U.S. at 747 (upholding detention scheme based in part on the "prompt detention hearing" required by § 3142(f)). Moreover, courts must conduct an ability-to-pay hearing *before* imposing any period of wealth-based detention. *Bearden*, 461 U.S. at 672–73 (prohibiting courts from depriving a person of liberty "simply because, through no fault of his own, he cannot pay . . . .").[22]

- **An adversarial hearing.** The Court has required an "opportunity to be heard in person and to present witnesses and documentary evidence . . . [and] the right to confront and cross-examine adverse witnesses . . . ." *Morrissey*, 408 U.S. at 489; *see also Turner*, 564 U.S. at 448; *Salerno*, 481 U.S. at 751; *Gagnon*, 411 U.S. at 786.

- **Reasoned written findings on the record that imprisonment is the least restrictive alternative.** The Court has also required a "written statement by the

---

[22] The Fifth Circuit recently ruled that pretrial detention hearings are required within 48 hours in order to protect the pretrial liberty interest created by the Texas State Constitution—a liberty interest that the Fifth Circuit interpreted as quite limited. *ODonnell*, 882 F.3d at 543. Plaintiff here seeks procedural protection, not from the deprivation of that state liberty interest, but from deprivation of their federal substantive due process right to pretrial liberty and right against wealth-based detention, both of which are fundamental rights under the Federal Constitution that merit a prompt hearing upon arrest per *Salerno* and *Bearden*.

factfinders as to the evidence relied on and reasons for" imprisonment.[23] *Gagnon*,

411 U.S. at 786; *see also Salerno*, 481 U.S. at 752; *Wolff*, 418 U.S. at 564–65;

*Morrissey*, 408 U.S. at 489. Before imposing wealth-based detention, courts must

make an affirmative inquiry into ability to pay. *Turner*, 564 U.S. at 447 (requiring

courts to "elicit" financial information); *Bearden*, 461 U.S. at 672; *United States v.*

*Scales*, 639 Fed. App'x 233, 239 (5th Cir. 2016); *United States v. Payan*, 992 F.2d

1387, 1395 (5th Cir. 1993). And finally, the Court must consider alternatives, such

as a lower bail amount: "the court must consider alternate measures . . . other than

imprisonment. Only if alternate measures are not adequate to meet the State's

interests . . . may the court imprison" a person who is unable to pay. *Bearden*, 461

U.S. at 672.

- **Findings by clear and convincing evidence.** The Supreme Court has only

  approved of pretrial detention orders where the government proves its case by

  clear and convincing evidence. *Salerno*, 481 U.S. at 752. And the Court has

  explicitly held that the clear and convincing standard is the absolute minimum in

  the context of civil commitment, where, like pretrial detention, the factfinder risks

  committing someone "based solely on a few isolated instances" of aberrant

---

[23] The Fifth Circuit's *ODonnell* ruling also held that the liberty interest under the Texas State Constitution
did not merit magistrates issuing written findings memorializing their orders of detention. 882 F.3d at
542. By contrast, the fundamental rights Plaintiff seeks to protect here under the Federal Constitution
merit written findings to ensure that, "faced with possible scrutiny" by an appellate court or the public,
Galveston County magistrates will "act fairly" before ordering pretrial detention. *Wolff*, 418 U.S. at 565.
Notably, the Fifth Circuit declined to require written findings solely because of the volume of cases in
Harris County. Here, magistrates handle a far smaller volume—approximately twenty arrestees per day,
total—only a small minority of whom require pretrial detention.

behavior, even though "such behavior is no basis . . . for confinement." *Addington*, 441 U.S. at 427, 433. The significant harms of pretrial detention merit this "intermediate standard" between preponderance of the evidence and reasonable doubt: "The individual should not be asked to share equally with society the risk of error when the possible injury to the individual is significantly greater than any possible harm to the state." *Id.* at 424, 427; *see also Foucha* 504 U.S. at 86; *Santosky v. Kramer*, 455 U.S. 745, 756 (1982) ("This Court has mandated an intermediate standard of proof—'clear and convincing evidence'—when the individual interests at stake in a state proceeding are both 'particularly important' and 'more substantial than mere loss of money.'"); *Singh v. Holder*, 638 F.3d 1196, 1203 (9th Cir. 2011) (interpreting *Addington*, *Santosky*, and *Foucha* to require a determination based on clear and convincing evidence that an alien is a flight risk or danger to the community to justify denial of a bond in the immigration context); *In Re Humphrey*, 228 Cal. Rptr. 3d 513, (Cal. Ct. App. 2018) (requiring a determination based on "clear and convincing evidence that no less restrictive alternative will satisfy that purpose" to impose monetary bail because pretrial liberty is a fundamental interest).

