# Exhibit R

MAY 2017

# $ELLING OFF OUR FREEDOM

How insurance corporations have taken over our bail system




# CONTENTS

**Color Of Change** and **ACLU's Campaign for Smart Justice** would like to acknowledge:

Katie Unger, who spearheaded the research and analysis for this report.

Thanks to the many advocates and practitioners whose insights and work were invaluable to this report, particularly to Alec Karakatsanis, Jonah Engle and Larry Schwartztol for providing thoughtful feedback. Thanks to the National Institute on Money in State Politics (Helena, MT) and Big Lake Data.

Special thanks to the ACLU's Udi Ofer, John Cutler, Andrea Woods, and Megan French-Marcelin; ACLU of California's Margaret Dooley-Sammuli; and Color Of Change's Rashad Robinson, Scott Roberts, Ryan Senser, Enchanta Jackson, and Michele St. Julien, who moved this report from vision to finished product; and Adina Ellis and the ACLU Communications Team, who provided critical editing and support.





**01**     *Executive Summary*

**04**     **Introduction**

**09**     **At a Glance:** *A View of the Bail Industry*

**11**          *What is a Surety?*

**12**     **How Does a For-Profit Bail Bond Work?**

**16**     **How For-Profit Money Bail Fuels Mass Incarceration**

**20**     **The Corporations Profiting from Money Bail**

**23**          *The Big Corporations Behind Bail*

**24**          *Bail Insurance Corporations Reap Rewards on Low Risk*

**26**     **How Bail Corporations Control People's Freedom**

**28**          *How Bail Corporations Decide Who Is and Isn't Set Free*

**29**          *How Bail Corporations Trap People in Debt*

**32**          *How Bail Corporations Rig Contracts and Shift Risk to Families*

**33**          *How Bail Corporations Enforce Control*

**34**     **How the Bail Industry Evades Oversight and Regulation**

**38**     **Bail Insurance Corporations Enlist Lawmakers to Keep Control**

**42**          *State by State: The For-Profit Bail Industry Fights Reform*

**43**          *The Bail Industry at the Federal Level*

**44**     **Conclusions and Recommendations**

**48**     *Definitions*

**50**     *Endnotes*



CONTENTS



# EXECUTIVE SUMMARY

This report tells the rarely heard and even less understood story of how the bail industry has corrupted our constitutional freedoms for profit: the freedom from exploitation in bail, the guarantee of being recognized as innocent until proven guilty, and the guarantee of the equal application of the law to all people.

Corporate opportunists have hijacked public authority and created an unnecessary and largely unaccountable $2 billion bail industry that profits from trapping people both inside and out of jail, often for long after their charges with the courts have been resolved. It may seem paradoxical to learn that bail—a process meant to guarantee freedom and fairness in the criminal justice system for people who have not been convicted of a crime— is being used by corporations in this way. Yet it happens daily nationwide, typically with little resistance from the politicians, judges, and prosecutors sworn to protect public rights.

The for-profit bail industry has reinforced and profited from the racially biased nature of our criminal justice system, which routinely targets low-income people, Black people, and other people of color for reasons that have nothing to do with their guilt or innocence.

This report exposes how the industry works, the corporations and enablers in government that are behind it, who they impact and the extent of their damage, the inherent problems with allowing a for-profit industry to hold the key to the jailhouse gates, and why this practice of for-profit money bail must end.

01

## The Basics of Money Bail

# Each year, millions of people are forced to pay money bail after they are arrested.

Just over two decades ago, most people arrested for felonies were released without having to pay bail. But today, millions of people must pay bail in order to avoid detention in jail while their case is underway, though they are still innocent in the eyes of the law. If they cannot pay the amount set for their bail, they remain in jail for their inability to pay. Many plead guilty regardless of the case against them and suffer the long-running consequences of convictions in order to be released. To come up with the money for release,

far too many people and their families are lured into exploitative arrangements with bail bond corporations that typically charge a nonrefundable fee of 10 percent of the full bail amount. Many are trapped in a cycle of debt and fees related to their payments, and even people whose charges are dropped or who are determined to be innocent do not get their money back. Their debt and financial losses, and the resulting problems in their lives, can persist long after their court case is resolved. Unsurprisingly, there is racial bias in determining who needs to pay and who does not, and in how high bail is set. Corporate insurance companies are largely responsible for the way the bail system works today, and they are also the largest beneficiaries of it.

## Who Profits From the Corporate Takeover of Our Bail System?

In most of America, the insurance corporations and local bond agents that make up the private for-profit bail industry operate in the shadows—little understood and with inadequate oversight. Yet, in another sense, they operate very much out in the open—portrayed to the public at large by news and entertainment media as a nearly automatic and inherently necessary part of the system. In reality, for-profit bail is actually a global anomaly used only in the Philippines and the United States.

This report shows how corporate insurers operate with little risk, even leading some of them to boast of going years without paying any losses. Fewer than 10 main insurers underwrite a significant majority of the approximately $14 billion in bail bonds issued in the United States each year. Bail insurance corporations are increasingly held as under-the-radar subsidiaries of large global companies. Traded in London, Tokyo, and Toronto, or

registered in tax havens like the Cayman Islands and Bermuda, these corporations and their executives operate far from the influence of the people and communities over whom they hold so much power.

Laws the industry often helps write and the politicians it has helped fund work to sustain the ability of bail corporations to extract money from arrested people and their families. And a combination of insufficient and ineffective government oversight enables the many abuses they perpetrate. In particular, the big insurance corporations behind bail have been very effective at crafting and institutionalizing laws, regulations, and practices that protect their profits; they have cultivated a more than 20-year relationship with the American Legislative Exchange Council (ALEC), the pro-privatization lobby group, to successfully write and pass their own custom laws in state legislatures nationwide, while very effectively derailing alternatives and reforms.

## How Bail Corporations Control People's Freedom

The result of bail corporations' control is that millions of people are no longer free: people stuck in jail and families stuck in debt to create profit for these corporations.

**Leaving People in Jail.** With only its bottom line to answer to, the bail industry determines who it will accept as customers and who it will leave detained while their cases slowly make their way through a complicated and extremely flawed criminal justice system.

**Trapping Families in Debt and Loss.** People who post bail directly with courts get their money returned at the end of a case, regardless of its outcome. But bail corporations keep families' payments, even when charges are dropped or people are found innocent. They also collect money from installment plans and fees long after they have any financial risk. In Maryland, the bail industry kept at least $75 million over five years just in premiums from people whose cases were resolved without a conviction in District Court alone.

**Rigging Contracts to Forfeit People's Rights.** Bail insurers' contracts with people seeking bail—and their families or friends who co-sign—contain exploitative terms. Common provisions require people and their families to sign away their privacy,

including by submitting to invasive surveillance, and to pay sweeping and unpredictable costs.

With little accountability, the for-profit bail industry has thus created a way to profit from usurping the role and function of the courts, trapped families in debt while escaping scrutiny for consumer practices, made armed arrests and surveilled people without meaningful oversight by police, and evaded insurance regulators. This report includes original and secondary research and stories from news media across the country about individuals harmed by bail corporations and the for-profit bail system overall.

Calls to eliminate the for-profit bail industry have persisted for a century, from publicly published studies in the 1920s to Robert F. Kennedy to advocates and community leaders today.[1] Many jurisdictions across the country are now trying to minimize or eliminate both the destructive role of money bail and the bail corporations that sustain it. Yet on the whole, though the corruption and impact of this system have been widely exposed, the industry persists.

In light of these findings, we call on state and federal regulators, attorneys general, and legislators to immediately investigate the industry and bring it out of the shadows, building on the evidence offered by this report. State and local governments must respond to this wealth-based detention crisis and work to create a stronger and fairer criminal justice system that neither depends on the for-profit bail industry nor supports it.

# INTRODUCTION



In the United States, a person is locked into a state or local jail nearly 11 million times a year, and unaccountable corporations have taken over our public authority as the gatekeepers for our bail system in order to profit.

**O**ver more than 20 years, the use of money bail has grown substantially.[2] In the period from 1990 to 2009, in the majority of the nation, the proportion of jail releases involving the private bail industry doubled for people arrested for felonies.[3] Bail amounts have risen, too.[4] The national median for bail for a felony arrest is now $10,000, while the Federal Reserve has found that nearly half of Americans would be unable to pay for an unexpected expense of $400.[5]



Unsurprisingly, an increasing number of Americans cannot afford to pay these bail amounts. With access to release effectively based on wealth, millions of American families have no option but to pay nonrefundable premiums to the for-profit bail industry to secure release from detention.

Along with the dramatic increase in the use and amount of bail, the number of nonconvicted people in jail[6] has also increased as the number of people who are serving sentences from conviction has shrunk.[7]

Across the United States today, around 450,000 people— approximately 70 percent of all people in jail—sit in jail though they remain innocent in the eyes of the law. [8]

Many are stuck behind bars for weeks, months, or even years because they and their families cannot afford to pay bail. As a result of either the cooperation or

neglect of prosecutors, judges, legislators, and regulators, bail corporations have been allowed to prey on low-income people, Black people, and other people of color who are already targeted and disproportionately impacted at every phase of the criminal justice process.

Like payday lenders[9] who profit from families' needs for immediate funds,[10] bail corporations take advantage of the urgent crisis of detention to lock people and their families in bad contracts, surveillance and control, and debt. No matter the eventual outcome of the case, even in cases in which the arrest itself is determined to be wrongful, the money that families scrape together to pay bail corporations is lost to them forever.

The face of the bail industry is the storefront of small bail bond companies lining the streets near courthouses. Familiar from TV and movies, they often sport neon signs and catchy slogans. Largely hidden is the role that insurance companies play.

Behind the scenes, insurance companies take a cut of nearly every bail premium paid in the country. Increasingly, bail insurers are part of major global finance companies. There are now as many as 25,000 bail bond businesses across

**NOTE:**

**6** *"Jail"* refers to the local detention facilities where people are incarcerated while awaiting trial, awaiting sentencing post-conviction, awaiting transfer to another jurisdiction, or serving sentences of under a year. This is distinct from "prisons," longer-term facilities run by the state or the federal government that typically hold people with sentences of more than one year.

**9** *"Payday loan"* refers to a type of short-term borrowing where an individual borrows a small amount at a very high rate of interest. The borrower typically writes a post-dated personal check in the amount they wish to borrow plus a fee in exchange for cash. The loans often come due on the borrower's subsequent payday.

the country, but just a few insurance companies back the vast majority of these bonds.[11] Based on the authors' calculations, just nine insurance companies back a significant majority of the $14 billion in bail bonds issued each year.[12] Between agents and insurance companies, the industry collects around $2 billion a year.[13] Estimates vary from $1.4 to $2.4 billion; however, opaque corporate finance reporting and varied state and local recordkeeping hide the true size of the industry.[14]

With only its bottom line to answer to, the bail industry determines who it will accept as customers (and on what terms) and who will remain detained while their cases slowly make their way through a complicated criminal justice system.

Trapping people behind bars simply because they cannot afford to buy their release is fundamentally unacceptable and has severe consequences in people's lives. Detention in jail for even short periods has been shown to have a long-lasting impact on individuals' employment, financial, and family stability; increase the risk of re-arrest; and make it far more likely that individuals will be found guilty or pressured into pleading guilty simply to secure their own freedom from detention. Moreover, jail is dangerous in itself, and may even be deadly.

Although the scale of the industry today makes addressing this reality more challenging and urgent than ever, it is not a new problem. Within years of the bail industry's emergence around 1900, there were already wide calls for reform.[15] Those demands continue to be voiced

loudly today, with courts, police chiefs, communities, and others across the legal system calling for an end to the injustice and corruption of for-profit bail.[16]

Despite nearly a century of efforts to fix the deep injustices presented by money bail and the for-profit bail industry, insurance companies and their trade associations have used millions of dollars in donations to politicians—and effectively leveraged relationships with groups like the right-wing, pro-privatization ALEC —to successfully resist reform and write their own rules.

