UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
GALVESTON DIVISION

| | |
|---|---|
| Aaron Booth, on behalf of himself and all others similarly situated,<br><br>   Plaintiff,<br><br>    v.<br><br>Galveston County *et al.*,<br>      Defendants. | Civil Action No. 18-cv-0104 |

## DECLARATION OF MICHAEL YOUNG

I, Michael Young, declare:

1. I am the Chief Public Defender for Bexar County, Texas. I am over the age of eighteen and of sound mind. I have personal knowledge of and could testify to the facts set forth in this declaration.

2. This declaration describes my experience successfully advocating for Bexar County to provide arrestees representation at their initial bail setting, as well as the way bail setting can prejudice case outcomes, and the necessity of counsel for avoiding that prejudice.

## I. Background

3. I am an attorney licensed to practice law in the State of Texas and have been so licensed since November 1995.  Most of my legal career has been devoted to the area of criminal law.  I began my career working as an Assistant District Attorney in Hidalgo County and Cameron County located along the border with Mexico.  I have operated a private criminal law practice providing criminal defense for 2004 through 2012.  I have worked as an Assistant Federal Public Defender for the Southern District of Texas, Brownsville Division prior to accepting the position as Chief Public Defender of the Bexar County Public Defender's Office in April 2015.

4.      As Chief Public Defender I manage the Bexar County Public Defender's Office. Our office operates as part of a hybrid indigent defense representation model, which includes the appointment of private criminal and juvenile defense trial and appellate attorneys.  The specific scope and type of cases our office handles is determined by the commissioners court and the judges before whom we practice.  My duties are both administrative and substantive.  The administrative duties are those reasonably related to the operation of any county department or division of government, including budgeting, compliance with county policies, supervision of employees and coordination with human resources, and planning and developing policies and procedures for the internal organization and operation of the Public Defender's Office.  In addition to the administrative duties, my position requires that I coordinate with the Judiciary and the Bexar County District Attorney's Office and the local criminal defense bar.  I work broadly to propose, develop, and implement policies and programs to improve indigent defense in Bexar County.  Finally, I coordinate with officials with the State of Texas and nationally to participate in and contribute to issues of indigent defense at the local, state and national level.

## II.      Overview

5.      Based on my experience as an attorney working in criminal law for 25 years, as well as my experience managing a public defender's office for 3 ½ years, it is my opinion that an arrested person's initial bail setting can irrevocably prejudice the outcome of their case. It is also my opinion that counsel is necessary to avoid that prejudice. I describe this opinion in Section III below.

6.      I have successfully advocated for Bexar County to provide representation to arrestees at their initial bail setting.  Initially, this representation was limited to those arrested persons suffering from a mental illness beginning in September 2015.  The scope of our representation at magistration was expanded to include all arrested persons for whom a bond had not been set nor were represented by counsel in January 2019.  In my opinion, the administrative burdens of implementing a system to provide counsel at initial bail setting are far outweighed by the relative harm suffered by arrestees who have their bail set without representation. I describe this opinion, and the mechanics of how Bexar County provides counsel at initial bail setting, in Section IV below.

## III.     Initial Bail Setting Can Irrevocably Prejudice the Outcome of a Criminal Case, and Counsel is Required to Mitigate that Prejudice

7.      My experience in multiple jurisdictions, as both a prosecutor and as a defense attorney, has led me to form the opinion that initial bail setting can irrevocably prejudice the outcome of a criminal case.

8.      When I was employed with the Cameron County District Attorney's Office in Brownsville Texas as a prosecutor, I would occasionally be assigned to attend initial magistration hearings (hereinafter referred to as the 15.17 hearing in reference to Tex. Code Crim. P. Art. 15.17) conducted by the municipal judges of Brownsville, Texas.  I was present to represent the district attorney's office. Also present, was the arrested person and the magistrate.  There was no provision of counsel to indigent arrested persons, but occasionally retained counsel would appear for their clients.  When retained counsel appeared they would present an argument to the magistrate that the arrested person was not a flight risk and request a lower bond.[1]

9.      When I started working as the Chief Public Defender in Bexar County, the practice was generally that the 15.17 hearing consisted of solely the arrested person and the magistrate.  A representative of the District Attorney's Office was on-site and had the option to appear at the 15.17 hearing, but generally did not do so. I attended and observed these hearings with my employees as part of our preparation to advocate for providing counsel at 15.17 hearings.

10.     The prejudices that can and do result from not having counsel present at the 15.17 hearing are many.  These include the lack of understanding of the criminal process and the purpose of the 15.17 hearing, the likelihood of making incriminating statements, and the inability of the arrested person to present evidence in favor of release to the magistrate.  Most dramatically, if an arrested person cannot present evidence in favor of pretrial release, the pretrial incarceration of the defendant has the coercive effect of clients entering pleas to offenses they did not commit simply to obtain their release. Each of these prejudices will be discussed below.

11.     Because of the nature and timing of the 15.17 hearing, an arrested person is often confused as to the purpose of the hearing.  While 15.17 details the admonishments that a magistrate must give, they are often recited quickly and in a perfunctory manner.  To the arrested person unfamiliar with the legal process, I have personally observed that the arrested person sees this appearance before a "judge" as their chance to tell their side of the story about the facts that led to their arrest.  This is not an unrealistic belief given their situation.  Obviously, if an arrested person tried to present their version of what occurred it is likely they will make admissions that are detrimental to their case.  This possibility is not cured by the magistrate admonishing that an arrested person has the right to remain silent: it is clear that many arrested persons see this as their opportunity to explain to the magistrate what happened that led to their arrest.  With counsel present

---

[1] This was the practice in Cameron County, Texas when I was employed with the district attorney's office in 2003-2004 and may or may not reflect the current practice in that jurisdiction.

they would advise their client about the purpose of the 15.17 hearing and that attempts to excuse or explain their actions would likely be detrimental to their interest.

12.   One of the primary purposes of the 15.17 hearing is to set the amount of bond for the arrested person. This is critical and often determines the outcome of the case. If an arrested person is released pretrial, they will have more time to prepare their defense and make a reasoned decision on how to proceed with the disposition of their case. If they are detained pretrial, the likelihood that an arrested person will enter a guilty plea simply to obtain their release is real and occurs with alarming frequency.

13.   The magistrate will, or should, consider many factors in making a decision on the amount of the bond. Typical reasons for pretrial release include ties to the community, employment, and stable housing. There are serious problems with the argument that the arrested person, alone and without any guidance, is expected to present these to the magistrate. First, the arrested person has been advised by the magistrate to remain silent. The magistrate may, or may not, ask the arrested person if there is anything they want to say about the amount of bond. This puts the arrested person in an untenable position. In addition, even if the arrested person does present to the magistrate information regarding their job, that they have stable housing and that they promise to appear as ordered in court, these statements are often discounted by the magistrate as self-serving and not credible based on the circumstance of the arrested person.

14.   By contrast, based on my personal experience, counsel is able to speak for the arrested person. Counsel knows and can quickly identify what factors will be persuasive to the magistrate. In addition to arguing that their client *told them* positive factors supporting release, attorneys can *verify* positive factors to present to the magistrate. For example, in representing the mentally ill at the 15.17 hearing, our attorneys would contact employers by phone to verify employment and present this to the magistrate and contact landlords or family members to verify addresses and the availability of stable housing. These are factors that are often crucial to a magistrate ordering an arrested person's pretrial release. Without a law degree or notice of how these factors bear on release, an arrested person not represented by counsel would not anticipate this information would be critical at the 15.17 hearing, and even if they did, they would lack the resources to obtain this information.

15.   The greatest prejudice resulting from pretrial detention that results from uncounseled 15.17 hearings is that an arrested person will eventually enter a plea to an offense they did not commit simply as a means to secure their release. I have observed that there are arrested persons who cannot secure their release from pretrial detention even when bonds are set at very modest level—three hundred dollars or even lower. For these individuals, without a bond reduction, the only possible manner to obtain their release is through final resolution of their case. In my experience, court-appointed attorneys, who are pressed for time, or eager to earn a fee through a plea agreement (or

both), will rarely file bond-reduction motions to argue for their clients' release, meaning that the bail set at magistration will remain in place in the vast majority of cases.  If an arrested person cannot obtain their pretrial release and they wish to assert their innocence, there is an extended amount of time before they can have their case heard before a jury. Given the extended amount of time that an arrested person has to suffer from pretrial detention, it is often the case that they will enter a plea of guilty even when they believe they are not guilty of the offense.  For example, in Bexar County, felony defendants are brought to court before an indictment is filed so that the prosecutor can make a plea offer before indictment. Sometimes, when a felony case is so weak that dismissal is appropriate, prosecutors offer a plea to a misdemeanor charge instead.