The Supreme Court has repeatedly held that the Due Process Clause requires the foregoing procedures, at a minimum, before depriving someone of their physical liberty. In each of these cases, the risk of wrongful imprisonment was the same or even lower than the near-certainty of wrongful imprisonment associated with the complicated nature of secured bail determinations. *E.g.*, *Turner*, 564 U.S. at 446 (describing question at issue

28

as "straightforward"); *Gagnon*, 411 U.S. at 787 (describing mitigating evidence in most parole revocation cases as "simple").

There are no government interests warranting departure from these precedents. Any argument about the cost of these additional procedures rings hollow: Galveston County currently spends approximately $82 per day to jail hundreds of arrestees unnecessarily. Ex. P at 9; *see Morrissey*, 408 U.S. at 483–84 & n.10 (agreeing that the cost of unnecessary imprisonment outweighs the cost of robust parole revocation procedures). In addition to the cost of jailing arrestees, the policy results in increased rates of recidivism, further increasing the County's law enforcement and jail costs. *ODonnell*, 251 F. Supp. 3d at 1121–22.[24] *Cf.* Ex. O at 21–23. The policy can result in lower rates of court appearance for people who manage to pay for their release, perhaps as a "reaction to arbitrariness" that the Supreme Court has recognized in the parole revocation context. *Morrissey*, 48 U.S. at 484 & n.11 ("[F]air treatment in parole revocations will enhance the chance of rehabilitation by avoiding reactions to arbitrariness"); *ODonnell*, 251 F. Supp. 3d at 1121–22.[25] And the policy is also a

---

[24] Crediting Heaton, *supra* note 21; Gupta *supra* note 21; Stevenson, *supra* note 21; Lowenkamp, *supra* note 21.

[25] *See supra* note 24.

financial drain on low-income communities, imposing further economic costs on Galveston County. *Id.* at 1122[26]; Ex. O at 23; *Selling Off Our Freedom*, Ex. R at 31.

These considerations indicate that, if anything, Galveston County *shares* an arrestee's interest in robust procedural protections for pretrial release. Aside from the economic cost of wrongful pretrial detention, the County has an independent interest in ensuring that County residents maintain a "normal and useful life within the law" and that they are treated with "basic fairness." *Morrissey*, 408 U.S. at 484. The procedural protections Plaintiff seeks more than satisfy the *Mathews* balancing test—they are a win-win.

### C.      Galveston County Is Liable for its Bail Schedule Policy

Galveston County is liable for its Bail Schedule Policy, which stems from "widespread practices that are 'so common and well settled as to constitute a custom that fairly represents municipal policy.'" *ODonnell*, 882 F.3d at 538 (quoting *Johnson v. Moore*, 958 F.2d 92, 94 (5th Cir. 1992)). By their "acquiescence in a longstanding practice or custom which constitutes the standard operating procedure" in Galveston County, the Local Administrative Judges have incurred liability for Galveston County. *Id.* (quoting *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 737 (1989)).

---

[26] Crediting Lisa Foster, Office for Access to Justice, *Remarks at the American Bar Association's 11th Annual Summit on Public Defense* (Feb. 6, 2016); Marie VanNostrand, *Legal and Evidence–Based Practices: Applications of Legal Principles, Laws, and Research to the Field of Pretrial Services* at 15 (National Institute of Corrections, Apr. 2007); Stephen Demuth, *Racial and Ethnic Differences in Pretrial Release Decisions and Outcomes: A Comparison of Hispanic, Black, and White Felony Arrestees*, 41 Criminology 873 (2003).