Recently, some communities have succeeded in fighting back and breaking the cycle, with the support of judges, law enforcement, regulators, agencies, and legislators. In January 2017, New Jersey began to implement statewide reforms that will largely eliminate wealth-based release,[17] backed by all branches of state government and also by popular vote. At the same time, New Orleans passed a long-fought measure to reform the use of money bail for many violations of city ordinances.[18] Also in 2017, two California legislators introduced legislation to dramatically reduce reliance on money bail. Other jurisdictions are making changes following litigation challenging money bail and its implementation. More cities, counties, and states are taking steps to stop corporations from exploiting people and their families through bail, and from sapping resources from entire communities. Successful alternatives to commercial money bail exist around the country.[19]



**B**altimore's City Paper exposed how Demorrea Tarver and his family fell into the trap of for-profit bail in 2008 on  Tarver's first and only arrest, at 18 years old, in Maryland. Unable to pay the full premium to a bail agent, his family entered into an installment plan.

Though the charges were completely dropped weeks after the arrest, "even with monthly payments, Tarver owes more today than the day he took out the bond." Tarver, now a 26-year-old father, and his mother are struggling just to make interest payments.[20]

# AT A GLANCE:
## A VIEW OF THE BAIL INDUSTRY

## The Prevalence of Money Bail



- People were booked into local and county jails 10.9 million times in 2015. [21]

- On any given day, around 440,000 people remain detained in the United States without having been convicted of a crime. That's 70 percent of the people in jail. [22]

- From 1990 to 2009, people charged with felonies were increasingly required to pay money bail for their release—growing from 37 percent to 61 percent—and the percentage released on their own recognizance plummeted in the majority of the nation. [23]

- Ninety percent of those in jail awaiting resolution of felony charges in 2009 were detained even though bail had been set. [24]



Awaiting trial ●   Convicted ●

## 70%
of the people in jail have not been convicted of a crime.

## $1.4 - $2.4 billion
collected per year by bail industry.

## The For-Profit Bail Industry

- Fewer than 10 insurance companies are behind a significant majority of bonds issued by as many as 25,000 bail bond agents.

- These insurers collect around 10 percent of the premium bail agents charge families.

- Between bail agents and their insurance backers, the industry collects between $1.4 billion and $2.4 billion a year. The true size of the industry is hidden by opaque corporate finance reporting and varied state and local recordkeeping [31]

- The bail insurers have used ALEC to promote and pass at least 12 different model bills to insulate and expand for-profit bail's role.

## The High Cost of For-Profit Money Bail

■ Using for-profit bail is the most common form of release, doubling from 24 percent to 49 percent of releases from jail from 1990 to 2009.[25]

■ The national median for bail for a felony arrest is now $10,000, though in some jurisdictions it can be much higher; for example, the median in California is $50,000.[26]

■ An estimated $14 billion in bonds are secured by for-profit bail each year.[27]

■ Money paid to for-profit bailers, unlike cash bail posted directly with the court, is not refunded at the end of a case, regardless of the outcome.

### Releases using for-profit bail



1990    24%

2009    49%

National Felony Bail Median =

# $10,000

# $75 million

Charged in cases WITHOUT any finding of wrongdoing in Maryland in five years.



## Who Is Trapped by Money Bail

■ Maryland's Office of the Public Defender found that over a five-year period, "more than $75 million in bail bond premiums were charged in cases that were resolved without any finding of wrongdoing," more than twice the premium charged in cases resulting in a conviction in District Court.[28]

■ For-profit bond premiums cost families in Maryland more than $250 million, not including interest or fees over five years. Those payments were concentrated in Maryland's poorest communities and overwhelmingly paid by Black people.[29]

■ In New Orleans, in 2015, nearly 4,900 families paid $4.7 million in nonrefundable premiums to for-profit bail companies for misdemeanors and felonies. Black New Orleans residents paid 84 percent of bail premiums and associated fees.[30]

■ Four states do not allow for-profit bail: Illinois, Kentucky, Oregon, and Wisconsin.

# WHAT IS A SURETY?

**T**he "insurance" for bail is different from typical car, home, life, or health insurance. Bail is a type of "surety bond." Other typical surety bonds include construction bonds and other contract performance bonds. With surety bonds, the insurance company guarantees to a third party that the person or entity seeking the bond can fulfill their obligations. They require the person seeking the bond to indemnify the insurer, guaranteeing payment and costs, and leaving the insurer on the hook only as a last resort.

# HOW DOES A FOR-PROFIT BAIL BOND WORK?

12

When a person is arrested and booked into jail, a court will typically determine whether they are eligible for release while their case is in progress and may set conditions under which they can go home for the weeks, months, or even years it may take for a case to wind its way through the court system. One increasingly common condition of release is the payment of money bail.[32]

When people are faced with a money bail amount they are unable to afford, they or their families are most likely to pay a private bail bond company. Across the country, the bail industry is estimated to back around $14 billion in bail bonds a year, generating revenues estimated at $1.4 billion to $2.4 billion.[33]

These bail bond companies charge a nonrefundable fee of typically 10 percent of the full bail amount.[34] For lower bond amounts especially, fees may far exceed 10 percent.[35] Some bail bond agents take less than 10 percent upfront and set up installment plans.

Family members or friends must often co-sign contracts with the bail bond industry; they guarantee to the bond agent that they will be responsible for paying the full bail amount if the person does not appear in court or violates the terms of the contract. Bail agents often require people and their families to put up property and other assets as collateral. Most contracts reviewed by the authors of this report have also included additional fees and often onerous conditions on a person and their co-signers.[36]

When the bail bond agent has been paid, the agent will file a bond with the court to obtain the person's release. The bond is a legal promise to pay the bail in full if the court declares the bond forfeited, which may be triggered for failure to appear.

Most bail bond agents are backed by a bail insurance corporation as "surety."[37] The bail agents pay a percentage, usually around 10 percent of the premium they charge, to an insurance company for underwriting. Bail bond agents guarantee they'll be responsible for any forfeitures, but they also typically pay another 10 percent into a "Build-Up Fund" that the insurer holds onto as a reserve to make sure that funds will be available.



BAIL BOND

10% to Bail Bond agent

10% to Global Insurer



# HOW FOR-PROFIT MONEY BAIL FUELS MASS INCARCERATION

16

While this bail process plays out daily in most of the United States, it is far from the norm. Only the United States and the Philippines allow a for-profit bail industry. [38]

————

The growth of money bail has gone hand-in-hand with the massive expansion of mass incarceration and plays a key role in perpetuating the cycle of criminalization and conviction that has targeted low-income Black communities and communities of color. The for-profit bail industry has captured nearly all of the increase in money bail releases over nearly two decades. The trap of money bail is central to prosecutors' ability to extract guilty pleas without trials, and the industry profits from the impossible dilemmas facing detained people.

The U.S. Constitution does not take denial of liberty lightly—people who have not been convicted of a crime generally have the right to go home to maintain jobs, pay their bills, take care of loved ones, and mount a defense while their case continues. Yet on any given day, around 450,000 people remain detained across the country without having been convicted of a crime.

Ninety percent of people in jail awaiting resolution of felony charges in 2009 in the majority of the nation were still detained even though bail had been set.[39] In Arizona, a county attorney acknowledged, "most low-risk people who can't pay their bail are being held by a city or town for failing to appear for a traffic ticket." [40] The industry-backed expansion of money bail detains people most impacted by deep disparities in wealth, income, and economic opportunity: The Prison Policy Initiative found that Black men and women ages 23 to 39 held in local jails had earned a median income of only $900 and $568, respectively, [41] in the month prior to being held. [42]

There is enormous and arbitrary variation as well as demonstrated racial disparity in the bail amounts and conditions set for people. Release determinations and bail amounts diverge widely judge by judge, court by court, and state by state—based on prosecutors' demands, bail schedules, and judicial choice, and the laws and rules of the jurisdiction. Research has shown that money bail determinations are racially disparate, compounding the huge disparity in arrests, charges, and incarceration faced by Black people at every stage of the criminal justice system.[43] Black defendants between 18 and 29 received higher bail amounts and were less likely to be released on recognizance than were white defendants.



Research in New York City found that, controlling for other factors, the likelihood of conviction jumped from 50% to 92% when people remained in jail while their cases proceeded.[44]

Beyond the dangers and disruption of jail, pretrial detention was the biggest predictor of conviction—largely due to pleas.

Once people are trapped in detention by bail they cannot afford, and which research shows is racially discriminatory, prosecutors can use detention or the promise of release as a prod to extract guilty pleas, especially at the outset of a court process, when people may not have even minimal legal representation in many states.

How For-Profit Money Bail Fuels Mass Incarceration

The conservative Yankee Institute for Public Policy and Reason Foundation explained:

"Many poor defendants who can neither afford to post bond nor languish in jail while awaiting trial are incentivized to plead guilty to charges **even if they're innocent.**

The resulting criminal conviction poses a slew of barriers for individuals attempting to re-enter society." [45]

The push to plead—regardless of long-term collateral consequences—is particularly strong for the vast numbers of people charged with low-level offenses that would not often include any jail time for a conviction. [46]



# THE CORPORATIONS PROFITING FROM MONEY BAIL

20

The top nine bail insurers cover the vast majority of the estimated $14 billion in bond posted by the for-profit bail industry each year.

**W**ith the freedom of millions of people at stake, it's crucial to uncover who profits from the status quo. On the front line, bail bond agents are the most direct beneficiaries and the only piece of the corporate bail system that most people see. Thousands of these individual agents and bail bond agencies collect fees. With storefronts lined up near courts and lists of bail companies next to jail phones, the industry appears highly local and decentralized.

But behind the storefronts, a small number of insurance companies take a cut of nearly all the bail bond premiums collected by bail agencies in the country. While there are still around 30 bail insurance companies, the top nine bail insurers cover the vast majority of the estimated $14 billion in bond posted by the for-profit bail industry each year.

Bail insurance is increasingly part of larger, often global companies, and it is a small part of their businesses. Traded in London, Tokyo, and Toronto, or registered in tax havens like the Cayman Islands and Bermuda, these corporations and executives operate far from the influence of the people and communities over whom they hold power.

For example, Tokio Marine, Japan's largest property and casualty insurer, which earned nearly $40 billion in revenue globally last year, owns multiple bail sureties and bought a wholesale bail agency in 2016.[47] And Toronto-based Fairfax Financial, which now owns multiple bail insurers, is a nearly $10 billion global insurance and financial empire.

Private equity company Endeavour Capital owns a majority stake in the nation's largest bail agency, Aladdin Bail Bonds, and its dedicated insurance company, along with an array of retail, manufacturing, and other brands. Aladdin far outstrips competitors in California, writing around half of bonds posted in San Mateo County over the last two years, and nearly 40 percent in Santa Clara County in 2015. The company has grown substantially: Its insurer, Seaview, reported $9.5 million in annual premiums from bail, which suggests it is backing nearly a billion dollars in bail bonds in a year.48

In addition to the global giants, there are several privately held domestic bail insurers. These include most of the members of the bail insurers' trade organization that drives the industry's political muscle, the American Bail Coalition. These companies include Florida-based Bankers Surety, which also offers retail home, flood, and other insurance; AIA Holdings (Allegheny Casualty Company); American Surety Company; Roche Surety and Casualty Company; Financial Casualty & Surety; and longtime Maryland-based Lexington National Insurance Company.