16.     I am personally familiar with the positive effects of providing counsel at the 15.17 hearings for indigent arrested persons.  In September 2015 our office began providing representation to indigent arrested persons suffering from a mental illness at the 15.17 hearing.  In Bexar County, Texas the 15.17 hearings are conducted 24 hours a day, 7 days a week.  Between 50,000 and 60,000 arrested persons are magistrated each year in Bexar County, Texas.  Our office hired three attorneys to provide representation at the 15.17 hearing for our clients suffering from a mental illness.  We were able to provide representation for 24 hours a day, 5 days a week.

17.     In order to evaluate the effect of having counsel present, we were able to compare the arrested persons suffering from a mental illness that our office was able to represent on the 5 days we were present with the arrested persons suffering from a mental illness who were seen by a magistrate on the 2 days we were not present.  The results of the first year of operation of the program showed that for the same population of arrested persons suffering from a mental illness, 77% of those represented by the Bexar County Public Defender's Office at the 15.17 hearing were released on a personal bond.  For those arrested persons not represented by our office, only 57% were released.  The presence of counsel resulted in a great disparity between who received a personal bond and those who did not.  An additional evaluation was conducted for the same period to determine if the presence of counsel had an effect later in the case process.  We were able to determine that for arrested persons we represented at the 15.17 hearing and were released on a personal bond, 75% of those cases were closed satisfactorily and for non-represented arrested persons released on a personal bond only 58% closed satisfactorily.[2]  These reports are attached to my declaration as Exhibit 1.

## IV.     The Harm Suffered by Arrestees Who Must Represent Themselves at Bail Setting Far Outweighs the Administrative Chore of Providing Counsel

---

[2] All persons granted personal bonds are supervised by pretrial services.  If an arrested person commits another offense or fails to appear in court, their case may be closed "unsatisfactorily".

18.     Providing counsel at the 15.17 hearing is not without its logistical challenges, but there are always practical ways to address these challenges.  For 15.17 hearings to happen at all, there must be some existing system to bring together the magistrate, the arrested person, the district attorney, and often the arresting agency to make the hearings happen. Provision of counsel for the arrested person can be incorporated into the existing system for coordination among these entities.

19.     I obtained the legal authority to represent persons at the 15.17 hearing when the Bexar County Criminal District Court Judges and the County Court Judges hearing criminal matters each signed a standing order giving the Bexar County Public Defender's Office the authority to represent all indigent, arrested persons suffering from a mental illness at the 15.17 hearings.[3]  The orders stated that the appointment was for the limited purpose of magistration and that our office's representation did not extend beyond magistration.  After magistration, counsel would be appointed in accordance with the local indigent defense plan.[4] These orders are attached to my declaration as Exhibit 2.

20.     The logistical problem-solving that the County engaged in to support issuance of these standing orders is far outweighed by the benefit that has accrued to arrested individuals represented at 15.17 hearings, and to the County budget.

21.     Our office initially sought to represent the mentally ill at the 15.17 hearings for various reasons.  Bexar County has had a public defender's division that represented defendants suffering from a mental illness in misdemeanor court since approximately 2006.  Therefore, we possessed particular expertise working with this population.  In addition, because they suffered from a mental illness, this population was less able to advocate for themselves and more likely to suffer the negative consequences of pretrial incarceration. My view—which turned out to be correct—was that providing counsel at 15.17 hearings would lower pretrial detention rates for this population.

22.     It is my personal belief that pursuant to the United States Constitution, United States Supreme Court precedent and provisions of the Texas Code of Criminal Procedure that indigent arrested persons are entitled to representation at the 15.17 hearing.  In addition to the legal arguments in favor of representation at 15.17, there is a fiscal benefit: our program reduces jail bed day utilization and therefore results in financial savings to the county.  As part of the review of the second year of our program to provide representation for mentally ill arrested persons at magistration, an analysis of the average

---

[3] The body of each of the two orders was virtually identical with the exception that one dealt with felony offenses and one with misdemeanor offenses.

[4] Note that the indigent defense plan provided that the Public Defender's Office would be appointed to misdemeanor mental health cases.  Therefore, some portions of the arrested persons represented at 15.17 were also appointed to our office for representation thereafter.

length of confinement for cases that were presented for release but denied a personal bond by the magistrate.  The relevant section of the report reads as follows:

> Cases that are denied a mental health PR bond at Central Magistrate are monitored to determine the average length of confinement before release. For denied cases during the 2016-2017 fiscal year, the average confinement was 12.6 days. This resulted in 119 denied clients being detained for a total of 1,504 days. Since the program's inception, the denied clients have been held for 2,740 days total.
>
> Using the monthly averages, an estimate was calculated to project the number of confinement days the program has avoided. Multiplying the number of cases granted per month times the monthly average days of confinement, the data shows a total of 3,615.5 days of confinement avoided by the efforts of this program for the 2016-2017 fiscal year alone. Since 2015, the mental health PR bond jail diversion grant has successfully avoided approximately 6,255.1 days of confinement.

Ex. 1. Incarceration costs vary throughout the state, but it is generally accepted that incarcerating mentally ill arrested persons costs approximately $200 per day, meaning the 6,255.1 jail bed days saved translates into $1,251,020.

23.     Because of the positive results from providing representation to arrested persons suffering from a mental illness at the 15.17 hearing, our office began efforts to extend that representation to all arrested persons.  In that regard, we solicited from and received a standing order from both the Criminal District Court Judges and the County Court at Law Judges hearing criminal matters to represent all arrested persons at 15.17 with some limitations.[5]   These orders were effective in January 2019 and are attached as Exhibit 3.

24.     Because the public defender's office was already working at magistration representing arrested persons at the 15.17 hearing who suffered from a mental illness, extending the representation involves minor logistical changes to review potential arrested persons to determine if they qualify for representation under the new order. Each person arrested and presented for processing at the 15.17 hearing is accompanied by a "booking slip."  This document contains identifying information and lists the reason for the arrest.  Our attorneys will seek out the arrested person in the holding area to discuss their case and determine if they want our office to represent them at the 15.17 hearing.  If they do, we then review the criminal history, contact family members and/or employers

---

[5] The order from both the misdemeanor and the felony judges was again virtually identical.  The orders stated that the Bexar County Public Defender's office was appointed to all arrested persons at the 15.17 hearing with the exception of cases where a bond was already set, cases where an attorney was already appointed or where the arrested person refused our services.

and gather as much positive information to present to the magistrate.  We then discuss the case with the assistant district attorney on duty and ask if they can agree to a personal bond.  If not, when the arrested person is called before the magistrate, we appear with them and argue for a personal bond or low bond depending on the circumstances.

25.     When we initially started providing counsel for mentally ill arrested persons at 15.17 hearings, the original grant we received from the Texas Indigent Defense Commission provided funds to hire three (3) full-time attorneys.  These original three attorneys continue to work on representing the mentally ill at the 15.17 hearing and are also providing representation to all under the new standing orders.  The Bexar County Budget Department, County Manager, and the Commissioners' Court have recognized the value of this program and have supported its expansion.  In that regard, above the amount awarded in the grant, Bexar County has provided my office with funding to hire an additional four (4) attorneys to provide representation at magistration.

26.     We are very early in the process of providing representation to all arrested persons at magistration therefore we have not gathered data on this portion of the program.  However, based on my past experience and what I have observed thus far, I anticipate that the outcomes will be similar to the outcomes obtained in the program to represent the mentally ill at magistration.  Despite the short period of time we have been representing all at magistration, the initial results are promising.  We have obtained personal bonds for numerous clients, successfully argued to reduce charges in some cases and successfully argued for a lower bond than was recommended by the assistant district attorney.  Respecting arrested persons' constitutional right to counsel is well worth the money and effort.

I declare under penalty of perjury that the foregoing is true and correct. Executed on - February 11, 2019.