### 1. Galveston County's Bail Schedule Policy Consists of Widespread and Well-Settled Practices, and the Local Administrative Judges Have Acquiesced in These Practices

There can be no question that the Bail Schedule Policy is standard operating procedure in Galveston County. The County detains arrestees under the minimum bail schedules routinely, frequently, and flagrantly. This policy results in severe and obvious constitutional violations, to which, as explained below, the Local Administrative Judges' attention has been called, and which have been the subject of considerable public debate.

The Bail Schedule Policy is extremely well-settled. As described in significant detail *supra* at Background Section II.A, the arresting officer and the duty prosecutor set bail in the same manner in every case, according to written minimum bail schedules. Bail-setting by the arresting officer is in fact mandated by written County policy, requiring booking officers to record bail amounts on preprinted bail orders. Ex. J at 4, Ex. L at 3. These preprinted orders are automatically adopted by magistrates in identical proceedings every day, where the magistrates approve bail orders after reading from a standard script. Ex. L; *see also* Ex. E; Ex. F; Ex. J at 5; Ex. M, Attach. 9 at 13; Ex. T; *supra* Background Section II.B.

The policy is also widespread. County officials apply the Bail Schedule Policy to dozens of arrestees booked into Galveston County Jail every week. Ex. M, Attachs. 1-5.[27] Magistrates sign preprinted bail orders without holding any substantive hearing, and

---

[27] Attach. 1 at 8:34–10:31 (reading 11 names); Attach. 2 at 8:35–12:35 (reading 21 names); Attach. 3 at 17:44–21:13 (reading 18 names); Attach. 4 at 20:12–24:04 (reading 21 names); Attach. 5 at 12:30–17:30 (reading 26 names).

without changing the bail amounts in over 90% of cases. Ex. N, Attach. 1. The County detains dozens of arrestees every week solely because they cannot afford their bail. As a result, the percentage of Galveston County's jail population detained before trial exceeds the average in similar counties, and the County has struggled with keeping its jail population below the jail's capacity. *See* Ex. M, Attach. 9 at 5; Ex. N, Attach. 1; Ex. P at 9, 15, 17.

The widespread, well-settled nature of the Bail Schedule Policy is bolstered by how flagrantly the policy is implemented by County officials. The County has tailor-made forms for arresting officers to preprint bail orders. Ex. L, Ex. T. Magistrations are shown via closed-circuit television in the lobby of the jail. And as detailed *supra* at Background Section III, there has even been a public, political fight over bail reform in Galveston County, during which County officials have made clear that the County orders preset bail amounts as a matter of practice, and that the purpose of this practice detain indigent arrestees.

The aggregate picture is undeniable. The Local Administrative Judges are in possession of formal reports from the Texas Indigent Defense Commission and the Council on State Governments detailing the County's Bail Schedule Policy, which make plain the system's constitutional deficiencies, as well as similar findings from the ACLU of Texas and an outside consulting firm. *See supra* at Background Section III (detailing the reports' findings).

On top of these investigations, local news outlets have repeatedly reported that significant numbers of people locked in Galveston County Jail are there only because

they cannot afford to pay for their release. *See, e.g.*, Ex. P at 1 (describing bail schedule investigation as "one of the latest pieces in a yearslong discussion among officials about the county's criminal justice system, particularly the system for assigning bail bond and other pretrial practices"), 7 ("Judges need enough discretion to keep truly dangerous people locked up, but those decisions should be made on factors other than the accused's ability to raise money . . . ."), 9 ("Local defense attorneys and civil rights groups, along with some inmates' relatives, largely attribute the crowding to a requirement that inmates post monetary bonds for release."), 15 (quoting former County Commissioner Ryan Dennard: "We're currently going through some heightened incarceration rates that are not based upon anything other than internal management, in terms of how folks in the justice system are administering the bail process."), 17 ("To qualify [for personal bond], defendants must prove they are low-risk by providing proof of things such as employment, a permanent residence and community support."). The Local Administrative Judges themselves are quoted in some articles. In one recent article, Defendant Lonnie Cox, the Local Administrative Felony Judge, was quoted as saying that the "standard bond amounts have not changed in pretty close to 20 years." Ex. P at 11.