**The Corporations Profiting from Money Bail**

## The Big Corporations Behind Bail



Bail insurance is increasingly part of larger, often global companies. These corporations and executives operate far from the influence of the people and communities over whom they hold power.

**TOKIO MARINE AMERICA**

**$40 Billion**

JAPAN

HCC Surety
American Contractors Indemnity Company
United States Surety
U.S. Specialty Insurance
Bail USA

**FAIRFAX FINANCIAL HOLDINGS LIMITED**

**$9.5 Billion**

CANADA

United States Fire Insurance
The North River insurance
Seneca Insurance

**$100 Million**

ENGLAND / BERMUDA

**R&Q**
Accredited Surety

**LEXINGTON NATIONAL** INSURANCE CORPORATION

*fcs* **FINANCIAL CASUALTY & SURETY, INC.**

**American Surety Company** THE Bail Insurance Company

Everyone else.

**ENDEAVOUR**

**BANKERS FINANCIAL CORPORATION**

ALLEGHENY CASUALTY
INTERNATIONAL FIDELITY
ASSOCIATED BOND

Seaview Insurance

Aladdin Bail bonds / Two Jinn

Bankers Surety

IFIC  Allegheny Casualty Co.

## Bail Insurance Corporations Reap Rewards on Low Risk

Tokio Marine
Fairfax Financial Holdings
Randall & Quilter
Endeavour Capital
Bankers Financial
AIA Holdings
Financial Casualty & Surety
Lexington National
ASC-USI

Bail insurers have shaped the industry to protect their profits. While the industry touts the risk of forfeiting bail as the primary incentive for performance, bail insurance companies put the responsibility for losses onto the bail agents—who in turn routinely put the responsibility on families.

As an example, a 2013 contract between Bankers Surety and a bail bond agency required the agency to take "all liability for any undertaking of bail," including requiring full payment of all forfeitures, losses, costs, or expenses to the insurer, with interest.[49] In the event that all those protections don't work, insurers have as backup the Build-Up Fund, paid into by the bail agent with a percentage of each bond. For the insurance companies, the system

works; they collect hundreds of millions of dollars a year in their cut of the bail premiums and face virtually no risk.

For-profit bail insurers are different from other backers of surety bonds. In surety bonds, the insurer is responsible for losses only as a last resort, but over the first three months of 2015, the top 100 surety bond writers[50] combined still had direct losses averaging 13.2 percent on $1.34 billion in



**$14 billion**





BAIL BONDS

Bail Agents

"Typically, in the bail bond business, agents are responsible for any losses they incur. This responsibility is reflected in the fact that the Company **sustained no losses on this book of business in 2015 and 2014."** [51]
—Reported an affiliate of AIA Holdings, one of the largest bail insurers

In 2013, AIA's chief legal officer, Jerry Watson, told a reporter of his 107-year-old company, "You know how many checks has [sic] this company written to pay a bail loss? **...Not a single one."** [52]

Continental Heritage Insurance Company, a smaller bail insurer, was even clearer:
**"The company has not paid a loss on its waste surety or bail segments during the past 17 years."** [53]

The Corporations Profiting from Money Bail

coverage written. But bail insurers have boasted how low their risks are:

In financial filings, the bail insurers say that even reported losses are not necessarily real. In its 2015 filings with California's Department of Insurance, Lexington National reported that losses are mostly a timing issue and are usually recouped.[54]

As further protection, the bail industry has worked to change laws and rules to limit industry responsibility for payment, and to hinder or undo changes and improvements in pretrial practices.[55] With a steady stream of profits with little risk, it's no surprise that the bail insurers lead efforts to fight reform, write the rules, and protect their cash flows.



# HOW BAIL CORPORATIONS CONTROL PEOPLE'S FREEDOM

26

"They're innocent until proven guilty, but the bail system assumes they're guilty."

— Judge W. Kent Hamlin
**Superior Court of Fresno County, California**

## How Bail Corporations Decide Who Is and Isn't Set Free

As paying private bail bond corporations has become an increasingly common form of release, these private businesses have effectively become decision-makers for whether millions of people can walk free.

The American Bar Association was clear whose interests come first:

"It is the bondsmen who decide which defendants will be acceptable risks... Decisions of bondsmen—including what fee to set, what collateral to require, what other conditions the defendant (or the person posting the fee and collateral) is expected to meet, and whether to even post the bond—are made in secret, without any record of the reasons for these decisions." [56]

That something as fundamental as the ability to get out of jail has been taken over by the private decisions of profit-seeking companies and their corporate backers is dangerous. Opaque corporate judgments of who to accept, who to ignore, and what to require can shield discriminatory practices and abuse. And since for-profit bail companies make money as a percentage of the bail amount set, they have an incentive to seek out people facing higher bail, which typically reflect a court's perception of higher risk, while people with few resources and lower bail may not be seen as worthwhile clients.

The impact of detention on people left in jail can be enormous. In recent years, there has been a steady drumbeat of horror stories of individuals trapped in jail due to inability to pay money bail. For 28-year-old Sandra Bland, who died in a Waller County, Texas, jail, unaffordable bail played a key role in the path from a traffic stop for a failure to signal to tragedy. At the time of her death, Bland had spent three days in jail, unable to raise $515 to pay a bail company to post bond. She was one of hundreds of people who had not been convicted that year who lost their lives in jails. [58] In Harris County, Texas alone, 55 people died behind bars without being convicted of a crime between 2009 and 2015. [59] Beyond the tragedies, jail exposes people to danger, trauma, the risk of violence and disease, and it exacerbates mental illness, addiction, and other medical conditions. [60]

The Colorado Criminal Defense Institute found that being held in detention led to a long list of devastating consequences: loss of jobs and destruction of businesses, evictions, loss of personal and family belongings and equipment needed to work, family and custody disruptions, and lost educational opportunities. [61] Detention also led to increased public costs, as people and their families required homeless shelters, public assistance, and public defenders during and after their detention. [62]

The freedom of millions of people who pass through the country's jails each year is too critical to allow for-profit interests to hold the keys. It also sets up taxpayers to pay the costs of jailing some 430,000 people every day who are presumed innocent, at a daily cost of between $50 and $350 per person, amounting to billions of dollars per year. [63]

Seattle Weekly uncovered how Cedric Smith's freedom was denied by for-profit bail. Facing $10,000 bail, and with some money saved, a full-time job, a stable place to live, and the means to support himself, Smith expected to put up $1,000 and return home, but he was rejected. Smith asserted his innocence, refusing to accept an offer to plead guilty, and was jailed until his case was dismissed 41 days later. When Smith was finally freed, he needed food stamps to eat and a new job. [57]

## How Bail Corporations Trap People in Debt

For-profit bail bond companies take advantage of the urgency of detention to bind people to contracts that can mean debt and payments that last far longer than any court proceedings. Like payday lenders that prey on families in crisis, bail companies profit from an imbalance of knowledge, power, and a lack of options that can trap families into cycles of debt so that even though they are not jailed, they are not free.  Whereas bail posted directly with the court is returned to the family that posted it when charges are dropped, for-profit bail companies keep the premium they've collected—**even when charges are dropped or an arrest is deemed wrongful**—collecting millions from innocent people.

• In just five months of 2016, nearly 200 people in California's San Joaquin County paid for-profit bail companies to be freed from jail when no case was even filed and the charges were dropped. For-profit bail companies would likely have charged these families around $400,000 to post the bonds. [64]

• A November 2016 report by Maryland's Office of the Public Defender found that over a five-year period, **"more than $75 million in bail bond premiums were charged in cases that were resolved without any finding of wrongdoing,"** more than twice the premium charged in cases resulting in a conviction in District Court. [65]

Often, for-profit bail companies advertise steep discounts in upfront payments from the typical 10 percent premium. But when families pay less than the full premium upfront, the remaining debt on the installment plan is still owed to the bail bond company long after charges are resolved or dropped, **even though the company has no further obligation to the court and faces zero financial risk of having to pay out on the bond.** These ongoing debts can stretch for years and be a severe hardship for families, and they can push families into collections, interest payments, bad credit, wage garnishment, and more.

In San Francisco, Carlos Valiente was arrested and had bail set at $70,000. Valiente (a construction worker who earned $14 an hour) and his mother paid California's largest bail bond agency, Aladdin, $1,000 and owe Aladdin an additional $6,000 in installments. Valiente's case was dismissed, but he still owes Aladdin more than $6,000, which he will try to pay off over the next four to five years, reported KQED.[66]



Bail companies generally have family members on the hook and liens on homes or other assets that keep strong pressure to pay. For example, a Baltimore reporter revealed that although Rafiq Shaw was found innocent of charges stemming from a Maryland arrest, he was left owing

$8,000 in weekly $100 payments after paying an initial $2,000 with money from his fiancée and mother, along with all of his savings. Shaw's mother is the guarantor and said "the bondsman calls her every few weeks, threatening garnishment if the debt isn't paid." For Shaw and his fiancée, who have an infant, he stated, **"There's no way I can pull it off."**

In California, Melodie Henderson testified at a legislative hearing about the impact of paying bail on her family and life. Assemblyman Rob Bonta wrote: **"After being arrested, she had a choice—pay the bail bondsman and go into debt, or sit for days in jail until her court date and risk her job, apartment, car and family. It wasn't a real choice. Henderson spent years trying to pay back the bail bondsman. She postponed school, borrowed tens of thousands of dollars from her grandparents, got dangerously behind on other bills and severely damaged her credit. She suffered from depression. And she's considered one of the lucky ones because she was able to secure the money and her freedom."[68]**



## How Bail Corporations Sap Low-Income Communities

For-profit bail saps communities of resources they need. Over five years, for-profit bond premiums cost families in Maryland more than $250 million, not including interest or fees. A study found that those payments were concentrated in Maryland's poorest communities and overwhelmingly paid by Black people, compounding the drain of resources and the impact of disparate policing on already struggling communities.[69]

Similarly, in a study of people arrested in New Orleans in 2015 for misdemeanors and felonies, nearly 4,900 families paid $4.7 million in nonrefundable premiums to for-profit bail companies. Black New Orleans residents were disproportionately impacted and paid 84 percent of the bail premiums and associated fees. These millions were a real hardship for people and their families in a city where 85 percent of defendants are too poor to hire an attorney. One person interviewed said, **"My momma said she put up about, I want to say about $1,500. Like, she didn't pay her light bill a couple times. She didn't pay her rent a couple times."[70]**

## How Bail Corporations Rig Contracts and Shift Risk to Families

Contracts with corporate insurers and bail agents are filled with terms that give the corporations immense power over the person to be released and their family and friends who co-sign. With continued incarceration as the alternative to accepting the bail industry's terms, people and their families have little ability to contest the one-sided and complex contracts they sign. Though contracts vary and state laws often regulate terms, the authors of this report reviewed several bail agent and surety contracts and found common themes requiring contract signers to do the following:

*This mock contract is for example only. It is not intended to reflect any real or existing entity; rather it is meant to demonstrate the effects of certain provisions in bail bond contracts.*

### BAIL BOND CONTRACT

#### Pay all the costs associated with the bond.
Beyond the premium, people seeking bail and their families may be on the hook for any costs, expenses, and fees involved with the bond. Bail contracts may give the corporation the right to demand payment before the costs are even incurred if the insurer demands it.

#### Submit to invasive surveillance.
When individuals enter into contracts with bail corporations to be released from captivity, they sign away basic rights and privacy to a private business in order to exercise their fundamental right to liberty. This includes waivers to searches without a warrant, vehicle tracking, physical and digital surveillance, and sweeping access to personal information for both the released person and their friends or family who co-sign as indemnitors. Surveillance costs are typically passed on to contracted individuals and families.