_____

Michael Young

# EXHIBIT 1



**FIRST ANNUAL REVIEW OF PUBLIC DEFENDER REPRESENTATION**

**AT CENTRAL MAGISTRATION**

**SUMMARY**

The Bexar County Public Defender's Office began trial operations at the Central Magistration Facility on September 1, 2015. This report serves as a review of the first year of the Office's tenure by examining its evolution and focuses on both successes and areas of advancement. The Bexar County Public Defender's Office ("BCPDO") was awarded a grant from the Texas Indigent Defense Commission on June 18, 2015.  The grant allows attorneys from the BCPDO to be present at the Central Magistration Facility ("CMAG"), counsel arrestees with mental illness on the magistration process, represent them before the magistrate, and facilitate their release on personal bonds with mental health treatment required as a condition.  The overall objectives of the program are to reduce jail costs, reduce recidivism, and improve outcomes of mentally ill defendants.  By providing for the immediate appointment of the BCPDO to individuals who have been identified as appropriate for diversion from the Bexar County Jail to in-patient and out-patient treatment programs, mentally ill defendants are more likely to get help that can address the underlying causes of the behaviors that have led them into the criminal justice system.

The program has had a significant impact in its first year of operation. The BCPDO has streamlined the process of identifying those arrestees potentially eligible for diversion. The Office has increased the number of arrestees assessed for diversion and released on personal bond. Once released, BCPDO clients are more likely to complete the requirements of personal bond than other arrestees. Clients represented by the BCPDO are also more likely to actively engage in their mental health services following release.  The drawback of this past year has been the limited scope of cases in which the office could provide representation. Of 7,806 potential clients with indications of mental illness, our office has provided representation in 262 cases. Low case volume has limited expected jail population reductions. However, the success of those clients we represented clearly demonstrates the potential for the office.

**OVERVIEW of PROCESS**

The BCPDO attorney works with the detention staff, district clerk, mental health assessor, mental health clinician, district attorney, and magistrate judges to represent indigent arrestees with mental illness at their Article 15.17 hearings. BCPDO representation begins with the identification of potential clients and a subsequent determination of indigency.  The BCPDO attorney advises the clients of their rights, charge, and possibilities for release, including the opportunity to receive a personal bond with required mental health treatment as a condition of the bond. The client must consent to the mental health assessment and conditions before proceeding. Once the client has accepted the services, the personal bond interview ("PRI") and the mental health assessment are performed. The BCPDO attorney then conferences with the on-site assistant district attorney to determine if there is an agreed recommendation

for release on a personal bond.  Finally, the PRI, mental health assessment, and agreed recommendation (if any) are submitted to the judge for review. After these documents have been reviewed the magistrate judge calls the "Mental Health Docket".  The judge advises clients of their rights and charges, sets their bond, and determines if they are requesting court-appointed counsel. After arguments from the BCPDO attorney and the district attorney, the judge grants or denies personal bond conditioned upon mental health treatment. From start to finish, the entire representation of a client can take anywhere from 3-9 hours.

**Working Hours:**

The BCPDO staffs CMAG with three full time Assistant Public Defenders ("APD"). Initially, the office planned to operate at the facility 24 hours a day for five days a week. The BCPDO has attempted several schedule variations to more efficiently provide representation to a greater number of clients. The onsite mental health services at CMAG are provided by the Center for Healthcare Services ("CHCS"). Arranging mental health assessments and creating treatment plans has proven difficult due to staffing changes by CHCS. At the time of the grant proposal, CHCS was not yet meeting its goal of providing a mental health professional 18 hours a day/7 days a week. CHCS staffed a morning clinician working 7:00 am to 3:30 pm Sunday-Sunday and an evening clinician working Monday-Friday, 7:30 pm to 4:00 am.

After working 24 hours/day the first week in September, the BCPDO attorneys shifted hours to mirror the clinicians. Soon after beginning this schedule, the BCPDO was informed by the Bexar County Mental Health Department ("MHD") that there would no longer be a "weekend clinician" available after September 16, 2015.  On that date, the CHCS clinicians began a Monday-Friday schedule with only a morning and evening clinician during those days. The BCPDO again shifted its schedule to mirror these working hours. In October, CHCS shifted the morning clinician's working days to Tuesday-Saturday and the BCPDO attorneys adjusted their schedule accordingly. The CMAG attorneys worked these hours until March 21, 2016. On March 10, 2016, the BCPDO was informed that CHCS hired a weekend clinician whom would be working 7:00am-5:00pm on Saturday and Sunday. The regular morning clinician reverted to a Monday-Friday schedule. Due to this, the BCPDO began a 24 hour schedule working Monday-Friday on March 21. These hours were adjusted in an attempt to provide representation to clients who are "already magistrated" as the magistrate judges will not allow the BCPDO to represent clients who have already been through their Texas Code of Criminal Procedure Article 15.17 hearing.  This schedule continued until May 1, when CHCS again shifted the weekday clinician's schedule to work Tuesday-Saturday with another morning clinician coming in on Sunday and Monday. Due to only having three APDs, the BCPDO is unable to cover the remaining two days of the week when a clinician is present.

**Identifying Clients:**

At CMAG, the BCPDO is authorized to represent clients who have a qualifying mental illness and are determined indigent. Special Order No. 67606, issued by the Bexar County District Court Judges on July 15, 2015, states, in part, the following:

> The appointment of the of the Bexar County Public Defender's Office shall be for the limited purpose of representation of the indigent arrested person during the magistration process and related solely to the determination of the bond and the conditions of the bond for arrested person described in this order…

2

IT IS THEREFORE ORDERED, that effective September 1, 2015, in any case in which an arrested person has been determined to be indigent and has requested court appointed counsel in accordance with the policies and procedures contained in the Bexar County Criminal District Courts Indigent Defense Plan, and additionally has been deemed to have a mental illness, the Bexar County Public Defender's Office is appointed to represent said arrested person for the limited purpose of magistration only.

A potential client can be identified as mentally ill through several avenues: (1) an affirmative answer to the Arrest & Booking Sheet "Law Enforcement Questions;" (2) CCQ Hit; or (3) affirmative answers to the Brief Jail Mental Health Screenings. The "Law Enforcement Questions" are placed on the back of the arresting officer's "Booking Sheet." The Booking Sheet supplies identifying information for the arrested person, including the current charge(s). The back of the Booking Sheet has four questions that the arresting officer is supposed to ask the arrested person:

1. Have you ever been diagnosed as having a mental illness by a doctor of by a mental health professional? (Circle 1)  YES  NO
2. Have you ever or are you currently taking any medication for mental illness? (Circle 1) YES NO
3. Have you ever tried to kill yourself? (Circle 1)  YES NO
4. Do you currently have thought of killing yourself? (Circle 1)  YES NO

If any of these questions are circled "yes" the person is identified as having an indication of mental illness.[1] If all of these questions are answered "no," the Pre-Trial Mental Health Assessor will run the Continuing Care Query or "CCQ." The CCQ is a statewide system to identify if a person has previously received mental health services from a state-sponsored mental health provider. Finally, if the arrested person answers "no" to all questions and is not in the CCQ system, the Brief Jail Mental Health Assessment ("BJMHA") is performed by the Mental Health Assessor. The BJMHA is an eight-part question series asking the following questions:

1. Do you *currently* believe that someone can control your mind by putting thoughts into your head or taking thoughts out of your head?
2. Do you *currently* feel that other people know your thoughts and can read your mind?
3. Have you *currently* lost or gained as much as two pounds a week for *several* weeks without even trying?
4. Have you or your family or friends noticed that you are *currently* much more active than you usually are?
5. Do you *currently* feel like you have to talk or move more slowly than you usually do?
6. Have there *currently* been a few weeks when you felt like you were useless or sinful?
7. Are you *currently* taking any medication prescribed for you by a physician for any emotional or mental health problems?
8. Have you *ever* been in a hospital for emotional or mental health problems?

---

[1] If the person answers "yes" to currently having thoughts of killing themselves, "suicide protocol" is put in place and the person is handcuffed and placed in a cell alone until assessed by the clinician or nursing staff.

If the arrestee answers "yes" to two of the Questions 1-6 or "yes" to either Question 7 or 8, he or she will be referred to the BCPDO. Any of these methods provide an indication of mental illness that requires further evaluation by the clinician.

Once a client is identified as potentially having a mental illness, the attorney must determine if he or she  is eligible for a personal bond, as provided for by Articles 17.03 and 17.032 of the Texas Code of Criminal Procedure. To begin this vetting process, the APD must request the potential client's criminal history from the district clerk's office. The criminal history is reviewed for informational purposes. Once it is determined that the potential client is eligible for release on a personal bond, the APD requests pre-trial services interview the arrestee to determine if indigent and eligible for the public defender's services. If indigent, the client must agree to mental health services, knowing that the judge will make treament a condition of his or her bond if released. For many potential clients, this is a daunting requirement.  If the client understands, agrees, and wants services, the BCPDO accepts the case.