In the midst of this public debate, the Galveston County Commissioners' Court issued a resolution committing a minimum of $2 million to modernizing the County's

pretrial release system,[28] and calling for a prompt end to pretrial detention for people charged with misdemeanors and state jail felonies. *See* Ex. Q. Yet after learning of the County's unconstitutional Bail Schedule Policy through two independent auditors, an investigation by a local advocacy group, repeated local reporting, and a resolution by the Commissioners' Court, *see* Ex. M, Attachs. 7–10; Ex. P at 20, Ex. Q, the Local Administrative Judges have not corrected this policy. Through their acquiescence in Galveston County's bail schedule practices, Local Administrative Judges have adopted these practices as County policy.

### 2.    The Local Administrative Judges Are Galveston County Policymakers

The Local Administrative Judges[29] are Galveston County policymakers who have incurred county liability by their "acquiescence in a longstanding practice or custom which constitutes [] 'standard operating procedure.'" *Jett*, 491 U.S. at 737 (quoting *Pembaur v. City of Cincinnati*, 475 U.S. 469, 485–87 (1989) (White, J., concurring)). They are each County policymakers because they have the power to set final policy "on a particular issue" for the "actions at issue here"—post-arrest practices in misdemeanor and felony cases. *McMillian v. Monroe Cty.*, 520 U.S. 781, 783, 785 (1997). And each of the

---

[28] Texas law authorizes either the Commissioners' Court or the Judges to establish and staff a personal bond office. Tex. Code Crim. Proc. Art. 17.42. Though the Commissioners' Court has established a personal bond office and "stands ready" to spend $2 million to modernize it, the Commissioners' Court has not actually budgeted or spent that $2 million. Pretrial Release Resolution, Ex. Q; *see* Galveston County Budget Excerpt, Ex. K. Nor have the Judges taken advantage of the Commissioners' Court's overture.

[29] The technical term for these judges under state law is "local administrative statutory county court judge" and "local administrative district judge." For clarity, Plaintiff's filings refer to the local administrative statutory county court judge as the "local administrative misdemeanor judge," and the local administrative district judge as the "local administrative felony judge."

34

Local Administrative Judges represents Galveston County when doing so. Of course, a judge cannot incur municipal liability for any actions taken in a judicial capacity to enforce state law. *Johnson v. Moore*, 958 F.2d 92, 94 (5th Cir. 1992). But judges can incur municipal liability for actions they take in an administrative capacity. *ODonnell*, 882 F.3d at 538.

State law delegates broad authority to the Local Administrative Judges, including authority to:

> implement and execute the local rules of administration, including the assignment, docketing, transfer, and hearing of cases;

> promulgate local rules of administration if the other judges do not act by a majority vote;

> supervise the expeditious movement of court caseloads, subject to local, regional, and state rules of administration;

> set the hours and places for holding court in the county;

> supervise the employment and performance of nonjudicial personnel; and

> supervise the budget and fiscal matters of the local courts, subject to local rules of administration.

Tex. Gov't Code § 74.092. Each of these provisions authorizes the Local Administrative Judges final policymaking authority to correct Galveston County's post-arrest practices, by, for example, promulgating ameliorative rules of administration in the absence of action by the other judges, or affirmatively scheduling prompt, meaningful bail hearings for arrestees.

Critically, the Local Administrative Judges represent Galveston County—not the State—when exercising this policymaking authority. A policymaker acts for the county when his "actual function" under state law is to make county policy. *McMillian*, 520 U.S. at 786. The question is not whether the Local Administrative Judges represent Texas or Galveston County in "some categorical, 'all or nothing' manner"— they may well be state policymakers in some contexts, and county policymakers in others. *Id.* at 785. For purposes of this analysis, the question is whether the Local Administrative Judges make county policy "in a particular area"—here, post-arrest policies in misdemeanor and felony cases. *Id.* at 786; *accord Brady v. Fort Bend Cty.*, 145 F.3d 691, 699 (5th Cir. 1998) (holding sheriff was county policymaker "with respect to the specific action at issue here"). The answer is dictated by the definition of their functions under relevant state law, *id.*, which points unequivocally to their status as county policymakers.