#### Allow bail companies to arrest people and return them to jail (Even if they're making all their court appearances)
By taking a person back to jail, for-profit bail agents face no more risk that the person will not appear in court and have no more responsibility under the bond filed. The basic application for the leading Maryland bail insurance corporation, Lexington National, includes far more than the threat of flight as a reason for re-arrest. It includes changes in the value of collateral, which means that a drop in the value of a home or car that a family used to guarantee a bail bond could send a person back to jail. Contracts allow bail companies to seek bail revocation and warrants for arrest for failure to make payments, for a contact phone number being disconnected, and even for getting a job without immediately notifying the bail company.

#### Allow selling or foreclosing on collateral and demanding additional collateral.
In New Jersey, the Star-Ledger found dozens of lawsuits that bail bond companies have filed in courthouses across the state against friends and family "after defendants failed to keep up their end of the deal."[71]



## How Bail Corporations Enforce Control

The immense power that bail corporations and their agents have over the people bound to their contracts is inherently coercive, and journalists and communities have repeatedly reported overt extortion, sexual coercion, vigilantism, and corruption.

And reality TV plays up the drama of Dog the Bounty Hunter, while armed bail agents and the bounty hunters[72] they use as subcontractors wield the tools of arrest, foreclosure, and force in the course of regular business, with varied and often inadequate training, regulation, and oversight.

For example, in 2015, bail bond agents in Florida injured a woman at a fast-food drive-through while attempting to capture another person in the car. The woman was shot in the head, apparently inadvertently, in the bond agents' attempts to arrest a client who had failed to appear for court.[73]

According to insurance executive and industry legal defender Jerry Watson, a person using for-profit bail "implicitly agrees that the bondsman may use reasonable force in apprehending him. The bail contract underscores the private nature of the surety's right of recapture and is the basis for the expectation that the government will not interfere."[74]

So for-profit bail has been allowed to privatize law enforcement functions without real protections for the people who've signed their contracts or for the bystanders and community members who may find themselves in the way of for-profit bail's pursuit of its own interests.

# HOW THE BAIL INDUSTRY EVADES OVERSIGHT AND REGULATION

34

In a 2014 report, the New Jersey State Commission of Investigation wrote, "Operating in the shadows of poor government oversight, the system is dominated by an amalgam of private entrepreneurs who profit from the process but are subject to weak controls easily manipulated or ignored with little or no consequence."[76]

The regulation of bail corporations and agents varies state by state. Bail insurers are generally regulated by state insurance regulators. In many states, including New York, California, and Florida, they also regulate and license individual agents. Other states regulate bail agents through state, county, or local regulators. This piecemeal regulatory system means that for-profit bail has privatized a crucial piece of the criminal justice system and gained control over people but isn't fully under the control of the courts; it traps families into debt but has escaped scrutiny for its consumer practices; and it arrests and follows people without full oversight by police.

Instead, the for-profit bail industry benefits from being a comparatively small part of the insurance business regulated by state insurance divisions. These regulators have responsibilities over companies selling health, life, car, home, and business insurance and more. For example, the New York State Department of Financial Services' Insurance Division oversees nearly 1,700 insurance companies with assets exceeding $4.2 trillion, while there are only 25 insurance companies in New York with agents listed under the bail laws.[75] States like Maryland, whose insurance regulators play a more active role, enable the industry's conduct, approving rates and terms that fail to protect people.

This has allowed for-profit bail to run rampant. Before New Jersey passed sweeping bail reform that massively reduced the use of money bail, an investigation by the State Commission of Investigation found "endemic" problems with the industry and described the regulation of the bail industry as "diminished and archaic" and a "bureaucratic afterthought." In a 2014 report, the commission wrote, "Operating in the shadows of poor government oversight, the system is dominated by an amalgam of private entrepreneurs who profit from the process but are subject to weak controls easily manipulated or ignored with little or no consequence."[76]

New Jersey's findings of endemic failures were echoed when the Minnesota Department of Commerce announced a settlement in January 2016 that entered into consent orders with all 21 insurance companies that provide surety bonds to the 41 bail bond agencies operating in Minnesota. The Minnesota Commerce Commissioner said,

"Enforcement action was necessary because too many people in the bail bond industry thought they were in the Wild West."[77]

In the last few years, the California Department of Insurance (CDI) Commissioner, Dave Jones, has sought unsuccessfully to increase funding the department receives to monitor for-profit bail. Until now, CDI has reported that bail is less than 2 percent of the state insurance market but more than 10 percent of its enforcement workload.[78] Between 2010 and 2015, complaints about for-profit bail to the CDI nearly quadrupled, with common complaints including scams, misrepresentation, extortion and kidnapping, bribery, perjury, theft, fraud, and more.[79]

When CDI invested more substantial resources in enforcement, the result was Operation Bail Out, in which 31 bail agents from seven different bail bond agencies across five northern California counties were arrested in September 2015. The

How the Bail Industry Evades Oversight and Regulation

sweep followed an extensive investigation into illegal business practices, corruption, illegal solicitation, and more.[80]

Similarly, a study found that in 2008, while Colorado's insurance regulators oversaw approximately 550 bail bonding agents out of 110,500 regulated insurance producers (less than half of 1 percent), bail bond agents accounted for a majority of all their enforcement actions for the year (99 out of 180).[81]

While even centralized state insurance regulation leaves for-profit bail slipping through the cracks, Texas' system leaves gaping holes. For-profit bail is regulated at the county level by bail bond boards in larger counties and by registration with sheriffs in counties with fewer than 110,000 people. Bryan Clayton, first assistant district attorney for the 119th Judicial District, told reporters that the counties that lack bail bond boards "are just the wild, wild West." [82] These sprawling counties are not permitted to require licensing or collateral from bond agents, and they have little capacity to oversee and verify bond agent claims, according to an investigation by Dallas News.

New Jersey, Minnesota, and others have found that failures affected nearly the whole industry in their states, enabled by gaps in oversight and regulation that hid the conduct found by these regulators. This overt misconduct compounds all the harm and costs to people and families that have been allowed as this private, for-profit industry has increasingly dominated the process of release from detention.



# BAIL INSURANCE CORPORTIONS ENLIST LAWMAKERS TO KEEP CONTROL



38

The reach of the American Bail Coalition—
and therefore the for-profit bail industry—
into legislatures is far beyond what the trade
association's small size would suggest.

**B**ail insurers lead national efforts to keep for-profit bail embedded in the criminal justice system with proactive efforts to craft laws in their favor. They fund lawmakers and lobbyists to keep their access and resist when courts, communities, and legislators demand change.

When for-profit bail speaks, it's usually the insurers talking through the American Bail Coalition (ABC). ABC has been working together to fight reform since 1992.[83] In recent years, it has been increasing its activity and funding, with contributions tripling to nearly $1.2 million from 2012 to 2014. Executive Director Jeffrey Clayton says of ABC's role in policy-setting that affects the bail industry, "If it gets wheels, we will get involved."[84] ABC pops up nationwide at local hearings, in statehouses, in the media, and recently, in the involvement of former Solicitor General Paul Clement defending the industry in litigation challenging the constitutionality of wealth-based detention in Georgia and Texas. [85]

The reach of the ABC—and therefore the for-profit bail industry—into legislatures is far beyond what the trade association's small size would suggest. ABC's outsized influence has come in no small part from its "life-preserver," a more than 20-year relationship with ALEC, a pro-privatization group funded by corporations.[86] Through ALEC, corporations and state politicians meet and agree on model policies on a wide range of issues (such as stand-your-ground laws and controversial anti-immigration legislation, including Arizona's SB 1070). [87]

ABC Board Chair Bill Carmichael, president of American Surety Company, serves as Chairman of the ALEC Private Enterprise Advisory Council.[88,89] This continues a long line of bail insurance executives and ABC staff and officers with prominent

ALEC positions. From 2014 through 2016, outgoing ABC Executive Director Nicholas Wachinski was named the Private Sector Chair of ALEC's American City County Exchange.[90]

For-profit bail has used ALEC to promote and pass at least 12 different model bills to insulate and expand for-profit bail's role, including four bills requiring full cash or fully secured bail or restricting personal and deposit bonds, four bills restricting instances when for-profit bail can be required to pay out, and a bill[91] passed in Florida and Texas and introduced federally that burdens pretrial services with excessive reporting and diverts resources from providing services. [92]

ALEC helped ABC spread the industry-written bill inventing "post-conviction" bonds, which open a whole new set of people and their families to the for-profit bail trap. [93] In Mississippi, the first state to pass a post-conviction bond law written by the industry, Washington Monthly reported on the impact of this new scheme: Kristina Howell faced jail if she was unable to pay a $1,044 fine, so she paid a bail bond company $155—more than half her earnings for a week—to get two months to pay her fine or be returned to jail. Two months later, still owing more than $700, she pawned her engagement ring and a gold necklace from her baptism. To obtain the money, she'd fallen behind on electricity bills and her internet was shut off, and she still had to borrow from friends to make the final payments before her final court date. "Right now I'm just trying to make enough money to keep anything else from getting cut off," she said. [94]

While ALEC has shifted its position on certain aspects of criminal justice and mass incarceration in recent years, for-profit bail continues to organize to defend the privatization of release and to use the access of ALEC to enable its hold.



Bail Insurance Corporations Enlist Lawmakers to Keep Control

## State by State: The For-Profit Bail Industry Fights Reform

State and local legislatures, elected judges, prosecutors, sheriffs, and bail bond boards set the rules and implementation of bail and pretrial justice. So corporate bail and its industry associations spend their donations and lobbying money state by state. In 10 key states, the for-profit bail industry contributed more than $1.7 million to state-level candidates, committees, parties, or ballot measures in the 2010-2016 election cycles.[95] This conservative figure from the National Institute on Money in State Politics' Follow the Money database does not include contributions from bail insurers with substantial business interests beyond bail.

As families continue to pay the price of for-profit bail's control of the jailhouse gates, the industry's relatively modest investment in key states has yielded many returns.

**NOTE:**

**95**  *Unless otherwise specified, state political donations data was obtained from the National Institute on Money in State Politics' Follow the Money Database by searching for donations to candidates, parties, or committees coded by NIMSP as Bail Bond Industry for the election cycles from 2010 to 2016, along with searches for the bail insurers that are primarily or exclusively bail. Insurance companies with significant other business were omitted unless donations were directly tied to a bail subsidiary. Given variation in self-reported data, naming variation (not all bail companies are readily identifiable by name), and the lack of a comprehensive list of bail agents— who may contribute as individuals— and companies, this approach is conservative.*

## Political Contributions By State

Contributions from the Bail Bond Industry for the election cycles from 2010 to 2016.
**Source:** *National Institute on Money in State Politics Follow the Money Database*



| TX | MD | FL | CA | GA | WA | NC | OK | IN | PA |
|---|---|---|---|---|---|---|---|---|---|
| $322,765 | $309,762 | $296,921 | $290,749 | $135,747 | $110,452 | $93,637 | $60,350 | $54,745 | $52,732 |

There are many examples from across the country. In Florida, in 2009, the Broward County Commission cut pretrial alternatives to bail after bail bond companies donated thousands to the campaigns of the county commissioners.[96] In New Mexico, bail corporations and their associations undermined 2016 legislative reform efforts led by the state's chief judge so substantially that many advocates were no longer able to support the effort.[97]

And in Connecticut, the bail industry successfully mobilized in 2016 to stop the governor's plan that would have eliminated bail for many misdemeanors—despite strong support from the left and the right.[98]

This section highlights the influence of the bail industry in two key states.

## California:

## Buying Influence at Every Level

For-profit bail corporations and associations spend money to derail reforms at every level in California.