**Personal Bond Interview/Mental Health Assessment:**

Once a client is determined to have an indication of mental illness, be indigent, agree to services and has an eligible charge they must go through another "vetting process" with the clinician from CHCS. The clinicians do not refer anyone for services who is currently withdrawing from a drug that causes potentially harmful physical withdrawal symptoms. The CHCS clinicians do not accept any clients who do not have a "verified" address (confirmed through a third party) and do not live in Bexar County. If the address cannot be verified, CHCS is unable to provide services and the application is submitted to the judge for release on a personal bond without mental health treatment.

If there is no clinician present to perform assessments, the magistration hearing is bifurcated. The first hearing entails the advising of rights, requesting court appointed counsel, and setting bond. The personal bond interview is conducted prior to the clinician's arrival and the mental health assessment is delayed until that time.  Once the clinician arrives the process proceeds normally. The magistrate judges agreed to this system in order to give the client an opportunity to bond out while awaiting the clinician's arrival.

**METRICS**

The BCPDO collects data during each shift to catalogue the arrestees coming through CMAG.  If any of the arrestees are identified as having a potential mental illness, their information is recorded for evaluation. If the on-duty APD determines they are unable to present the case to the magistrate for release, this reason is categorized and noted. This data collection process has evolved over the year and provides the BCPDO the opportunity to examine areas for improvement.

**Cases Reviewed:**

From September 1, 2015-September 31, 2016, the BCPDO worked a total of 554 shifts at CMAG. During those shifts, we reviewed 7,806 potential clients who had an indication of mental illness. Due to various factors, not all of these clients were presented to the magistrate judges.  Some of the reasons for ineligibility are statutory, while others are a result of local policy or logistical problems in the system.  The table below lists the reasons for ineligibility from greatest to least.  The single greatest reason for ineligibility was due to the arrested person having a "violent charge".  This is an example of

clients that are statutorily ineligible for a personal bond.  Other significant reasons for ineligibility were "already magistrated" or "timed out/homeless".  These are examples of logistical problems in the system that could be addressed to increase the number of eligible cases.

| Reason for Ineligibility | Total | Percent |
|---|---|---|
| Violent Charge | 1355 | 17% |
| Remanded Without Bond | 836 | 11% |
| Parole/Probation | 767 | 10% |
| Already Magistrated | 766 | 10% |
| Muni. Court Warrants/Tickets/Civil | 596 | 8% |
| On Bond | 582 | 7% |
| Timed Out (Include: Homeless) | 572 | 7% |
| Accepted: Disqualifying Reason | 448 | 6% |
| Unknown/Other | 310 | 4% |
| Presented: Granted/ Denied | 262 | 3% |
| Out of County Warrant | 246 | 3% |
| Violent History | 233 | 3% |
| Warrant/MTRP | 189 | 2% |
| Out of County Resident | 123 | 2% |
| Not Indigent | 111 | 1% |
| Bond Forfeiture | 110 | 1% |
| Bond Increase | 91 | 1% |
| Suicidal | 68 | 1% |
| Habitual | 54 | 1% |
| Refused Services/Attorney/Clinician | 52 | 1% |
| Intoxicated | 35 | <1% |

**Cases Presented:**

If determined eligible, the BCPDO presents the client for release to the magistrate judge. From September 1, 2015 through September 31, 2016, the BCPDO presented 262 cases for release to the magistrate judges. Of those cases presented, 197 were granted and 65 were denied.   The number of personal bond hearings fluctuates from month-to-month and the overall number of bond hearings per month is displayed in the chart below:



The presence of the BCPDO has assisted in streamlining the overall process of identifying arrested persons for release on a personal bond with mental health services. This is demonstrated by the overall increase in defendants released since the BCPDO began operations.  According to data provided by Pre-Trial Services and the MHD, from February 2014-April 2015, 125 defendants were diverted to CHCS.  In a comparable 10 month time period (from September 2015-June 2016), 308 defendants were diverted to CHCS.  This represents a 150% increase in the number of releases since the BCPDO began operations. This is a reflection of  the BCPDO's positive impact at CMAG through a formalization of the process required in identifying clients for diversion.

### Assessments:

The presence of the BCPDO has increased both the number of clients assessed for diversion and those released. An analysis of the numbers provided by the Mental Health Department from January 2015-August 2015 indicate that a total of 1,982 assessments were performed. With the help of the BCPDO, a total of 2,402 assessments were performed for the same time period the following year. More importantly, the number of full assessments dramatically increased. In April 2015, the MHD began differentiating the type of assessment performed, whether it was a brief, full, or suicidal ideation assessment. From April 2015 until August 2015, 306 full assessments were completed.  Upon introduction of the BCPDO in September 2015 through August 2016, a total number of 1,200 **full assessments** were performed.

### Releases:

The overall objective of the grant was to provide counsel at Article 15.17 hearings and assist in diverting eligible arrestees from the jail.  The APD's ability to increase compliance and cooperation of the arrestee in the mental health interview and the resulting number of people referred to treatment has facilitated this goal. While there is continued room for improvement, we believe that this objective has been met, and the importance of representation at an Article 15.17 hearing by an APD cannot be overstated. This is most clearly demonstrated by comparing the release rate of arrested persons who are represented by an APD to those presented for release without representation. When an APD is not on duty, CHCS is referred clients by one of the several Pre-Trial employees. As demonstrated by the table below, the clients represented by the BCPDO are much more likely to be granted personal bonds than those who are not. The average release percentage for clients with representation by BCPDO is 77% and is only 57% without.

These numbers are further explained in the following table:

| | Presented: | Released: | BCPDO Releases/Presentations: | Non-BCPDO Releases: |
|---|---|---|---|---|
| September: | 37 | 22 | 13/16 (81%) | 9/21 (43%) |
| October: | 51 | 41 | 14/17 (82%) | 27/34 (79%) |
| November: | 38 | 24 | 10/13 (77%) | 14/25 (56%) |
| December: | 48 | 28 | 15/22 (68%) | 13/26 (50%) |
| January: | 55 | 33 | 19/25 (76%) | 14/30 (47%) |
| February: | 54 | 32 | 21/34 (62%) | 11/20 (55%) |
| March: | 52 | 35 | 20/28 (71%) | 15/23 (65%) |
| April: | 54 | 37 | 17/21 (81%) | 20/33 (61%) |
| May: | 49 | 33 | 15/19 (79%) | 18/30 (60%) |
| June: | 40 | 23 | 13/17 (76%) | 10/23 (43%) |
| July | 33 | 20 | 10/10 (100%) | 10/23 (43%) |
| August: | 37 | 26 | 14/18 (78%) | 12/19 (63%) |
| September: | 38 | 28 | 16/22 (73%) | 12/16 (75%) |

It is reasonable to assume that the higher percentage of releases with BCPDO representation is due to the fact that the APD is present to advocate before the magistrate for release on personal bond. In cases where the BCPDO is not involved, Pre-Trial will compile documents related to release on a personal bond, but these documents are submitted to the magistrate without elaboration or argument. The ability of the APD to not only advocate for the personal bond, but to address concerns the magistrate may have and relate the personal experience of speaking to the client, their family and the clinician all contribute to the higher release percentage for clients with BCPDO representation.

Once released, BCPDO clients are also more likely to complete the requirements of the personal bond, resulting in fewer bond revocations and better case dispositions[2]. As shown below, clients represented by an APD at CMAG have higher compliance rates and lower Failure to Appear ("FTA") rates than those released without[3].

---

[2] Data concerning case disposition is still being collected and analyzed. It is presumed that in any given case where there is no failure to appear and/or the defendant is not re-arrested will result in a better case disposition.
[3] Any given case is "Closed Satisfactorily" if the client makes all court appearances, participates in treatment and is not rearrested prior to case disposition.