The position of local administrative felony judge was established by 1987 amendments to the Court Administration Act, which establishes a framework for local court administration and case management in all Texas courts. Tex. Gov't Code Ch. 74. In a subsection entitled "Administration by County," the Act delegates final administrative authority to local administrative judges elected at the county level. Tex. Gov't Code §§ 74.091–092. Though judicial districts for the felony judges are not uniformly coterminous with county boundaries, the Act deliberately established one local administrative felony judge for "each county." § 74.091. The local administrative judges are elected by only those felony judges who sit in the county. §§ 74.091, 74.0911. And their administrative authority is limited to courts in the county. § 74.092. These judges

36

are quite literally the "local administrators" for all misdemeanor and felony courts in the

county, as well as the chief enforcement agents for the local rules of administration. The

Supreme Court agreed in *McMillian* that each of these factors: the "historical

development" of the position, the "designation" as a county position, the lack of any

authority "outside his county," and his election locally by "voters in his county," weighs

in favor of an "actual function" of setting county policy. 520 U.S. at 786–92. The Local

Administrative Judges' "actual function" is further demonstrated by prior uses of their

administrative power to set County policy—including policies concerning post-arrest

practices in Galveston County Jail. Ex. H at 1 (forbidding unconstitutional pretrial

detention for failure to pay fees), 2 (delegating authority to set cases for jail docket), 3

(denying pretrial release before magistration for all felony arrestees and some

misdemeanor arrestees).

The Fifth Circuit has repeatedly acknowledged that, when state law grants judges

the type of administrative authority at issue here, judges are county policymakers. In

*Familias Unidas v. Briscoe*, 619 F.2d 391, 404 (5th Cir. 1980), the Circuit wrote that the

actions of a judge "charged by . . . statutes with the performance of numerous executive,

legislative and administrative chores" "may justifiably be considered to constitute or

represent county 'policy.'" The "administrative chores" at issue in *Familias Unidas*

compare closely with the responsibilities of a local administrative judge. *Compare id.*

(describing as "administrative chores" budgetary powers and authority to preside over

meetings of commissioners' court) *with* Tex. Gov't Code § 74.092 (authorizing local

administrative judges to supervise the budget, the movement of caseloads, and the

performance of nonjudicial personnel) *and* Rule 2.10(b) of the Local Rules of Galveston County Courts, Ex. G at 1–2 (authorizing local administrative judges to call and preside over administrative meetings of all judges in the county). Later, in *Bigford v. Taylor*, the Circuit reiterated that a judge is a county policymaker when he has "virtually absolute sway over the particular tasks or areas of responsibility entrusted to him by state statute" and "he, alone, is the final authority or ultimate repository of county power." 834 F.2d 1213, 1222 (5th Cir. 1988) (quoting *Familias Unidas*, 619 F.2d at 404). And most recently, in *ODonnell v. Harris County*, the Circuit concluded that Harris County's misdemeanor judges set county policy if they acquiesce in unconstitutional application of a bail schedule, much in the way the Local Administrative District Judges have done here. 882 F.3d at 538; *see also Johnson v. Moore*, 958 F.2d 92, 94 (5th Cir. 1992) (reminding that a judge can "institute municipal policy" "with respect to actions taken pursuant to his or her administrative role"); *Rhode v. Denson*, 776 F.2d 107, 109 (5th Cir. 1985) (reminding that the "power to make and enforce policy . . . is marked by authority to define objectives and choose the means of achieving them"); *Williams v. Butler*, 863 F.2d 1398, 1402 (8th Cir. 1988) (holding judge was final county policymaker for administrative task of hiring and firing employees).[30] The Local Administrative Judges'

---

[30] In the alternative, Plaintiff seeks an injunction against each misdemeanor and felony judge for acquiescence in the Bail Schedule Policy. Each judge is certainly a "person," and her acquiescence (failing to promulgate corrective rules) is "under color of state law." 42 U.S.C. § 1983. Injunctive relief lies against the judges regardless of whether they are state or county policymakers. *Ex Parte Young*, 209 U.S. 123, 157 (1908) (permitting injunctive relief against state officials, notwithstanding Eleventh Amendment immunity, so long as there is "some connection" with a violation of federal law); *see Armstrong v. Exceptional Child Ctr., Inc.*, 135 S.Ct. 1378, 1384 (2015) (describing power inherent in courts of equity to enjoin unconstitutional actions).

acquiescence in the well-settled, widespread unconstitutional application of the bail schedules has effectively adopted these practices as Galveston County policy.