At the state level, the industry vehemently opposed the 2014 passage of Proposition 47, which reduced penalties for low-level drug and petty theft offenses—offenses that bail industry representatives called the "bread and butter" of the bail industry.[99] Led by Aladdin Bail Bonds and Lexington National, the industry was second only to law enforcement in funding the opposition campaign.[100]

The industry's opposition spending on Proposition 47 was part of nearly $300,000 in industry contributions to statewide candidates and committees in the 2010 to 2016 election cycles. With new legislation proposed to reduce the use of money bail and increase enforcement at the state level, the industry is expected to use all of its influence to resist reform.

Counties have been leading on bail reform in California, so the industry has focused on local officials to defang reform there too. In October 2016, Santa Clara County voted on reforms that will significantly reduce the use of money bail. Leading up to the vote, an elected county supervisor extended the bail industry a "lifeline" amid proposals that will radically reduce the number of people who are presumed innocent who are incarcerated in the county. San Jose Inside reported that the CEO of large California bail agency Bad Boys Bail Bonds had held a fundraiser for that supervisor's failed 2014 mayoral run at his Willow Glen home, and that he and others in the industry had given $6,000 to the supervisor's political campaigns since 2012.[101]

California's corporate bail industry pays to elect judges too, with $21,000 in campaign contributions from 2010 to July 2016.[102] The California Bail Agents Association is also partnering with the national Professional Bail Agents of the United States to pay $50,000 to Republican National Committee member Harmeet Dhillon to support them in battling federal lawsuits in California challenging the constitutionality of the bail system brought by Equal Justice Under Law.[103]

Bail Insurance Corporations Enlist Lawmakers to Keep Control

## Maryland:

# Fighting Reform on Insurers' Home Turf

As Judge Ben C. Clyburn, Maryland, testified at the General Assembly, "We are very realistic in terms of bail here in Maryland. Bail bondsmen they have a lobby - a very strong lobby - and there is a reason why they're still here."[104] Maryland's bail lobby has succeeded in preventing repeated attempts at reform, though multiple studies have documented failures in Maryland's bail system for decades.[105]

The anchor of Maryland corporate bail's influence and the Maryland Bail Bonds Association is the state's main bail corporation, Maryland-based Lexington National Insurance Company, and family-owned Fred Frank Bail Bonds. Lexington National's agents collected more than $120 million in premiums from people and their families in 2015, channeling more than $11 million to Lexington National.[106] At least $220,000 in state political contributions in the 2010 to 2016 election cycles came from people or entities associated with the companies and family. And in 2015, bolstering its long-standing family connections, Lexington National hired former American Bail Coalition Executive Director Nick Wachinski as CEO.[107]

Extensive state-level research by Common Cause, a nonpartisan group focused on government accountability, found a focus on the chairs of the committees that oversee the industry's legislation, with more than $120,000 donated to two key chairmen from 2011 to 2016.[108] Now former U.S. Attorney General Eric Holder is supporting bail reform in Maryland, calling the current system "irrational...unjust...and likely unconstitutional," and Maryland's court system and attorney general are working to change the state's unjust bail system.[109] Lexington National has brought in former Solicitor General Paul Clement, who wrote ABC's amicus brief defending bail,[110] and the industry has increased its donations, with payments to Maryland politicians increasing to $135,250 in just the first two years of the current election cycle to confront the current reform threat.

The bail industry is pushing for a bill to derail the reforms, and in the week before the 2017 Maryland legislative session, Lexington National poured more than $18,000 into political contributions to Maryland state legislators.[111]

## The Bail Industry at the Federal Level

Though most political activity by bail insurers, corporations, and their associations has occurred at the state and local levels, for-profit bail hasn't ignored federal legislators. Over five years, from 2011 through 2016, the industry funded $500,000 in contributions to federal candidates or committees.[112] In return, Representative Ted Poe (R-TX) and Senator Orrin Hatch (R-UT) have introduced a federal version of the ABC/ALEC anti-pretrial services legislation.[113] And congressional opposition has surfaced to

fight efforts to eliminate money bail—most notably, the No Money Bail Act, introduced by Representative Ted Lieu (D-CA), which would make states with money bail systems ineligible for certain federal law enforcement funding.[114] With a new federal administration and attorney general unlikely to challenge the constitutionality of certain money bail practices, the industry may shift its attention to influencing federal legislators and regulators to protect its profits.

# CONCLUSIONS AND RECOMMENDATIONS



44

The for-profit bail industry allows large corporations to manipulate our justice system to serve their own financial interests rather than justice. The profit-motivated bail industry is unnecessary and inherently abusive and exploitative.

———————

**F**or-profit bail presents barriers—to justice, to ensuring the public good, and to guaranteeing our most basic constitutional freedoms—and should be abolished. Until private companies are extricated from the pretrial justice system, those with the power to investigate, regulate, and restrain the industry must vigilantly do so, bringing it out of the shadows and building on the findings of this report.

## Specifically, this report recommends the following:



• States should **abolish** the for-profit bail industry. Elected representatives must end the bail insurance industry's financial hold on millions of Americans each year.

• Where for-profit bail continues, state and federal regulators, attorneys general, and legislators must immediately **investigate the industry** and **conduct ongoing oversight**. Further investigations will bring more stories to light, create a greater understanding of the perverse and harmful operations of the industry, and expose unethical activity.

• Judges and prosecutors should **reevaluate their practices** of assigning unaffordable bail amounts and consider instead release on one's own recognizance or, where appropriate, reasonable non-financial conditions of release. Where courts order money bail, they should **rely on unsecured bonds** rather than profit-motivated surety bonds.

• Legislators and public officials should respond to communities' demands and work to **create a stronger and fairer criminal justice system** that neither depends on money bail nor supports it.

• Corporations interested in operating ethically should take a close look at their business ties and investments and **cut any ties to the bail industry.**

**Conclusions and Recommendations**



### Alternatives to Money Bail

Money bail, which drives people into the hands of private bail corporations, is not required to promote court attendance and successful release. Organizations like the Vera Institute have identified proven opportunities at nearly every stage in the arrest and pretrial process to avoid the unjust and costly consequences of trapping people behind bars who have not been convicted of a crime—including avoiding detention through citations, pre- or post-charge diversion, and earlier hearings.[115]

Simple and low-cost methods of support, including automated phone calls and even text messages, improve appearance rates dramatically without the burdens of money bail or paying for-profit bailers.

A 2005 study in Jefferson County, Colorado, found that simply calling defendants to remind them of their court date brought failure-to-appears down to 8 percent from the county's usual rate of 21 percent. After Oregon's Multnomah County started using an automated reminder system in 2005, its failure-to-appear rate fell 31 percent; soon the system was saving the county $1.55 million each year, according to a 2007 report by the Multnomah County Local Public Safety Coordinating Council.[116]

Alternatives that facilitate safe and successful release and return for trial without forcing people to pay for their freedom have been implemented and proven many times over many years, yet they remain the exception due to the persistent opposition of the industry that profits from money bail.



# DEFINTIONS

48

# Definitions

While popular media uses "bail" as the shorthand for "money bail," "bail" is the set of conditions placed on a person to be released from custody before trial in order to ensure appearance in court. There are monetary and non-monetary forms of bail. [117]

**Money bail:** Most states provide people a few options to pay money bail, depending on the jurisdiction, the judge or magistrate, and the resources of the person:

- **Surety bail:** This is the most common form of release. A private, for-profit bail bond agent files a bond with the court to guarantee a person's appearance in court or pay of the bond in full. Money paid to the agent is not returned at the end of the case.

- Other forms of money bail include **cash bail**, where a person or family member puts the full bail amount on deposit with the court; **deposit bail**, where in some jurisdictions, people or their families can deposit a refundable percentage (often 10 percent) of the total bail directly with the court with a promise to pay in full for failure to appear; and **property bond**, in which a person or someone acting on their behalf pledges property to meet the bail set and the court places a lien on the property, which can be seized for failure to appear. In all these cases, people and their families have their money or assets returned to them (sometimes minus certain court fees) once the person has appeared at all necessary court proceedings.

**Non-monetary bail** includes **release on recognizance**, which frees someone on a signed guarantee to appear or a citation by law enforcement; **conditional release**, which releases people to the supervision of pretrial services or other reporting, behavioral, or monitoring conditions; and **unsecured bond**, which requires no upfront money, but the bail amount is owed in full for failure to appear.

**Jail** refers to the local detention facilities where people are incarcerated awaiting trial, sentencing post-conviction, or transfer to another jurisdiction, or serving sentences of under a year. This is distinct from **prisons**, longer-term facilities run by the state or the federal government that typically hold people with sentences of more than one year.

# ENDNOTES

# 50

# Endnotes

**1**    "For Better or for Profit: How the Bail Bonding Industry Stands in the Way of Fair and Effective Pretrial Justice." Justice Policy Institute, September 2012. Accessed February 11, 2017. http://www.justicepolicy.org/uploads/justicepolicy/documents/_for_better_or_for_profit_.pdf and Brooker, Claire M., Michael R. Jones and Timothy R. Schnacke. "The History of Bail and Pretrial Release." Pretrial Justice Institute, September 24, 2010. Accessed February 11, 2017. http://pretrialnola.org/wp-content/uploads/2015/09/09-24-2010-PJI-History-of-Bail.pdf.

**2**    Cohen, Thomas H., Ph.D. and Brian Reaves, Ph.D. "State Court Processing Statistics, 1990-2004: Pretrial Release of Felony Defendants in State Courts." U.S. Department of Justice, Office of Justice Programs. November 2007, NCJ 214994. Accessed February 11, 2017. https://www.bjs.gov/content/pub/pdf/prfdsc.pdf.

**3**    This data set covers felonies in the 75 largest counties. Reaves, Brian, Ph.D., U.S. State Court Processing Statistics, "Felony Defendants in Large Urban Counties, 2009-Statistical Tables." Department of Justice, Office of Justice Programs, Bureau of Justice Statistics. December 2013, NCJ 243777. Accessed February 11, 2017. https://www.bjs.gov/content/pub/pdf/fdluc09.pdf.

**4**    Bozelko, Chandra. "The cash bail system should be eliminated rather than reformed." The Guardian, February 5, 2016. Accessed January 6, 2017. https://www.theguardian.com/commentisfree/2016/feb/05/the-cash-bail-system-should-be-eliminated-rather-than-reformed; Council of Economic Advisers. "Fines, fees, and bail payments in the criminal justice system that disproportionately impact the poor." Issue Brief, December 2015. Accessed January 6, 2017. https://obamawhitehouse.archives.gov/sites/default/files/page/files/1215_cea_fine_fee_bail_issue_brief.pdf.

**5**    Board of Governors of the Federal Reserve System. "Report on Economic Well-Being of U.S. Households in 2015." Federal Reserve, June 14, 2016. Accessed February 11, 2017. https://www.federalreserve.gov/2015-report-economic-well-being-us-households-201605.pdf

**6**    "Jail" refers to the local detention facilities where people are incarcerated while awaiting trial, awaiting sentencing post-conviction, awaiting transfer to another jurisdiction, or serving sentences of under a year. This is distinct from "prisons," longer-term facilities run by the state or the federal government that typically hold people with sentences of more than one year.

**7**    In contrast, the number of convicted people in jail had nearly returned to 2000 levels by 2014. Jail Inmates in 2015 (Table 3). U.S. Department of Justice. December 2016. Available online: https://www.bjs.gov/content/pub/pdf/ji15.pdf. Minton, Todd D. and Zhen Zenj, "Jail Inmates in 2015." U.S. Department of Justice, Office of Justice Programs, Bureau of Justice Statistics. December 2016, NCJ 250394. Accessed February 11, 2017. https://www.bjs.gov/content/pub/pdf/ji15.pdf.