 

Clients represented by an APD are more likely to actively engage in their mental health services. This is critical to the success of any program to divert persons from jail into mental health services. The APD visits extensively with potential clients for the program, explains program requirements in detail, and moves forward only when the client expresses a genuine desire to participate in the mental health services. Once a defendant begins mental health services, some do not continue to participate in the treatment. They are then considered to have become "non-engaged" in services. In order to reduce recidivism and improve case outcomes, defendants must accept the services and remain engaged in treatment. The charts below show that defendants granted personal bonds without APD representation are more than twice as likely to refuse or not engage with their mental health services provider:



As identified in the grant proposal, CMAG did not previously allow for the representation of these individuals by counsel during this process. Once clients are released, they are assigned a pre-trial officer in the Special Needs Unit ("SNU") who supervises them until the completion of their criminal case. At least one SNU officer remarked that clients represented by the BCPDO at CMAG are markedly better at both becoming and staying engaged with mental health services. Clients reported that speaking with an attorney encouraged them to work hard to fulfill the conditions of their bond. Based on results obtained in the first year of operation, it is logical to assume that more resources, experience, and better efficiencies will expand the BCPDO's impact in the future.

**Successes:**

While data collected indicates that representation by the BCPDO correlates with better outcomes, this is further demonstrated by the success of individual clients.  After representation at CMAG, if the charge is a misdemeanor, the Mental Health Department of the Bexar County Public Defender's Office will continue representation of the client. Once released from CMAG, public defender clients have an intake appointment that day or within the next two days. They can expect to see a psychiatrist within the next two weeks. This minimal waiting time is extraordinary when compared to the average 3-6 month waiting period for the "average" client seeking an appointment with a psychiatrist.[4]

The importance of prompt access to legal and mental health services cannot be understated. Many clients are unemployed or disabled and without social support and a network of dependable providers. Ready access to affordable services can be life-changing.  One of the most surprising aspects of representation at CMAG is the overwhelming number of people who *want* the mental health services. Clients will often remark that they knew they needed to seek treatment, but were unsure where to start. The individual successes of the client are not easily reduced to numbers. Instead, we offer a few examples to show the impact this has had on our client's lives:

- A client who was released with mental health services, was offered Mental Health Court Pre-Trial Diversion. This client appears in court on a monthly basis to track her progress and has been compliant with treatment and probation at every hearing.
- A client with no criminal history who was released on a personal bond with mental health services was compliant with bond conditions. The assessment for the Mental Health specialty court was so positive that the program recommended the Mental Health Pre-Trial Diversion program, despite his charge, which normal Pre-Trial Diversion precludes. The client proceeded with a "regular" Mental Health Court plea that allowed charge reduction, a deferred adjudication, and reduced fines.
- A client with enhanced misdemeanor charges was dealing with substantial personal and health difficulties, including new charges (creating new warrants), drug addiction, and finding a place of treatment. Eventually a local medical home accepted the client and a two-case plea deal was negotiated with the condition that the client to stay at the local treatment center. Since that time, the client has remained compliant with probation, continued treatment and residency at the treatment center, and attained awards for sobriety status. Her probation officer reports she has been prompt and compliant.
- A client was homeless and unemployed at the time of their arrest.  He was diverted from jail and released on a personal bond with electronic monitoring, mental health treatment and placement in a local homeless shelter. The assigned attorney approached the prosecutor, who agreed to dismiss the case if the client appeared on time. The client appeared on time in clean, ironed clothes and a new haircut and the case was dismissed.  Several months later the BCPDO followed up to check on the status of the former client.  The follow-up interview took place at the furnished apartment the client had obtained through the San Antonio Housing Authority.  It is also important to note that the client insisted that the interview take place on a weekend so he would not have to take time off from his new full-time job.

---

[4] The 3-6 month figure was provided by the Bexar County Mental Health Department.

**AREAS OF ADVANCEMENT**

The BCPDO has met its initial objective of informing arrestees of their rights, representing them at the initial Article 15.17 hearing, and facilitating their release to an appropriate out-patient treatment program in lieu of transport to the Bexar County Jail. While the BCPDO has made significant strides in the representation of arrestees with mentally illness at CMAG, there are several areas where further improvement is necessary.

The BCPDO aimed to increase the utilization of personal bonds for indigent arrestees with mental illness through increased cooperation and interest on the part of the arrestee. We believe this has been accomplished, but issues with attorney-client confidentiality remain. Currently there is no guarantee of confidentiality at CMAG. If a transport officer is available, the APDs speak with clients at a desk located in the middle of the CMAG facility, which is surrounded by cells, detention officers, police officers and other staff. If no transport officer is available, the APD is required to speak to the client through a mesh screen at the cell.  To speak with clients, the APD must first advise the client about the non-confidential nature of their conversation, thereby undermining the attorney-client relationship.  If the client agrees to waive confidentiality, the APD must discuss the client's mental health issues, a sensitive subject which they do not want disclosed to an audience.  While confidentiality continues to be a concern, the BCPDO believes that it has achieved the best results possible under the current model.

Currently, magistrates will only approve the release of an arrested person with a verified home address who agrees to begin/transfer outpatient mental health services at CHCS.  Originally, the BCPDO could refer homeless individuals for release to Haven for Hope. In December, the BCPDO was informed that it could no longer refer clients to Haven for Hope because of a change in local policy. As a result, the office is unable to obtain release for persons who are homeless. By working with local officials and Haven for Hope, the BCPDO hopes to address this gap in services in the coming year.

To increase release on personal bond, the BCPDO has begun advocating for the release of clients who are currently in services with another provider, with the condition that they continue with their current services.  CHCS has informed the BCPDO that they have hired a fourth clinician and plan to move to a 24 hour schedule, 5 days of the week, with a morning clinician the remaining two days. The BCPDO plans to increase personnel to match these hours and provide more representation to indigent and mentally ill clients.

The poor physical layout of CMAG continues to result in underutilization of resources.  On September 6, 2016, the Bexar County Commissioners approved a proposal to move CMAG operations to the Bexar County Jail. The BCPDO anticipates that a new facility designed with the Bexar County Public Defender's Office in mind could alleviate several of the barriers encountered by the program.

**CONCLUSION**

The Bexar County Public Defender Office's representation of arrestees with mental illness at Article 15.17 hearings is the first of its kind in Texas.  This has raised unique questions regarding the correct processes and the office's scope of representation. The past year has been a learning experience for both this office and judges alike. It has required the district, county and magistrate judges to examine

underused statutes and determine the best path forward.  Ultimately, the implementation of this program has required collaboration from all levels of judges, city and county officials, and countless other agencies. The BCPDO anticipates that this cooperation will continue in years to come, allowing the office the opportunity to provide constitutionally required representation to all arrested persons.

Michael L. Young
Chief Public Defender
Bexar County Public Defender's Office
Paul Elizondo Tower
101 W. Nueva, Suite 370
San Antonio, Texas  78205
(210) 335-0701
(210) 335-0707 fax
michael.young@bexar.org

BEXAR COUNTY PUBLIC DEFENDER'S OFFICE



# CENTRAL MAGISTRATE MENTAL HEALTH PR BOND

## YEAR 2 REPORT

---

### OCTOBER 1, 2016 – SEPTEMBER 30, 2017

---

### PREPARED BY

Stacey Eure, Data Analyst and Program Coordinator

Michael L. Young, Chief Public Defender

Bexar County Public Defender's Office

### PREPARED FOR

Texas Indigent Defense Commission

PAUL ELIZONDO TOWER
101 WEST NUEVA STREET, SUITE 370
SAN ANTONIO, TEXAS 78205

# Contents

SECTION 1: DATA.............................................................................................................................. 3

   Reviewed ........................................................................................................................................ 3

   Presented........................................................................................................................................ 4

   Granted........................................................................................................................................... 5

   Denied ............................................................................................................................................ 6

SECTION 2: CHANGES TO POLICY & PROCEDURE.................................................................. 6

   Shift Standardization ..................................................................................................................... 6

   Extended Leave ............................................................................................................................. 6

   Case Qualification.......................................................................................................................... 6

SECTION 3: RESULTS & FISCAL COMPARISON ....................................................................... 7

   Overall Results .............................................................................................................................. 7

   Judicial Engagement & Compliance................................................................................................ 7

   Mental Health Engagement & Compliance ..................................................................................... 8

SECTION 4: CONCLUSION ............................................................................................................ 9

O V E R V I E W

Bexar County, Texas was awarded a grant from the Texas Indigent Defense Commission (TIDC) for the program to provide representation to indigent arrested persons upon the first appearance before a magistrate.  This report provides a detailed summary of the program's statistics for the second year of its five-year provisionary grant. The data¹ provided was compiled in coordination with Bexar County Judicial Services Pretrial division and were not all tracked by the Bexar County Public Defender's Office (BCPDO).  This report provides an overview and comparison of the 2016-2017 fiscal year standings.