## II.   Galveston County Is Substantially Likely to Continue Causing Class Members Irreparable Harm By Locking Them in Jail Cells

There can be no dispute that class members[31] will continue to suffer irreparable injury if this Court does not enjoin Galveston County's Bail Schedule Policy. As Plaintiff has shown, class members are jailed in violation of their right to pretrial liberty and right against wealth-based detention. This constitutional violation, "for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns,* 427 U.S. 347, 373 (1976) (plurality opinion) (addressing First Amendment harms); *accord Miss. Power & Light Co. v. United Gas Pipe Line Co.*, 760 F.2d 618, 630 n.12 (5th Cir 1985) (noting that harm is irreparable "where the rights at issue are noneconomic, particularly constitutional rights"). Where "an alleged deprivation of a constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary." *Opulent Life Church v. City of Holly Springs, Miss.*, 697 F.3d 279, 295 (5th Cir. 2012) (quoting 11A Charles Alan Wright & Arthur R. Miller, *Fed. Prac. & Proc.* § 2948.1 (2d ed. 1995) [hereinafter, Wright & Miller]).

Deprivation of class members' constitutional rights alone is sufficient to merit a preliminary injunction. But pretrial detention irreparably harms class members in other ways: pretrial detention hampers arrestees' ability to assist their lawyers with their defense or turn down a coercive plea deal. Ex. D ¶¶ 33–34; Ex. O at 21–22. As a result,

---

[31] Plaintiff has contemporaneously filed a motion for class certification.

pretrial detention significantly increases the chances that class members will plead guilty and the nature and severity of their resulting jail sentences. Ex. C ¶ 16; Ex. D ¶ 34; Ex. I at 22–23, 25–26; *see* Ex. O at 21–22.  Jailing class members also results in loss of employment, loss of housing, interruption in educational programs, and even disruptions in custody of their children. Ex. C ¶ 17; Ex. D ¶ 32; Ex. P at 19; Ex. O at 23.  As a result, the class members may face permanent disruptions to their lives even if the charges are dismissed or they are acquitted at trial, simply because they cannot afford money bail. These harms—in addition to the harm of unconstitutional jail terms—merit preliminary injunctive relief.

III.    **The Harm of Being Unlawfully Locked in Jail Outweighs the Cost of Individualized Hearings, and Ending Such Harm is in the Public Interest**

The balance of hardships weighs heavily in favor of a preliminary injunction.  The status quo ante was that class members enjoyed freedom from arbitrary and discriminatory physical restraint. An injunction will preserve the status quo, assuring class members that Galveston County will afford them constitutionally mandated procedures before subjecting them to further jail time. Because the Local Administrative Judges have refused, for months, to implement procedures required by the Due Process and Equal Protection Clauses, despite actual knowledge of the harm resulting from their actions, the only way for class members to avoid arbitrary and discriminatory detention is for this Court to grant them preliminary relief.

Moreover, if this injunction causes any injury to the County whatsoever, it is in the form of an administrative burden—an injury that is outweighed by the financial benefit of

avoiding unnecessarily jailing people, and in any case, one that pales in comparison to arbitrary and discriminatory detention that the class members will continue to suffer should the Court not intervene. Plaintiff's requested relief would not require Defendants to release anyone; it would merely require them to give class members procedural protections mandated by the Constitution.

The public interest also supports preliminary relief here. "[T]he public interest always is served when public officials act within the bounds of the law and respect the rights of the citizens they serve." *Nobby Lobby, Inc. v. City of Dallas*, 970 F.2d 82, 93 (5th Cir. 1992) (quoting district court below). Preliminary relief requiring the County to comport with the Constitution only serves to further this goal.