**8**    Minton, Todd D. and Zhen Zenj, "Jail Inmates in 2015." U.S. Department of Justice, Office of Justice Programs, Bureau of Justice Statistics. December 2016, NCJ 250394. Accessed February 11, 2017. https://www.bjs.gov/content/pub/pdf/ji15.pdf.

**9**    "Payday loan" refers to a type of short-term borrowing where an individual borrows a small amount at a very high rate of interest. The borrower typically writes a post-dated personal check in the amount they wish to borrow plus a fee in exchange for cash. The loans often come due on the borrower's subsequent payday.

**10**    Consumer Financial Protection Bureau. Accessed April 11, 2017. https://www.consumerfinance.gov/askcfpb/1567/what-payday-loan.html.

**11**    O'Hollaren, Kelsey. IBISWorld Industry Report. "Bail Bond Services in the US." November 2016, pg 9, 26. Rutgers University. Accessed January 6, 2017. https://www.ibisworld.com/industry/bail-bond-services.html

**12**    Hughes, Zerline and Adwoa Masozi. "Release: The Bail Bond Industry is for Profit, But Not For Good." Justice Policy Institute, September 18, 2012. Accessed February 11, 2017. http://www.justicepolicy.org/news/4389. Rabuy, Bernadette and Pete Wagner.

**13**   "Following the Money of Mass Incarceration." Prison Policy Initiative, January 25, 2017. Accessed February 11, 2017. *https://www. prisonpolicy.org/reports/money.html* and O'Hollaren, Kelsey. IBISWorld Industry Report "Bail Bond Services in the US." November 2016, Rutgers University. Accessed January 6, 2017. *https://www.ibisworld.com/industry/bail-bond-services.html*

**14**   The sources for most estimates are unclear, but the lower $1.4 billion is believed to be based on an assumption of 10 percent premiums to the bail agents of the often-cited $14 billion in total bail (also estimated). Certain jurisdictions require disclosure of premiums but are subject to various accounting rules, and fees do not appear to be included. Estimates do not appear to take into account income made by the bail insurers from their portion of the revenue.

**15**   "For Better or for Profit: How the Bail Bonding Industry Stands in the Way of Fair and Effective Pretrial Justice." Justice Policy Institute, September 2012. Accessed February 11, 2017. *http://www.justicepolicy.org/uploads/justicepolicy/documents/_for_ better_or_for_profit_.pdf* and Brooker, Claire M., Michael R. Jones and Timothy R. Schnacke. "The History of Bail and Pretrial Release." Pretrial Justice Institute, September 24, 2010. Accessed February 11, 2017. *http://pretrialnola.org/wp-content/ uploads/2015/09/09-24-2010-PJI-History-of-Bail.pdf*.

**16**   Ibid.

**17**   "Chief Justice: Bail reform puts N.J. at the forefront of fairness." *NJ.com*. January 9, 2017. Available online: *http://www.nj.com/ opinion/index.ssf/2017/01/nj_chief_justice_bail_reform_puts_nj_at_the_forefr.html*.

**18**   "City Council unanimously passes overhaul to Municipal Court bail system." The New Orleans Advocate. January 12, 2017. Available online: *http://www.theadvocate.com/new_orleans/news/courts/article_eb41d288-d90b-11e6-b99c-4bb3e5442d1b.html*.

**19**   "Moving Beyond Money: A Primer on Bail Reform." Criminal Justice Policy Program at Harvard Law School. October 11, 2016. Accessed January 6, 2017. *http://cjpp.law.harvard.edu/publications/primer-bail-reform*; "Incarceration's Front Door: The Misuse of Jails in America." Vera Institute of Justice, February 2015. Accessed February 11, 2017. *http://archive.vera.org/sites/default/files/ resources/downloads/incarcerations-front-door-report.pdf*; and Jones, Michael R., "Unsecured Bonds: The As Effective and Most Efficient Pretrial Release Option." Pretrial Justice Institute. October 2013 *http://www.pretrial.org/download/research/Unsec ured+Bonds+The+As+Effective+and+Most+Efficient+Pretrial+Release+Option+-+Jones+2013.pdf*.

**20**   Winny, Annalies. "Demorrea Tarver's Charges Were Dropped, but the 10 Percent Fee He Promised a Bail Bondsman on His $275,000 Bail Has Him Drowning in Debt," Baltimore City Paper, July 20, 2016, accessed January 9, 2017, *http://www.citypaper.com/news/ mobtownbeat/bcp-072016-mob-bail-20160720-story.html*.

**21**   "Incarceration's Front Door: The Misuse of Jails in America." Vera Institute of Justice, February 2015. Accessed February 11, 2017. *http://archive.vera.org/sites/default/files/resources/downloads/incarcerations-front-door-report.pdf*.

**22**   Wagner, Peter and Bernadette Rabuy. Mass Incarceration: The Whole Pie 2017. Prison Policy Initiative. March 14, 2017. Accessed April 10, 2017. *https://www.prisonpolicy.org/reports/pie2017.html*

**23**   This data set covers the felonies in the 75 largest counties. Reaves, Brian, Ph.D., U.S. State Court Processing Statistics, "Felony Defendants in Large Urban Counties, 2009-Statistical Tables." Department of Justice, Office of Justice Programs, Bureau of Justice Statistics. December 2013, NCJ 243777. Accessed February 11, 2017. *https://www.bjs.gov/content/pub/pdf/fdluc09.pdf*.

**24**   Ibid.

**25**   Ibid.

**26**   Tafoya, Sonya, pub., PPIC, "Pretrial detention and jail capacity in California" 4 (2015). *http://www.ppic.org/main/publication_quick.asp?i=1154*

**27**   Hughes, Zerline and Adwoa Masozi. "Release: The Bail Bond Industry is for Profit, But Not For Good." Justice Policy Institute, September 18, 2012. Accessed February 11, 2017. *http://www.justicepolicy.org/news/4389.*

**28**   Gupta, Arpit, Ethan Frenchman and Douglas Swanson. "The High Cost of Bail: How Maryland's Reliance on Money Bail Jails the Poor and Costs the Community Millions." Maryland Office of the Public Defender, Justice Fairness and Dignity for All, November 2016, p. 4, 10-11. *http://www.opd.state.md.us/Portals/0/Downloads/High%20Cost%20of%20Bail.pdf*

**29**   Ibid.

**30**   Henrichson, Christian, Mathilde Laisne and Jon Wool. "Past Due: Examining the Costs and Consequences of Charging for Justice in New Orleans." Vera Institute of Justice, January 2017. Accessed February 14, 2017. *https://storage.googleapis.com/vera-web-assets/downloads/Publications/past-due-costs-consequences-charging-for-justice-new-orleans/legacy_downloads/past-due-costs-consequences-charging-for-justice-new-orleans.pdf.*

**31**   Rabuy, Bernadette and Pete Wagner. "Following the Money of Mass Incarceration." Prison Policy Initiative, January 25, 2017. Accessed February 11, 2017. *https://www.prisonpolicy.org/reports/money.html.* and O'Hollaren, Kelsey. IBISWorld Industry Report "Bail Bond Services in the US," November 2016, Rutgers University. Accessed January 6, 2017.

**32**   This data set covers the felonies in the 75 largest counties. Reaves, Brian, Ph.D., U.S. State Court Processing Statistics, "Felony Defendants in Large Urban Counties, 2009-Statistical Tables." Department of Justice, Office of Justice Programs, Bureau of Justice Statistics. December 2013, NCJ 243777. Accessed February 11, 2017. *https://www.bjs.gov/content/pub/pdf/fdluc09.pdf.*

**33**   Rabuy, Bernadette and Pete Wagner. "Following the Money of Mass Incarceration." Prison Policy Initiative, January 25, 2017. Accessed February 11, 2017. *https://www.prisonpolicy.org/reports/money.html* and O'Hollaren, Kelsey. IBISWorld Industry Report "Bail Bond Services in the US," November 2016, Rutgers University. Accessed January 6, 2017.

**34**   Immigration bail bonds, not discussed in this report, typically charge 15 percent to 20 percent.

**35**   Transcript of Injunction Hearing. O'Donnell et al v Harris County, Texas et al. U.S. District Court, Southern District of Texas, Case 4:16-CV-1414, March 7, 2017, pp. 55-56  *AboutBail.com.* How Immigration Bail Bonds Work. *https://www.aboutbail.com/pages/how-immigration-bail-bonds-work.*

**36**   Family members who take on responsibility for a loved one's bail are more accurately called "indemnitors." That is, they are obligated to pay when their loved one does not or cannot.

**37**   Some states still allow bail agents to post bonds backed by their own resources.

**38**   Liptak, Adam. "Illegal Globally, Bail for Profit Remains in U.S." New York Times, January 29, 2008. Accessed February 11, 2017. *http://www.nytimes.com/2008/01/29/us/29bail.html?_r=1&* and Johnson, Brian R. and Stevens, Ruth S., "The Regulation and Control of Bail Recovery Agents: An Exploratory Study" (2013). Peer Reviewed Publications. 3. *http://scholarworks.gvsu.edu/scjpeerpubs/3.*

**39** This data set covers the felonies in the 75 largest counties. Reaves, Brian, Ph.D., U.S. State Court Processing Statistics, "Felony Defendants in Large Urban Counties, 2009-Statistical Tables." Department of Justice, Office of Justice Programs, Bureau of Justice Statistics. December 2013, NCJ 243777. Accessed February 11, 2017. https://www.bjs.gov/content/pub/pdf/fdluc09.pdf.

**40** Grado, Gary. "Bail bond industry to fight change to 'no money' system." Arizona Capitol Times, August 29, 2016. Accessed February 12, 2017. http://azcapitoltimes.com/news/2016/08/29/bail-bond-industry-to-fight-change-to-no-money-system/.

**41** Kopf, Daniel and Bernadette Rabuy, "Detaining the Poor: How money bail perpetuates an endless cycle of poverty and jail time." Prison Policy Initiative, May 10, 2016. Accessed February 12, 2017. https://www.prisonpolicy.org/reports/incomejails.html

**42** "How Privatization Increases Inequality," In the Public Interest, September 2016. Accessed January 9, 2017. https://www.inthepublicinterest.org/wp-content/uploads/InthePublicInterest_InequalityReport_Sept2016.pdf.

**43** Ibid. And Wooldredge, John. "Distinguishing Race Effects on Pre-Trial Release and Sentencing Decisions." Justice Quarterly 29, no. 1 (February 2012): 41–75. Accessed via Taylor & Francis Online database on January 9, 2017. http://www.tandfonline.com/doi/abs/10.1080/07418825.2011.559480.

**44** Christopher T. Lowenkamp, Marie VanNostrand & Alexander Holsinger, "Investigating the Impact of Pretrial Detention on Sentencing Outcomes" 10–11 (2013); Mary T. Philips, New York City Crim. Justice Agency, Inc., "Pretrial Detention and Case Outcomes, Part 1: Nonfelony Cases" 25–29 (2007); Human Rights Watch and ACLU, "Every 25 Seconds: The Human Toll of Criminalizing Drug Use" 88 n.216 (2016) (discussing pressure to plead guilty while in pretrial detention among all defendants).

**45** Powers, Thurston and Lauren Krisai. "Reforming the Constitution State's Pre-Trial System." March 8, 2016. Accessed January 9, 2017. http://www.yankeeinstitute.org/policy-briefs/reforming-constitution-state-pre-trial-system/.

Ibid.

**46** Burns, Cheryl, "A Message from the President," BailUSA. Accessed April 4, 2017. http://bailusa.net/aquired-news.php.

**47** Based on the estimation of insurer premiums of 1 percent of total bond. (10 percent of a 10 percent bail bond premium charged by an agent).