---

### SECTION 1: DATA

REVIEWED

All booking slips with a charge of Misdemeanor class B or higher coming into Central Magistrate (CMAG) are screened for potential acceptance into the program. The number of incoming booking slips fluctuates with arrest statistics. Of the screened cases, only cases with an indication of mental illness are entered into our data and reviewed. During the reporting period (Oct 2016-Sep 2017), the BCPDO reviewed a total of 7,781 booking slips.



The total number of individuals magistrated plays a significant role in the potential individuals to be reviewed. As stated above, these cases must qualify under the mental health component before being reviewed. The following data indicates similar patterns and fluctuations in the number magistrated that explain the variations we experience. In terms of Reviewed cases, the program has experienced a trend of January - June being generally higher. The number of cases qualifying for review has a tendency to decrease July - December. The total individuals magistrated have shown the same tendency.



| | OCT | NOV | DEC | JAN | FEB | MAR | APR | MAY | JUN | JUL | AUG | SEP |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Magistrated | 4251 | 3798 | 3935 | 4491 | 4259 | 4856 | 4673 | 4576 | 4640 | 4706 | 4551 | 4344 |
| Reviewed | 489 | 585 | 675 | 828 | 784 | 906 | 600 | 693 | 659 | 573 | 571 | 418 |
| % Reviewed | 12% | 15% | 17% | 18% | 18% | 19% | 13% | 15% | 14% | 12% | 13% | 10% |

Comparing the first two years of the program's reviewed cases, the statistics retain a similar trend. This is significant due to staffing absences further explained in Sections 2 and 3. Overall, the program successfully reviewed an additional 390 booking slips; a difference that should further increase in the following fiscal year.



| | OCT | NOV | DEC | JAN | FEB | MAR | APR | MAY | JUN | JUL | AUG | SEP |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| FY 15-16 | 546 | 567 | 619 | 623 | 626 | 716 | 802 | 729 | 517 | 588 | 622 | 436 |
| FY 16-17 | 488 | 585 | 675 | 828 | 784 | 906 | 600 | 692 | 661 | 573 | 571 | 418 |

PRESENTED

During the 2016-2017 fiscal year, the program presented 424 cases before the judges at Central Magistrate; 178 cases more than the previous fiscal year. The attorneys presented 42% more cases with only a 5% increase in the number of cases reviewed. This statistic is a substantial display of the program developing an efficient system over the course of the first year and further expanding the program capabilities. This will be further discussed in Part 3.



| | FY 15-16 | FY 16-17 |
|---|---|---|
| Presented | 246 | 424 |

Of the cases reviewed, many are subject to rejection based on the provisions of the Criminal Laws of Texas sections 17.03 and 17.032, in addition to the program's Special Order. The number of cases reviewed directly influences the number of cases we are able to present. This statistic is further evidence of the impact that the total number magistrated has on the program.



| | OCT | NOV | DEC | JAN | FEB | MAR | APR | MAY | JUN | JUL | AUG | SEP |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Reviewed | 489 | 585 | 675 | 828 | 784 | 906 | 600 | 693 | 659 | 573 | 571 | 418 |
| Presented | 32 | 38 | 44 | 38 | 34 | 48 | 20 | 32 | 43 | 35 | 40 | 21 |
| % Presented | 7% | 6% | 7% | 5% | 4% | 5% | 3% | 5% | 7% | 6% | 7% | 5% |

Slower months can be explained by reasonable circumstances. Compared to the previous fiscal year, February should have seen an increase; however, one attorney received a summons for jury duty and was out of the office for a week. The decrease in April presentations was the result of one week with scheduled trainings in addition to a holiday. This reduced the program's standard 15 shifts per week to 5 shifts for that week. We also experienced a decrease in September due to time off that will be further explained in Part 3. Despite these outliers, the program averaged an increase of roughly 15 additional presentations per month than the previous year.



**Presented Cases**
Fiscal Year Comparison

| | OCT | NOV | DEC | JAN | FEB | MAR | APR | MAY | JUN | JUL | AUG | SEP |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| FY 15-16 | 17 | 13 | 22 | 25 | 34 | 28 | 21 | 19 | 17 | 10 | 18 | 22 |
| FY 16-17 | 31 | 38 | 44 | 38 | 34 | 48 | 20 | 32 | 43 | 35 | 40 | 21 |

GRANTED

Of the 424 presented cases, 305 were granted and effectively diverted into the Center for Healthcare Services program; a 66% increase from the previous year. For the fiscal year, the program averaged a 72% success rate in the magistrate court. Non-BCPDO presentations only released 53%. This statistic is important to note when reflecting on the number of presentations conducted. For the 2016-2017 fiscal year, the program's percentage of releases was higher than non-BCPDO 10 months out of 12. Since the



**Granted Cases**
Fiscal Year Comparison

| | FY 15-16 | FY 16-17 |
|---|---|---|
| Granted | 184 | 305 |

beginning of the program, the BCPDO percentage of releases has been higher 21 out of 24 months. The program's overall percentages of release remain the same at 72% (BCPDO) and 53% (non-BCPDO). Even without the non-BCPDO's advantage of weekend coverage, BCPDO clients are approximately 20% more likely to be released on the mental health PR bond with the aid of attorney representation.

| Bexar County Public Defender's Office FY 16-17 - Percentages of Releases | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Month | OVERALL: | | BCPDO Releases/Presentations: | | | Non-BCPDO Releases: | | |
| | Released: | Presented: | Released: | Presented: | % | Released: | Presented: | % |
| OCT-16: | 40 | 53 | 23 | 31 | 74% | 17 | 22 | 77% |
| NOV-16: | 36 | 48 | 31 | 38 | 82% | 5 | 10 | 50% |
| DEC-16: | 35 | 60 | 26 | 44 | 59% | 9 | 16 | 56% |
| JAN-17: | 40 | 66 | 25 | 38 | 66% | 15 | 28 | 54% |
| FEB-17: | 34 | 49 | 26 | 34 | 76% | 8 | 15 | 53% |
| MAR-17: | 53 | 75 | 39 | 48 | 81% | 14 | 27 | 52% |
| APR-17: | 29 | 49 | 15 | 20 | 75% | 14 | 29 | 48% |
| MAY-17: | 39 | 80 | 21 | 32 | 66% | 18 | 48 | 38% |
| JUN-17: | 52 | 92 | 30 | 43 | 70% | 22 | 49 | 45% |
| JUL-17: | 51 | 78 | 21 | 35 | 60% | 30 | 43 | 70% |
| AUG-17: | 56 | 94 | 30 | 40 | 75% | 26 | 54 | 48% |
| SEP-17: | 41 | 59 | 18 | 21 | 86% | 23 | 38 | 61% |
| OVERALL | 506 | 803 | 305 | 424 | 72% | 201 | 379 | 53% |

**DENIED**

Cases that are denied a mental health PR bond at Central Magistrate are monitored to determine the average length of confinement before release. For denied cases during the 2016-2017 fiscal year, the average confinement was 12.6 days. This resulted in 119 denied clients being detained for a total of 1,504 days. Since the program's inception, the denied clients have been held for 2,740 days total.

Using the monthly averages, an estimate was calculated to project the number of confinement days the program has avoided. Multiplying the number of cases granted per month times the monthly average days of confinement, the data shows a total of 3,615.5 days of confinement avoided by the efforts of this program for the 2016-2017 fiscal year alone. Since 2015, the mental health PR bond jail diversion grant has successfully avoided approximately 6,255.1 days of confinement.

---

## SECTION 2: CHANGES TO POLICY & PROCEDURE

---

**SHIFT STANDARDIZATION**

When the program was first initiated, three shifts were staffed Monday-Friday by three attorneys who rotated between the following shifts:

1. 11:00PM  -  7:00AM
2. 7:00AM  -  3:00PM
3. 3:00PM  -  11:00PM

While the shifts in question sufficiently provided 24 hour coverage throughout the week, the constant rotation made it difficult to stabilize relationships with judges, clinicians, officers, and other Central Magistrate staff. The office has since stabilized the shifts to eliminate the continual lack of continuity from one shift to the next. Each attorney has been assigned one shift thereby ending the shift rotations.

**EXTENDED LEAVE**

In addition to regularly scheduled personal and vacation time, the program experienced staffing shortages in April and September. In April, one attorney was out for a week for Jury Duty. In September, FMLA leave was used resulting in one attorney being absent for an entire month. With only three attorneys in the program, extended leave is often reflected in the overall monthly numbers.