Finally, in light of Plaintiff's lack of wealth, and his high likelihood of success, this Court should use its discretion to refrain from requiring Plaintiff to post a bond under Rule 65(c). *See Kaepa, Inc. v. Achilles Corp.*, 76 F.3d 624, 628 (5th Cir. 1996) ("the court may elect to require no security at all." (quotation marks omitted)). "[I]ndigents, suing individually or as class plaintiffs, ordinarily should not be required to post bond under Rule 65(c)." Wright & Miller, 11A Fed. Prac. & Proc. Civ. 3d § 2954 (internal citation omitted); *see id.* at § 2954 nn.24–26 (collecting cases including *Barahona-Gomez v. Reno*, 167 F.3d 1228 (9th Cir. 1999); *Wayne Chem., Inc. v. Columbus Agency Serv. Corp.*, 567 F.2d 692 (7th Cir. 1977); *Johnson v. Bd. of Police Comm'rs*, 351 F. Supp. 2d 929 (E.D. Mo. 2004)). There are no special circumstances warranting departure from the ordinary rule here: the injunction Plaintiff seeks will only require, in the overwhelming

majority of cases, that Galveston County issue the same secured bail orders as unsecured bail orders (personal bonds).

## CONCLUSION

The Court should issue classwide preliminary injunctive relief against Galveston County, requiring, as a precondition to issuance of an unaffordable secured money bail order:

a.   A prompt hearing inquiring into ability to pay, and permitting the arrestee to present and rebut evidence concerning flight risk or dangerousness,

b.   Advance written notice of the critical questions in the hearing,

c.   Reasoned written findings of the arrestee's ability to pay, and

d.   Reasoned written findings, by clear and convincing evidence, that secured money bail in the amount set is the least restrictive means of achieving the government's interest in mitigating the arrestee's risk of flight or danger to the community.

Respectfully Submitted,

  /s/ Trisha Trigilio
Trisha Trigilio (*Attorney-in-Charge*)
Texas Bar No. 24065179
S.D. Tex. Bar No. 2461809
Adriana Piñon
Texas Bar No. 24089768
S.D. Tex. Bar. No. 1829959
Andre Segura (*Pro Hac Vice* pending)
Texas Bar No. 24107112
American Civil Liberties Union Foundation of Texas
1500 McGowen Street, Suite 250
Houston, Texas 77004
Tel: 713-942-8146
Fax: 713-942-8966
ttrigilio@aclutx.org
apinon@aclutx.org
asegura@aclutx.org

  */s/ Kali Cohn*
Kali Cohn
Texas Bar. No. 24092265
S.D. Tex. Bar No. 3053958
American Civil Liberties Union Foundation of Texas
6440 N. Central Expressway
Dallas, TX 75206
Tel: 214-346-6575
Fax: 713-942-8966
kcohn@aclutx.org

  */s/Brandon J. Buskey**
Brandon J. Buskey (*Pro Hac Vice* pending)
Alabama Bar Number: ASB-2753-A50B
American Civil Liberties Union Foundation
Criminal Law Reform Project
125 Broad Street, 18th Floor
New York, NY 10004
Tel: 212-284-7364
Fax: 212-549-2654
bbuskey@aclu.org

  */s/Christopher M. Odell*
Christopher M. Odell
Texas Bar No. 24037205
S. D. Tex. Bar No. 33677
christopher.odell@arnoldporter.com
Hannah Sibiski
Texas Bar No. 24041373
S.D. Tex. Bar No. 559957
hannah.sibiski@arnoldporter.com
ARNOLD & PORTER KAYE SCHOLER LLP
700 Louisiana Street, Suite 4000
Houston, TX 77002-2755
Tel: 713-576-2400
Fax: 713-576-2499

*Attorneys for Plaintiff*

43

## Certificate of Conference

No conference has been held because counsel for Defendants has not yet been identified.

By:      /s/ Trisha Trigilio
**Trisha Trigilio**

## Certificate of Service

This motion was filed simultaneously with the complaint in this action. This motion and all accompanying exhibits, along with copies of the summons and complaint, will be served on each Defendant by delivery to Professional Civil Process on the same date that the Clerk of Court issues a summons for that Defendant.

By:      /s/ Trisha Trigilio
**Trisha Trigilio**