**48**

**49** "Agency Agreement between A Alpha Bail Bonds and Bankers Insurance Group," as Exhibit 10 to Form S-1, Amendment 1, Registration Statement of Twentyfour/Seven ventures, inc. April 26, 2013. Accessed February 15, 2017. https://www.sec.gov/Archives/edgar/data/1565700/000101489713000144/exhibit10.htm.

**50** Top 100 Writers of Surety Bonds United States & Territories, Canada & Aggregate Other Alien. n.p.: The Surety & Fidelity Association of America, 2015. http://www.surety.org/?page=StatReports#Top100 and "Agency Agreement between A Alpha Bail Bonds and Bankers Insurance Group," as Exhibit 10 to Form S-1, Amendment 1, Registration Statement of Twentyfour/Seven Ventures, Inc. April 26, 2013. Accessed February 15, 2017. https://www.sec.gov/Archives/edgar/data/1565700/000101489713000144/exhibit10.htm.

**51** Allegheny Casualty Company, International Fidelity Insurance Company. "Management Discussion and Analysis of Financial Condition and Results of Operations," for the year ending December 31, 2015. March 23, 2016. Accessed February 15, 2017. https://interactive.web.insurance.ca.gov/sdrive/companyprofile/2015/propertyAndCasualty/annual/13285.2015.P.AN.PM.O.A.3107706.pdf.

**52** Bauer, Shane. "Inside the Wild, Shadowy, and Highly Lucrative Bail Industry." May/June 2014. Accessed January 7, 2017. http://www.motherjones.com/politics/2014/06/bail-bond-prison-industry.

Downs, Lamar. Examination Report of Continental Heritage Insurance Company Boca Raton, Florida. Florida Office of Insurance Regulation, 2014, pg. 4. *http://www.floir.com/siteDocuments/ContinentalHeritage12312014.pdf.*

**53**

Lexington National Insurance Corporation, 2015 Annual Report, Dec. 31, 2015, accessed from California Department of Insurance.

**54**

After Pennsylvania ordered a bail company to pay forfeiture when an individual out on bond committed murder, the main bail insurer association, the American Bail Coalition, supported litigation and made sure a new law guaranteed that the bail industry wouldn't

**55**

ever have to pay in those situations again. First the bail industry took the case to the Pennsylvania Supreme Court, where it lost. In October 2013, the Pennsylvania Supreme Court wrote, "The express language of the Pennsylvania Rules of Criminal Procedure concerning bail, bail bonds, and forfeiture do not limit the availability of forfeiture exclusively to abscondment cases; indeed, the rules permit forfeiture for any breach of a bail condition." But the American Bail Coalition, led by then-Executive Director and Pennsylvania resident Nick Wachinski, was already in the middle of a five-year effort to pass Pennsylvania's Act 16 of 2015, which locked in the role of insurers in the state's bail system. Wachinski testified before the legislature and donated nearly $7,000 to a lead sponsor, while the industry overall donated nearly $50,000 over the 2010 to 2016 cycles. By the time the final 2015 Pennsylvania law was passed, a new provision was added explicitly to remove the chance that a bail bond company would pay for new crimes committed: "No third-party surety shall be responsible to render payment on a forfeited undertaking if the revocation of bail is sought for failure of the defendant to comply with the conditions of the defendant's release other than appearance." So in addition to guaranteeing bail insurers' position to earn a cut of all bail premiums, lawmakers helped the industry to successfully eliminate one of the already limited avenues their own state government had for holding it accountable. See Testimony of Nicholas J. Wachinski, Esquire Executive Director, American Bail Coalition. Regarding Senate Bill 1441, Committee on Banking and Insurance, September 23, 2014. Accessed February 14, 2017. *http://banking.pasenategop.com/files/2014/09/Wachinski-PA-SB-1441-NJW-Testimony.pdf.* Kitchen, Sean. "How Pennsylvania's Democratic Lieutenant Governor & An ALEC Lobbyist Deregulated the Bail Bond Industry." Raging Chicken Press, January 20, 2016. Accessed February 16, 2017. *https://ragingchickenpress.org/2016/01/20/how-pennsylvanias-democratic-lieutenant-governor-an-alec-lobbyist-deregulated-the-bail-bond-industry/.*

"ABA Standards for Criminal Justice, Third Edition, Pretrial Release." American Bar Association, March 2007. Accessed January 9, 2017. *http://www.americanbar.org/content/dam/aba/publications/criminal_justice_standards/pretrial_release.authcheckdam.pdf.*

**56**

Henterly, Lael. "When Bail Is Set, the Rich Walk and the Poor Go to Jail." Seattle Weekly Times, August 23, 2016. Accessed January 6, 2017. *http://www.seattleweekly.com/news/when-bail-is-set-the-rich-walk-and-the-poor-go-to-jail/.*

**57**

"Since Sandra." The Huffington Post database. July 2016. Available online: *http://data.huffingtonpost.com/2016/jail-deaths.*

**58**

Pinkerton, James and Lauren Caruba. "Jailhouse Jeopardy: Making bail not same for everyone." Houston Chronicle. December 27, 2015. *http://www.houstonchronicle.com/news/houston-texas/houston/article/Tough-bail-policies-punish-the-poor-and-the-sick-6721984.php*

**59**

On Life Support: Public Health in the Age of Mass Incarceration (2014). Vera Institute of Justice. Available online: *http://archive.vera.org/sites/default/files/resources/downloads/on-life-support-public-health-mass-incarceration-report.pdf http://data.huffingtonpost.com/2016/jail-deaths.*

**60**

The Reality of Pre-Trial Detention: Colorado Jail Stories (2015). Colorado Criminal Defense Institute. Available online: *https://community.pretrial.org/HigherLogic/System/DownloadDocumentFile.ashx?DocumentFileKey=8bc816ea-9264-caa3-7e49-acfaed7d0789&forceDialog=0.*

**61**

Ibid.

62    The Price of Jails: Measuring the Taxpayer Cost of Local Incarceration. Vera Institute. (May 2015) Available online: *https://storage.googleapis.com/vera-web-assets/downloads/Publications/the-price-of-jails-measuring-the-taxpayer-cost-of-local-incarceration/legacy_downloads/price-of-jails.pdf*.

63    San Joaquin County Courts Surety Bond Reports and correspondence, obtained by public records request.

64    Gupta, Arpit, Ethan Frenchman and Douglas Swanson. "The High Cost of Bail: How Maryland's Reliance on Money Bail Jails the Poor and Costs the Community Millions." Maryland Office of the Public Defender, Justice Fairness and Dignity for All, November 2016, p. 4, 10-11. Accessed February 14, 2017. *http://www.opd.state.md.us/Portals/0/Downloads/High%20Cost%20of%20Bail.pdf*

65    Lewis, Sukey. "$2 Billion Bail Bond Industry Threatened by Lawsuit Against San Francisco." May 6, 2016. Accessed January 9, 2017. *https://ww2.kqed.org/news/2016/05/03/2-billion-bail-bond-industry-threatened-by-lawsuit-against-san-francisco/*.

66    Kim, Anne. "Baltimore's Cash Bail System Traps Thousands, Propelling the Poor Deeper into Poverty." December 7, 2016. Accessed January 9, 2017. *http://www.citypaper.com/news/features/bcp-120716-feature-bail-20161207-story.html*.

67    Bonta, Rob. "California's Broken Bail System Punishes the Poor." August 22, 2016. Accessed January 9, 2017. *http://www.sacbee.com/opinion/op-ed/soapbox/article97214457.html*.

68    Gupta, Arpit, Ethan Frenchman and Douglas Swanson. "The High Cost of Bail: How Maryland's Reliance on Money Bail Jails the Poor and Costs the Community Millions." Maryland Office of the Public Defender, Justice Fairness and Dignity for All, November 2016, p. 4, 10-11. Accessed February 14, 2017. *http://www.opd.state.md.us/Portals/0/Downloads/High%20Cost%20of%20Bail.pdf*.

69    Henrichson, Christian, Mathilde Laisne and Jon Wool. "Past Due: Examining the Costs and Consequences of Charging for Justice in New Orleans." Vera Institute of Justice, January 2017. Accessed February 14, 2017. *https://storage.googleapis.com/vera-web-assets/downloads/Publications/past-due-costs-consequences-charging-for-justice-new-orleans/legacy_downloads/past-due-costs-consequences-charging-for-justice-new-orleans.pdf*.

70    Zambito, Thomas. "N.J. defendants are set free on bail payment plans without judges, prosecutors knowing." *NJ.com*. December 1, 2013. Accessed January 13, 2017. *http://www.nj.com/essex/index.ssf/2013/12/nj_defendants_being_set_free_on_bail_payment_plans_without_judges_prosecutors_knowing.html*.

71    "Bounty hunters" is the common term for bail enforcement agents or the industry-preferred term "fugitive recovery agent." According to their trade association, the National Association of Fugitive Recovery Agents, these individuals are "hired or contracted by a Bail Bond Company or Surety to act as their Agent for the purpose of locating and apprehending a Fugitive that has failed to appear in court or has otherwise violated the Bail Bond Contract or Release Conditions." See more at *www.fugitive-recovery.org*.

72    Sheets, Tess. "Woman Sues Bondsman Who Shot Her in McDonald's Drive-Thru." Tampa Bay Times. April 4, 2016. Accessed January 13, 2017. *http://www.tbo.com/news/crime/woman-sues-bondsman-who-shot-her-in-mcdonalds-drive-thru-20160404/*.

73    Labe, L. Jay and Jerry Watson. "Commercial Bail Bonds." Accessed January 13, 2017. *http://www.americanbailcoalition.org/wp-content/uploads/2016/01/ABA-Bail-Chapter-Commercial-Bail-Bonds.pdf*.

74    New York Department of Financial Services. Bailbonds Active Agent Listing. Accessed February 14, 2017. *https://myportal.dfs.ny.gov/web/guest-applications/bail-bonds-search*.

75    State of New Jersey Commission of Investigation. "Inside Out: Questionable and Abusive Practices in New Jersey's Bail-Bond Industry." Pg. 1, 2014. Accessed on January 9, 2017. *http://www.nj.gov/sci/pdf/BailReportSmall.pdf*.

**76**

Minnesota Department of Commerce. "Minnesota Commerce Department Reaches Sweeping Agreement to Reform State's Bail Bond Industry." January 13, 2016. Accessed February 14, 2017. http://mn.gov/commerce/media/news/?id=71-114183.

**77**

California Department of Insurance. "AB 2449 by Assembly Member Eggman, Bail Education, Investigation, and Prosecution Fund; California Department of Insurance Fact Sheet." Undated.

**78**

Letter from Commissioner Jones to Assembly Member Tom Daly, re: CDI Sponsored Assembly Bill 2449 (Eggman) - Support. April 13, 2016. California Department of Insurance. "Investigation Division & Customer Services Division Statewide Bail Cases and Complaints."

**79**   Undated.

California Department of Insurance. Update: South Bay bail agents targeted in law enforcement sweep, 2015 Press Release. September 9, 2015. Accessed February 14, 2017. http://www.insurance.ca.gov/0400-news/0100-press-releases/2015/

**80**   release083-15.cfm and Operation Bail Out: Bay Area Bail Bonds Operation. "Operation Bail Out" graphic. August 29, 2015. https://www.flickr.com/photos/ca_dept_insurance/20800521029/in/album-72157657509991139/.

Schnacke, Tim, "Best Practices in Bond Setting: Colorado's New Pretrial Bail Law." Center for Legal and Evidence Based Practices. July 3, 2013. https://cdpsdocs.state.co.us/ccjj/Resources/Ref/2013-07-03_BondSetting-ColoradoCCJJ.pdf.