**CASE QUALIFICATION**

Presentations have increased this fiscal year, in part, due to a more aggressive approach to case selection. The program has expanded the criteria to include more marginal to high-risk clients. This change has affected the overall compliance statistics of our clients, but the BCPDO has remained respectably ahead of compliance outcomes for non-BCPDO clients in the same program. These statistics will be covered further in the next section.

---

**SECTION 3: RESULTS & FISCAL COMPARISON**

---

OVERALL RESULTS

In terms of raw numbers, the fiscal year increases can clearly be seen. These statistics are collected and evaluated by the Bexar County Public Defender's office. This data; however, does not cover the compliance results of our clients successfully released to the Center for Healthcare Services (CHCS).

For the calculation of compliance, we must rely on data collected by Pretrial Services. The Pretrial Services department has undergone some changes in personnel handling the data in question. This has led to some necessary changes in our reporting.

Compliance is determined for both the Pretrial Services and CHCS components of the program. Participants that adequately follow the rules are considered compliant. Compliance is not mutually exclusive between Pretrial Services and CHCS. Individuals can be compliant with Pretrial and non-compliant with CHCS and vice versa. Judicial and mental health compliance is monitored separately.



| | Judicial Compliance | Mental Health Compliance |
|---|---|---|
| ■ BCPDO | 63% | 66% |
| □ Non-BCPDO | 59% | 58% |

JUDICIAL ENGAGEMENT & COMPLIANCE

Judicial engagement tracks attendance and willingness to participate in the mandatory court-related requirements of the bond. Engagement is closely tied with compliance and, in many cases, determines overall compliance. Clients may be deemed non-engaged if they do any of the following:

- Non-Report to Meetings
- Failure to Appear in Court
- Positive Urinary Analysis
- Active Warrant
- Re-Arrest



| | FY 15-16 | FY 16-17 |
|---|---|---|
| ■ Presented | 246 | 424 |
| ■ Granted | 184 | 305 |
| ■ Denied | 62 | 119 |

Judicial compliance statistics include CMAG PR bond clients that were seen by clinicians at CHCS, rather than clients that maintained a private physician for the mental health component of the program. Compliant individuals consist of those not rejected from the program due to non-engagement or other disqualifying actions. These statistics are concerned with the judicial side of the bond. Clients maintain constant contact with Pretrial officers and are required to adhere to strict attendance in regards to meetings and court dates. Pretrial will submit violation reports for any of the events listed. If multiple violations occur, Pretrial Services may terminate the individual as non-compliant and unsatisfactory. This fiscal year, the most common reason for unsatisfactory results was not reporting to meetings. Of the cases tracked during the 2016-2017 fiscal year, 63% of the BCPDO clients closed satisfactorily.





MENTAL HEALTH ENGAGEMENT & COMPLIANCE

Mental health statistics are derived from clients that were involved with physicians at CHCS, not private physicians. Mental health compliance aims to evaluate the number of clients that adequately followed the requirements of CHCS. Clients may be determined non-compliant for various reasons including:

- Non-Engagement
- Non-Enrollment
- Non-Report to Appointments
- Refused Services

Mental health engagement consists of attending appointments and fulfilling all actions deemed necessary by CHCS clinicians. That may include adjusting the number of appointments or taking prescribed medication. The most common reason for non-compliance was due to non-engagement. Of all eligible 2016-2017 closed cases, 66% of BCPDO clients were determined to be compliant with their mental health specialists at CHCS.





**SECTION 4: CONCLUSION**

The BCPDO is pleased with the upward trajectory of the number of clients serviced by this program. The data collected has shown the effectiveness of having counsel present at the magistration hearing for the clients eligible for this program.  A significantly greater percentage of the eligible population was granted mental health PR bonds when counsel was present.  Clients who were represented by the BCPDO at magistration were also observed to have a greater incidence of judicial and treatment compliance than those not represented by counsel at magistration.

This program has only been possible with the support of TIDC through its grant funding and oversight.  In addition, the BCPDO has received enormous support and collaboration from other departments in Bexar County.  Bear County Pretrial Services, Bexar County Mental Health Department, Bexar County District Attorney's Office, the Criminal District Court Judges and the County Court Judges have all been instrumental and supportive of the goal of this program.

BCPDO recognizes the importance of evidence based methods and is committed to reporting all activities of the program funded by this grant.  We will continue to work with TIDC to tailor our data gathering and reporting to properly analyze the effectiveness of this program. In addition, our office would gladly work with any entity interested in analyzing the data collected as part of this grant funded program.

Respectfully submitted,

Michael L. Young
Chief Public Defender
Bexar County Public Defender's Office
Paul Elizondo Tower
101 W. Nueva, Suite 370
San Antonio, Texas  78205
(210) 335-0701
(210) 335-0707 (Fax)
michael.young@bexar.org

---

[i] *All data subject to change without notice to improve reliability, function, or design*

# EXHIBIT 2

67606

**SPECIAL ORDER NO.** _____

| | | |
|---|---|---|
| STATE OF TEXAS | § | IN THE DISTRICT COURTS |
| | § | |
| | § | 144th, 175th, 186th, 187th, 226th, |
| AND | § | 227th, 290th, 379th, 399th, 437th |
| | § | |
| COUNTY OF BEXAR | § | HANDLING CRIMINAL CASES |

## STANDING ORDER FOR THE APPOINTMENT OF THE
## BEXAR COUNTY PUBLIC DEFENDER'S OFFICE TO REPRESENT
## MENTALLY ILL INDIGENT ACCUSED AT MAGISTRATION
### (Code of Criminal Procedure Art. 15.17 hearings)

This standing order of the Bexar County Criminal District Court Judges is intended to address the appointment of the Bexar County Public Defender's Office to represent indigent arrested persons who suffer from a mental illness during the arrested person's appearance before the magistrate at the Central Magistration (CMAG) facility.

The appointment of the Bexar County Public Defender's Office shall be for the limited purpose of representation of the indigent arrested person during the magistration process and related solely to the determination of the bond and the conditions of the bond for arrested persons described in this order.

In addition to the appointment of the Bexar County Public Defender's Office for the limited purpose of magistration, the arrested person shall be appointed counsel as provided in the Indigent Defense Plan of the Bexar County Criminal District Courts to represent the indigent arrested person for the remainder of the case.

The limited appointment of the Bexar County Public Defender's Office at magistration is concluded upon the termination of the magistration proceedings and no motion to withdraw is necessary.

67606

Document
scanned as filed.

07606

IT IS THEREFORE ORDERED, that effective September 1, 2015, in any case in which

an arrested person has been determined to be indigent and has requested court appointed counsel

in accordance with the policies and procedures contained in the Bexar County Criminal District

Courts Indigent Defense Plan, and additionally has been deemed to have a mental illness, the

Bexar County Public Defender's Office is appointed to represent said arrested person for the

limited purpose of magistration only.

SIGNED, ORDERED, AND REFERRED TO ON _July 15, 2015_.

LORINA RUMMEL
JUDGE
144th JUDICIAL DISTRICT COURT

MARY ROMAN
JUDGE
175TH JUDICIAL DISTRICT COURT

JEFFERSON MOORE
JUDGE
186th JUDICIAL DISTRICT COURT

STEVEN C. HILBIG
JUDGE
187th JUDICIAL DISTRICT COURT

SID L. HARLE
JUDGE
226th JUDICIAL DISTRICT COURT

KEVIN O'CONNELL
JUDGE
227th JUDICIAL DISTRICT COURT

MELISA SKINNER
JUDGE
290th JUDICIAL DISTRICT COURT

RON RANGEL
JUDGE
379th JUDICIAL DISTRICT COURT

07606

RAY OLIVARRI
JUDGE
399th JUDICIAL DISTRICT COURT

LORI I. VALENZUELA
JUDGE
437th JUDICIAL DISTRICT COURT

07/15/2015 VOL 4417 PG 1452

67608

## SPECIAL ORDER

| | | |
|---|---|---|
| **STATE OF TEXAS** | ) | **IN THE COUNTY COURTS** |
| | ) | **HEARING CRIMINAL MATTERS** |
| | ) | |
| **COUNTY OF BEXAR** | ) | **1,2,4,5,6,7,8,9,11, 12, 13, 14, AND 15** |

<u>STANDING ORDER FOR APPOINTMENT OF BEXAR COUNTY PUBLIC DEFENDER'S OFFICE
TO REPRESENT MENTALLY ILL INDIGENT DEFENDANTS ACCUSED AT MAGISTRATION
(Code of Criminal Procedure 15.17 hearings)</u>

This Standing Order of the Bexar County Criminal County Court at Law judges is intended to address the appointment of the Bexar County Public Defender's Office to represent indigent arrested persons who suffer from a mental illness during the arrested person's appearance before the magistrate at the Central Magistration Facility (CMAG).