**81**

Timms, Ed and Kevin Krause. "Smaller Texas Counties Struggle with Bail Bond Regulation | News." December 28, 2011. Accessed January 13, 2017. http://www.dallasnews.com/news/news/2011/12/28/smaller-texas-counties-struggle-with-bail-bond-

**82**   regulation.

American Bail Coalition. Newsletter October 2010, pp. 13-14. Accessed February 14, 2017. http://www.asc-usi.com/blogentry.aspx?id=4382&category%20%20AW%20needs%20to%20cite%20to%20examples%20of%20them%20making%20

**83**   these%20claims,%20but.

Grado, Gary. "Bail bond industry to fight change to 'no money' system." Arizona Capitol Times, August 29, 2016. Accessed February 12, 2017. http://azcapitoltimes.com/news/2016/08/29/bail-bond-industry-to-fight-change-to-no-money-system/.

**84**

Brief for Amici Curiae American Bail Coalition, Georgia Association of Professional Bondsmen, and Georgia Sheriff's Association, Maurice Walker v. City of Calhoun, U.S. Court of Appeals, 11th Circuit, Case No. 16-10521. Filed June 21, 2016, available at http://www.

**85**   americanbailcoalition.org/wp-content/uploads/2016/06/abcgapbbailamicus.pdf.

American Bail Coalition. Newsletter October 2010, pp. 13-14. Accessed February 14, 2017. http://www.asc-usi.com/blogentry.aspx?id=4382&category%20%20AW%20needs%20to%20cite%20to%20examples%20of%20them%20making%20

**86**   these%20claims,%20but.

"About," American Legislative Exchange Council (ALEC), Accessed April 4, 2017. https://www.alec.org/about/ and "ALEC Exposed." Accessed January 13, 2017. http://www.alecexposed.org/wiki/ALEC_Exposed.

**87**

"Private Enterprise Advisory Council," American Legislative Exchange Council (ALEC). Accessed December 15, 2016. https://www.alec.org/group/private-enterprise-advisory-council-2/. Accessed December 15, 2016.

**88**

"Bail Bond Industry Leader, Jerry Watson, Honored by National Legislative Organization." August 27, 2010. Accessed January 13, 2017. http://www.prweb.com/releases/2010/08/prweb4434154.htm. ABC Executive Director Emeritus Dennis Bartlett and former

**89**   Legal Director Jerry Watson have also had leadership positions, and Watson received the ALEC Leadership Award in 2010.

American Bail Coalition Announces Appointment Of Executive Director To Chairman Of American City And County Exchange, 8/6/2014, American Bail Coalition. http://www.americanbailcoalition.org/in-the-news/american-bail-coalition-announces-executive-director-policy-director-appointments/

**90**

American Bail Coalition. Newsletter October 2010, pp. 13-14. Accessed February 14, 2017. http://www.asc-usi.com/blogentry.aspx?id=4382&category%20%20AW%20needs%20to%20cite%20to%20examples%20of%20them%20making%20these%20claims,%20but.

**91**

"The Truth About Commercial Bail Bonding In America Advocacy Brief." The National Association Of Pretrial Services Agencies, n.d., Accessed February 14, 2017. http://www.pretrial.org/download/pji-reports/Facts%20and%20Positions%201.pdf.

**92**

Doyle, Sue. "ALEC and Private-Sector Bail Bonding." Allegheny Casualty International Fidelity Associated Bond, Bail Bond Blog. March 23, 2009. Accessed February 14, 2017. https://www.aiasurety.com/bail-bond-blog/alec-private-sector-bail-bonding/.

**93**

Santo, Alysia. "When Freedom Isn't Free." March/April/May 2015. Accessed January 7, 2017. http://washingtonmonthly.com/magazine/maraprmay-2015/when-freedom-isnt-free/.

**94**

Unless otherwise specified, state political donations data was obtained from the National Institute on Money in State Politics' Follow the Money Database by searching for donations to candidates, parties, or committees coded by NIMSP as Bail Bond Industry for the election cycles from 2010 to 2016, along with searches for the bail insurers that are primarily or exclusively bail. Insurance companies with significant other business were omitted unless donations were directly tied to a bail subsidiary. Given variation in self-reported data, naming variation (not all bail companies are readily identifiable by name), and the lack of a comprehensive list of bail agents—who may contribute as individuals—and companies, this approach is conservative.

**95**

Billings, Thanithia. "Private Interest, Public Sphere: Eliminating the Use of Commercial Bail Bondsmen in the Criminal Justice System." Boston College Law Review Vol. 57:1337. Available online: http://lawdigitalcommons.bc.edu/cgi/viewcontent.cgi?article=3527&context=bclr.

**96**

Asher, James. "How the Bail Industry (Successfully) Flexes Its Political Muscles." The Crime Report, December 27, 2016. Accessed February 15, 2017. http://thecrimereport.org/2016/12/27/how-the-bail-industry-successfully-flexes-its-political-muscles/ http://www.injusticewatch.org/news/2016/bail-bondsmens-political-muscle-working-overtime-against-reform-efforts/

**97**

Altimari, Daniela. "Battle Brewing Over Bail Reform at the Legislature." Hartford Courant. March 10, 2015. Available online: http://www.courant.com/politics/hc-bail-reform-connecticut-20160309-story.html.

**98**

Lamb, Jonah Owen. "Bail Bond Businesses in a Slump." June 30, 2016. Accessed January 9, 2017. http://www.sfexaminer.com/bail-bond-businesses-slump/.

**99**

Cal-Access. Californians Against Prop. 47, Sponsored By California Public Safety Institute And Peace Officers Research Association Of California Pic. Historical, 01/22/2015. Accessed January 9, 2017. http://cal-access.sos.ca.gov/Campaign/Committees/Detail.aspx?id=1368083&session=2013&view=general.

**100**

Wadsworth, Jennifer. "County Overhauls Profit-Based Bail System; Bondsmen Found to Have Withheld Millions in Fees." November 3, 2016. Accessed January 13, 2017. http://www.sanjoseinside.com/2016/11/03/county-overhauls-profit-based-bail-system-bondsmen-found-to-have-withheld-millions-in-fees/.

**101**

California Secretary of State. California Filings Searchable Database. http://dbsearch.sos.ca.gov/

**102**   Professional Bail Agents of the United States. "Message from the President Beth Chapman." PBUS Website, April 21, 2016. Accessed February 14, 2017. *http://www.multibriefs.com/briefs/PBUS/PBUS042716.php* and Professional Bail Agents of the United States.

**103**   "Message from the President Beth Chapman." PBUS Website, March 24, 2016. Accessed February 14, 2017. *http://multibriefs.com/briefs/PBUS/PBUS032416.php*.

**104**   Duncan, Ian. "Top District Court Judge Points to Power of Bail Bonds Lobby in Debate over Reform." January 23, 2014. Accessed January 13, 2017. *http://www.baltimoresun.com/news/maryland/crime/bal-top-district-court-judge-calls-out-bail-bonds-lobby-in-debate-over-reform-20140123-story.html*.

**105**   The Abell Foundation. Publications Library: Publications List. Accessed April 5, 2017. *http://www.abell.org/search/site?ff[0]=bundle%3Apublication&pagetitle=Publication%20List&searchMode=publication* and Maryland Governor's Office of Crime Control and Prevention. Governor's Commission to Reform Maryland's Pretrial System, May 27, 2014. Accessed April 5, 2017. *http://goccp.maryland.gov/pretrial/* and *http://msa.maryland.gov/msa/mdmanual/26excom/defunct/html/31r*.

**106**   Koenig, Sarah. "Bail laws fight loom." The Baltimore Sun, October 30, 2001. Accessed Feb. 14, 2017. *http://articles.baltimoresun.com/2001-10-30/news/0110300003_1_bail-bond-industry-maryland-bail-bondsmen*.

**107**   Hunter, Jonathan. "The Topic of Cash Bail Reform Will Be Considered by Maryland's Highest Court." November 22, 2016. Accessed January 7, 2017. *http://www.your4state.com/news/maryland/the-topic-of-cash-bail-reform-will-be-considered-by-marylands-highest-court/611693541*.

**108**   Pay to Play? How Special Interests Seek Influence in Annapolis; A Common Cause Maryland "Follow the Money" Report, January 2017, *http://www.commoncause.org/states/maryland/research-and-reports/pay-to-play.html*.

**109**   Prince, Zenitha. "Holder Urges Md. Bail Reform." Afro, January 11, 2017. Accessed February 14, 2017. *http://afro.com/holder-urges-md-bail-reform/*.

**110**   Pay to Play? How Special Interests Seek Influence in Annapolis; A Common Cause Maryland "Follow the Money" Report, January 2017, *http://www.commoncause.org/states/maryland/research-and-reports/pay-to-play.html*.

**111**   Dresser, Michael. "Maryland bail bond industry's contributions hang over contested bill." The Baltimore Sun, March 25, 2017. Accessed April 4, 2017. *http://www.baltimoresun.com/news/maryland/sun-investigates/bs-md-sun-investigates-bail-20170325-story.html*.

**112**   Federal contributions are from the Federal Election Commission Individual Contribution data set and Committee Master file covering 2011 through October 11, 2016 [retrieved November 28, 2016]. Records were identified searching for key terms "bail," "bond," "surety," and "casualty," as well as certain additional company names. Data was reviewed to eliminate extraneous and unrelated entries.

**113**   114th Congress, 2d Session. "S 3541." Accessed April 4, 2017. *https://www.congress.gov/114/bills/s3541/BILLS-114s3541is.pdf* and 114th Congress, 2d Session H.R. 6061. Accessed April 4, 2017. *https://www.congress.gov/114/bills/hr6016/BILLS-114hr6016ih.pdf*.

**114**   United States Representative Ted Lieu. "Congressman Ted W. Lieu Introduces The 'No Money Bail Act 2016.'" February 24, 2016. Accessed February 14, 2017. *https://lieu.house.gov/media-center/press-releases/congressman-ted-w-lieu-introduces-no-money-bail-act-2016-0* and U.S. Congressman Ted Poe, Second District-Texas, Press Releases: Congressman Poe Introduces Bill to Bring Accountability to Federally Funded Bail Programs, September 13, 2016. Accessed February 14, 2017. *http://poe.house.gov/2016/9/congressman-poe-introduces-bill-to-bring-accountabilty-to-federally-funded-bail-programs* and *Congress.gov*. Accessed February 14, 2017.

"Incarceration's Front Door: The Misuse of Jails in America." Vera Institute of Justice, February 2015. Accessed February 11, 2017. *http://archive.vera.org/sites/default/files/resources/downloads/incarcerations-front-door-report.pdf*.

**115**   See also Jones, Michael R., "Unsecured Bonds: The As Effective and Most Efficient Pretrial Release Option." Pretrial Justice Institute. October 2013. *http://www.pretrial.org/download/research/Unsecured+Bonds,+The+As+Effective+and+Most+Efficient+Pretrial+Release+Option+-+Jones+2013.pdf*.

See Oregon Knowledge Bank, *http://okb.oregon.gov/portfolio-item/auto-notification/* accessed April 11, 2017 for more examples and studies. Henterly, Lael. "When Bail Is Set, the Rich Walk and the Poor Go to Jail." Seattle Weekly Times, August 23, 2016. Accessed
**116**   January 6, 2017. *http://www.seattleweekly.com/news/when-bail-is-set-the-rich-walk-and-the-poor-go-to-jail/*.

"For Better or for Profit: How the Bail Bonding Industry Stands in the Way of Fair and Effective Pretrial Justice." Justice Policy Institute, September 2012. Accessed February 11, 2017. *http://www.justicepolicy.org/uploads/justicepolicy/documents/_for_better_or_for_profit_.pdf*
**117**