The appointment of the Bexar County Public Defender's Office shall be for the limited purpose of representation of the indigent arrested person during the magistration process only and related solely to the determination of the bond and the conditions of the bond for arrested persons described in this Order.

In addition to the appointment of the Bexar County Public Defender's Office for the limited purpose of magistration, the arrested person shall be appointed counsel as provided in the Indigent Defense Plan of the Bexar County Courts to represent the indigent arrested person for the remainder of the case.

The limited appointment of the Bexar County Public Defender's Office at magistration is concluded upon the termination of the magistration proceedings and no motion to withdraw is necessary.

It is therefore ORDERED that effective immediately, in any case in which an arrested person has been determined to be indigent and has requested court appointed counsel in accordance with the policies and procedures contained in the Bexar County Court's Indigent Defense plan, and additionally has been deemed to have a mental illness, the Bexar County Public Defender's Office is appointed to represent said arrested person for the limited purpose of magistration only.

It is ORDERED that this Standing Order be filed for record with the County Clerk of Bexar County.
SIGNED, ORDERED, AND ENTERED ON THIS 11th day of September 2015 by:

John Fleming
County Court at Law No. 1

Judge Celeste A. Brown
County Court at Law No. 8

Judge Jason Wolff
County Court at Law No. 2

Judge Walden Shelton
County Court at Law No. 9

Judge Jason R. Garrahan
County Court at Law No. 4

Judge John A. Longoria
County Court at Law No. 5

Judge Wayne A. Christian
County Court at Law No. 6

Judge Eugenia "Genie" Wright
County Court at Law No. 7

Judge Tommy Stolhandske
County Court at Law No. 11

Judge Scott Roberts
County Court at Law No. 12

Judge Crystal Chandler
County Court at Law No. 13

Judge Susan Skinner
County Court at Law No. 14

Judge Robert D. Behrens
County Court at Law No. 15

# EXHIBIT 3

# 71439

SPECIAL ORDER NO. _____

| | | |
|---|---|---|
| STATE OF TEXAS | § | IN THE DISTRICT COURTS |
| | § | |
| | § | 144th, 175th, 186th, 187th, 226th |
| AND | § | 227th, 290th, 379th, 399th, 437th |
| | § | |
| COUNTY OF BEXAR | § | HANDLING CRIMINAL CASES |

### STANDING ORDER FOR THE APPOINTMENT OF THE
### BEXAR COUNTY PUBLIC DEFENDER'S OFFICE TO REPRESENT
### ACCUSED AT MAGISTRATION
#### (Code of Criminal Procedure Art. 15.17 hearings)

This standing order of the Bexar County Criminal District Court Judges is intended to replace the previous order dated September 17, 2018, to address the appointment of the Bexar County Public Defender's Office to represent all consenting arrested persons charged with a felony who do not already have an attorney and do not have a bond in place, during the arrested person's appearance before the county Magistrate at the Justice Intake Assessment Center (JIAC).

The appointment of the Bexar County Public Defender's Office shall be for the limited purpose of representation of the arrested person during the magistration process and related solely to the determination of the bond and the conditions of the bond for arrested persons described in this order.

In addition to the appointment of the Bexar County Public Defender's Office for the limited purpose of magistration, the arrested person shall be appointed counsel as provided in the Indigent Defense Plan of the Bexar County Criminal District Courts to represent the indigent arrested person for the remainder of the case, if the arrested person is determined to be indigent.

The limited appointment of the Bexar County Public Defender's Office at magistration is concluded upon the termination of the magistration proceedings and no motion to withdraw is necessary.

IT IS THEREFORE ORDERED, that effective January 16, 2019, any consenting person charged with a felony offense and who has been found to not already have an attorney and a bond has not been set,

71439

the Bexar County Public Defender's Office is appointed to represent said arrested person for the limited

purpose of magistration only, before the county magistrate at the JIAC facility.

SIGNED, ORDERED, AND REFERRED TO ON _____ 1/16/19

RAY J. OLIVARRI
JUDGE
144th JUDICIAL DISTRICT COURT

CATHERINE TORRES-STAHL
JUDGE
175th JUDICIAL DISTRCT COURT

JEFFERSON MOORE
JUDGE
186th JUDICIAL DISTRICT COURT

STEPHANIE R. BOYD
JUDGE
187th JUDICIAL DISTRCT COURT

VELIA J. MEZA
JUDGE
226th JUDICIAL DISTRICT COURT

KEVIN O'CONNELL
JUDGE
227th JUDICIAL DISTRCT COURT

JENNIFER PEÑA
JUDGE
290th JUDICIAL DISTRICT COURT

RON RANGEL
JUDGE
379th JUDICIAL DISTRCT COURT

FRANK J. CASTRO
JUDGE
399th JUDICIAL DISTRICT COURT

LORI I. VALENZUELA
JUDGE
437th JUDICIAL DISTRCT COURT

71439

Document Type: STANDING ORDER FOR THE APPT OF THE BC PUBLIC DEFENDERS

Page 2 of 3

CERTIFIED COPY CERTIFICATE STATE OF TEXAS
I, MARY ANGIE GARCIA, BEXAR COUNTY DISTRICT
CLERK, CERTIFY THAT THE FOREGOING IS A TRUE
AND CORRECT COPY OF THE ORIGINAL RECORD AS
INDICATED BY THE VOLUME, PAGE AND COURT ON
SAID DOCUMENT.  WITNESSED MY OFFICIAL HAND
AND SEAL OF OFFICE ON THIS:

*January 16, 2019*

**MARY ANGIE GARCIA**
**BEXAR COUNTY, TEXAS**

By:  _____
SANDRA M. CASILLAS, Deputy District Clerk
*(NOT VALID WITHOUT THE CLERK'S ORIGINAL SIGNATURE.)*

**2019   SO   01**

SPECIAL ORDER NO. _____

FILED IN MY OFFICE
LUCY ADAME-CLARK
COUNTY CLERK, BEXAR CO.

| | | |
|---|---|---|
| STATE OF TEXAS | § | IN THE COUNTY COURTS |
| | § | 2019 JAN 16  P 4: 48 |
| | § | 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, |
| AND | § | 14 and 15 |
| | § | |
| COUNTY OF BEXAR | § | HANDLING CRIMINAL CASES |

## STANDING ORDER FOR THE APPOINTMENT OF THE
## BEXAR COUNTY PUBLIC DEFENDER'S OFFICE TO REPRESENT
## ACCUSED AT MAGISTRATION
### (Code of Criminal Procedure Art. 15.17 hearings)

This standing order of the Bexar County Criminal County Court Judges is intended to address the appointment of the Bexar County Public Defender's Office to represent all consenting arrested persons charged with a misdemeanor offense who do not already have an attorney and do not have a bond in place, during the arrested person's appearance before the County Magistrate at the Justice Intake Assessment Center (JIAC).

The appointment of the Bexar County Public Defender's Office shall be for the limited purpose of representation of the arrested person during the magistration process and related solely to the determination of the bond and the conditions of the bond for arrested persons described in this order.

In addition to the appointment of the Bexar County Public Defender's Office for the limited purpose of magistration, the arrested person shall be appointed counsel as provided in the Indigent Defense Plan of the Bexar County Criminal County Courts to represent the indigent arrested person for the remainder of the case, if the arrested person is determined to be indigent.

The limited appointment of the Bexar County Public Defender's Office at magistration is concluded upon the termination of the magistration proceedings and no motion to withdraw is necessary.

IT IS THEREFORE ORDERED, that effective January 16, 2019, any consenting person charged with a misdemeanor offense and who has been found to not already have an attorney and a bond has not

been set, the Bexar County Public Defender's Office is appointed to represent said arrested person for

the limited purpose of magistration only, before the county magistrate at the JIAC facility.

SIGNED, ORDERED, AND REFERRED TO ON ____16 January, '19____ .

JOHN LONGORIA
PRESIDING JUDGE