# Exhibit EEEE

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
GALVESTON DIVISION

AARON BOOTH, et al.,          )
    Plaintiff,            )
                          )   Civil Action
vs.                           )  No. 3:18-CV-00104
                          )
GALVESTON COUNTY, TEXAS, et al)
    Defendants            )


ORAL DEPOSITION

ALEXANDER BUNIN

MARCH 19, 2019

VOLUME 1


    ORAL DEPOSITION OF ALEXANDER BUNIN, produced as a

witness at the instance of the Defendant and duly sworn,

was taken in the above-styled and numbered cause on

March 19, 2019, from 9:47 a.m. to 11:40 a.m., before

Jill M. Vaughan, Certified Shorthand Reporter in and for

the State of Texas, reported by computerized stenotype

machine at the offices of Office of the Attorney General

808 Travis, Suite 1520, Houston, Texas, pursuant to the

Texas Rules of Civil Procedure and the provisions stated

on the record or attached hereto.

2

```
 1                    APPEARANCES

 2   FOR THE PLAINTIFF:

 3        Mr. Josh McCollum
          ARNOLD & PORTER
 4        700 Louisiana Street
          Suite 400
 5        Houston, Texas
          josh.mccollum@arnoldporter.com
 6

 7

 8   FOR THE DEFENDANTS DARRING, ELLISOR, COX, GRADY,
     NEVES, AND SLAUGHTER:
 9
          Ms. Dominique Stafford
10        OFFICE OF ATTORNEY GENERAL
          Civil Litigation Division
11        P.O. Box 12548, Capitol Station
          Austin, TX 78711
12        512-463-2080
          dominique.stafford@oag.texas.gov
13

14   FOR THE DEFENDANTS GALVESTON COUNTY
          DISTRICT ATTORNEY-JACK ROADY (Telephonically):
15
          Ms. Angela Olalde
16        GREER, HERZ & ADAMS, L.L.P.
          2525 South Shore Blvd.
17        Suite 203
          League City, TX 77573
18        409-797-3262
          aolalde@greerherz.com
19

20

21

22

23

24

25
```

1                        INDEX                        PAGE

2  Appearances ............................        2

3  ALEXANDER BUNIN

4       Examination by Ms. Stafford .........      4
         Examination by Ms. Olalde ...........     66
5  Signature and changes  ..................     69
   Reporter's Certificate ..................     71
6

7                    EXHIBIT INDEX

8  NO.          DESCRIPTION                        PAGE

9  EXHIBIT 1  Declaration .....................    40

10 EXHIBIT 2  Declaration .....................    46

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

4

1                          ALEX BUNIN

2      having been first duly sworn, testified as follows:

3                          EXAMINATION

4   BY MS. STAFFORD:

5         Q.   Good morning, Mr. Bunin.  My name is

6   Dominique Stafford.  I'm with the Attorney General's

7   office.  And I represent the district judges in this

8   case, Booth vs. Galveston County.  Do you understand

9   that?

10        A.   I do.

11        Q.   And I assume you're an attorney, you've been

12  deposed before?

13        A.   I have.

14        Q.   And can you state your name for the record,

15  please?

16        A.   My name is Alexander, A-l-e-x-a-n-d-e-r,

17  Bunin, B-u-n-i-n.  Most people call me Alex.

18        Q.   And how are you employed?

19        A.   I'm the chief public defender for Harris

20  County, Texas.

21        Q.   And how long have you been the chief public

22  defender?

23        A.   Since the office was created in --

24  December 6 of 2010.

25        Q.   So about eight years?

1      A.   Close -- close to nine now, yeah.

2      **Q.   And I understand you provided a declaration**

3  **in the case O'Donnell vs. Harris County.  Did you give**

4  **depositions in that case as well?**

5      A.   I did.

6      **Q.   Did you testify at the injunction hearing?**

7      A.   I did not.

8      **Q.   How did you get involved in this case?**

9      A.   I was contacted by a lawyer at the Houston

10  ACLU and asked if I would be willing to give a

11  declaration.

12      **Q.   And who was that lawyer?**

13      A.   Trisha Trigilio, if that is how you say her

14  name.

15      **Q.   It's Trigilio?**

16      A.   Yeah.

17      **Q.   Something like that?**

18      A.   Yeah.

19      **Q.   Did she tell you how she got your**

20  **information?**

21      A.   I've spoken to her before about other issues

22  in Houston involving the ACLU.  So I knew her and her

23  name.  I don't think we ever met in person, but we

24  talked over the phone over the last eight years a few

25  times.

```
 1        Q.    Okay.  And how did you guys communicate?

 2        A.    By phone and email.

 3        Q.    Email.  Okay.  Do you ever send her any

 4  drafts of your declaration?

 5        A.    Yes.

 6        Q.    And do you do that by email?

 7        A.    Yes.

 8        Q.    Can we get a copy of those drafts?

 9        A.    Yeah.  I may still have them.

10             MS. STAFFORD:  I want to get a copy of that

11  communication.

12             MR.  MCCOLLUM:  I'm going to object on the

13  grounds of privileged.  Our position is this is work

14  product.

15             MS. STAFFORD:  Okay.

16             MR.  MCCOLLUM:  I think we coordinated that

17  pretty clear in its October 10th order that

18  communications with third-party witnesses is work

19  product.

20             MS. STAFFORD:  Okay.  I'll note your

21  objections.  I think we're still going to ask for that

22  and we may have go to the court for that information.

23        Q.  (By Ms. Stafford) Just keep it.

24        A.  I think I still -- I mean, I think I still

25  have it, but yeah.
```

1    **Q.  Have you given trial testimony in any other**

2    **cases as it relates to your declaration or similar**

3    **declarations?**

4    A.  Nothing regarding bail lawsuits, no.

5    **Q.  And in your work as a public defender before**

6    **Harris County, do you ever represent a client on**

7    **initial bail hearings?**

8    A.  Yes.

9    **Q.  Which ones?**

10    A.  I was the Federal public defender for

11    20-something years and I practiced in probably at

12    least half a dozen or more different districts across

13    the country and all of them have what we call

14    detention hearings and initial appearances where a

15    Federal magistrate judge decides whether or not to

16    release someone.

17    **Q.  What about county level?**

18    A.  My first -- when I first became a lawyer

19    here in Houston in Harris County, I represented people

20    at bail -- well, not initial bail hearings but --

21    **Q.  Yeah.  My question is specific to initial**

22    **bail hearings.**

23    A.  Yes.  Right.  So in Texas I don't think I

24    ever appeared at someone's initial appearance.

25    **Q.  What about outside of Texas?**

1        A.    Texas is the only --

2        **Q.    County level?**

3        A.    Yeah.   Texas is the only place I've ever

4   practiced in state court.

5        **Q.    Okay.**

6        A.    The others were all Federal courts.

7        **Q.    And when did you first start representing**

8   **clients at initial bail hearings in Harris County?**

9        A.    That would have been in -- I'm going to say

10  the last couple days of July 2017.   I don't remember.

11  It might have been the 30th.

12       **Q.    And how did that all come about?**

13       A.    So I had been seeking a procedure to

14  represent people at bail hearings since I first came

15  to Harris County because of my experience in the

16  Federal courts.   I had asked the judges in Harris

17  County to consider such a procedure and -- for, you

18  know, basically eight years or seven years at that

19  point.   And this -- I mentioned it again to the

20  lawyers representing the judges in Harris County and

21  the hearing officers.   And I recall one of the -- one

22  of them -- I think it was one of the lawyers at

23  Gardere Wynne said, well, that would be a great idea.

24  And it was presented through our county attorney to

25  commissioners court and they asked me to come up with

```
 1  a proposal and figure out what it would cost and I

 2  worked with the budget office and it was implemented.

 3       Q.   And what was the proposal cost of it?

 4       A.   Ultimately they added a million dollars to

 5  my budget.

 6       Q.   How many attorneys did you hire with that

 7  1 million-dollar budget?

 8       A.   We added six lawyers specifically for that,

 9  but we also understood that lawyers already employed

10  would be doing overtime to -- to also -- because six

11  lawyers doesn't cover 24 hours, seven days a week for

12  an entire year.

13       Q.   And you said you had mentioned to the judges

14  in Harris County.  What judges did you speak to when

15  the --

16       A.   Well, judges would have meetings at least

17  annually; and so I would be invited to give an update

18  on my office or talk about issues.  And I would meet

19  with all of the criminal district judges of which we

20  have 22, all the misdemeanor county judges of which

21  we -- I think we began with 15.  We now have 16.

22       Q.   So you're saying it was for the district

23  judges and the county judges?

24       A.   Separate meetings, but these were issues I

25  brought up on a regular basis.
```

1      Q.   For both of them.  And O'Donnell, isn't --

2  is it just the county judges that are in that lawsuit?

3      A.   Right.  Well, there's two separate lawsuits.

4  There's now a lawsuit involving the felony district

5  judges, but to date the only involvement I've had was

6  in the suit against the county judges and the hearing

7  officers.

8      Q.   Now, were the felony district judges

9  involved at all in the implementation of your plan?

10     A.   They were.  It was a joint administrative

11 order.

12     Q.   And what was their involvement?

13     A.   They agreed that I would -- me, meaning me

14 and my office, would be allowed to represent

15 defendants at their first appearance with their

16 consent and that representation would be available to

17 anyone arrested in Harris County charged with an A or

18 B misdemeanor or any level of felony and it would

19 terminate upon the end of the hearing, the bail

20 hearing.

21     Q.   Did they put any sort of restrictions other

22 than limited to the hearings on any of these?

23          MR.  MCCOLLUM:  Objection, form.

24          THE WITNESS:  Excuse me?

25          MR.  MCCOLLUM:  Objection, form.

1    A.    There was a limitation that has since been

2  rescinded by the county judges that we were not

3  supposed to argue issues about probable cause.

4  They've now changed that.  So our representation is

5  not limited in any way in those cases.

6    Q.    (By Ms. Stafford) When did they change

7  that?

8    A.    It's recent.  They've just amended their

9  rules.  I don't know the exact date, but they've --

10  whenever their last amendment to their rules were.

11    Q.    Was it this year or last year?

12    A.    I believe it was this year.

13    Q.    Okay.  So this system, you said, has been

14  going on since July of 2017; is that correct?

15    A.    Correct.

16    Q.    So you think it might have been in 2019?

17    A.    That that changed, yes --

18    Q.    Okay.

19    A.    -- I believe that's true.

20    Q.    Okay.  What else did you do with that

21  1 million-dollar budget?

22    A.    So it went to -- it -- primarily it went to

23  staffing the lawyers, it went to paying for full-time

24  lawyers and also we replicated what the district

25  attorney's office did in staffing those hearings.  So

1    for many years district attorneys -- and one time it

2    was only experienced supervisors were present at those

3    hearings.  They presented probable cause, they argued

4    bail and that was almost like a separate job for them.

5    So they do -- they get paid for their 40 hours or

6    however many hours a week they worked to be trial

7    lawyers and division chiefs and then they were able to

8    get an additional salary, almost like a second job to

9    do those.  And we were allowed to have that same

10   system.  So when we needed other hours covered that

11   the six lawyers were not capable of, we would bring in

12   other lawyers in the office and would calendar them to

13   cover those hours; and we still do that.

14        Q.   What experience did those six lawyers have

15   when you first hired them?

16        A.   We didn't hire anyone who did not have

17   criminal trial experience.

18        Q.   Did you require a certain amount of

19   experience that they had to have practiced?

20        A.   No, no.

21        Q.   What was their experience level?

22        A.   I think everyone we hired -- some were

23   extremely experienced, one was an assistant -- had

24   been an assistant Federal public defender.  Actually

25   several of them had been assistance Federal public

1  defenders at some time.  But all had been criminal

2  trial attorneys and had -- I believe all had tried

3  cases.

4       Q.   **Do you find it hard to staff the 2:00 a.m.**

5  **hearings?**

6       A.   Some people like it.

7       Q.   **Oh, really?**

8       A.   Some people that -- that works with their

9  schedule.  So -- and as I said, we had other folks

10 that would pick up shifts.  But, no, we have people

11 that are -- that like those hours and they -- you

12 know, they don't complain.

13      Q.   **So what are their shifts, or do they have**

14 **shifts?**

15      A.   They do.

16      Q.   **How does that work?**

17      A.   So there's basically three 8-hour shifts

18 over 24 hours.  And if I remember correctly, it would

19 be 6:00 a.m. to 2:00 p.m., 2:00 p.m. to 10:00 p.m. and

20 then 10:00 p.m. to back to 6:00 a.m.  So -- and that

21 just continues, and there will be two lawyers at very

22 shift.

23      Q.   **And how do the lawyers get the defendants**

24 **that they're going to speak to?**

25      A.   Well, the defendants -- the defendants are

1    held in a single place.  When we started the program,

2    they were held at what's called an inmate processing

3    center, which is on Commerce Street in Houston.

4    Recently a new facility opened that we call the joint

5    processing center, which is on...

6         Q.   San Jacinto?

7         A.   It's on San Jacinto, but I'm blanking on the

8    cross street.  And in that facility there is a big,

9    open area that the deputies bring new prisoners who

10   have been received.  They've been identified, they are

11   ready to be interviewed by pretrial services officers

12   and our lawyers.  And we may talk to them first,

13   pretrial services may talk to them first; but there is

14   usually many hours before they get before a

15   magistrate, if they even need to appear before a

16   magistrate.  In some cases we have a system to

17   identify that they are presumed eligible for a

18   personal bond, and that is simply a -- done by

19   paperwork.  So the pretrial services officer brings it

20   to the -- we call them criminal hearing officers.

21   That's how they're created by a statute for Harris

22   County.  But they're magistrates, and they'll sign off

23   on them without a hearing.

24        Q.   Okay.  Let me break that down a little.  So

25   the attorneys are at the inmate -- or joint processing

1  center?

2      A.   Correct.

3      Q.   24 hours a day, 365 days a week?

4      A.   Correct.

5      Q.   Do they have an office there?

6      A.   We do.  It's very small because when they

7  designed that building, this was not contemplated.  So

8  we got what was going to be an interrogation room.

9  They had taken out the cameras, and we also have a

10  couple of cubicles that we can interview.  So we've

11  kind of expanded our space, but it wasn't really

12  designed for us.  The district attorneys, however, are

13  not there.  They appear by video.

14      Q.   And you said those that have been

15  identified.  What do you mean by that?

16      A.   I forget what I was talking about.

17      Q.   How do you -- how do they know to bring them

18  to the public defenders?

19      A.   Well, they don't.  They put them in this big

20  room.  They used to be holding cells, but now they're

21  just kind of a big room.  Looks like an airport

22  waiting room.  They can see TVs that have like closed

23  caption, CNN and other information on it.  And they

24  sit there.  And there's a PA system which you can

25  request somebody come to your cubicle to come see you.

1    So we have a -- there's a -- there's a justice

2    management system.  So we know by computer who has

3    been brought up there and who is available to be

4    interviewed.

5        **Q.    So when somebody comes in and is booked, do**

6    **they automatically get a public defender?**

7        A.    We would -- do they automatically get -- we

8    would address everyone who is -- who has been -- and

9    they actually haven't been booked yet.  They have just

10   been received at that point.  They book them after

11   this whole process is over.  But, anyway, we would --

12   we would reach out to every person that gets to that

13   stage that has been received.  I mean, someone may go

14   to medical, someone may go straight to medical,

15   someone may be, as they say, disruptive where they put

16   them, you know, somewhere else.  But everyone who is

17   -- who does not meet those exceptions is available

18   that are in the computer system.  We get a list of the

19   docket and we know to interview them and we call them

20   up.

21       **Q.    Se you're not specifically looking for**

22   **indigent defendants?**

23       A.    No.  In fact, the order does not -- the

24   basis for representation is not based on indigents.

25       **Q.    So walk me through the process of when a PD**

1  **calls somebody else up.  What happens?**

2       A.   Okay.  So we have an interview sheet that we

3  go through with them and it covers -- it covers

4  information that we would need to know about their --

5  their income, employment.  It's not just financial

6  but, you know, things about their history that would

7  help us just at this hearing because we don't want to

8  know about the facts of their case.  We don't want to

9  know too much about what's going on otherwise we'll --

10 we may create conflicts later, especially if there are

11 people -- multiple people arrested in the same case.

12 So our information that we're gathering is about their

13 tie to the community and their criminal history, if

14 any.

15      **Q.   So you guys don't do conflict checks when**

16 **you're --**

17      A.   There's not a way to do that at that point,

18 no.  In fact, we know there are cases in which we

19 could not represent them beyond this hearing because

20 two people are arrested for the same robbery and one

21 may blame the other.  So we know there -- there are

22 potential conflicts; but because we don't get into the

23 facts of their case, we avoid those issues.

24      **Q.   So how do you argue about probable cause if**

25 **you don't know the facts of their case?**

1      A.   Well, we limit that argument to what is

2   stated in the probable cause.  So if, for instance,

3   the prosecutor were to read the facts and it was

4   missing an element, we would point that out.

5      Q.   So after you do the interview, what happens?

6      A.   We do the interview then --

7           MR.  MCCOLLUM:  Objection, form.

8      A.   -- then we wait -- I mean, there is

9   either -- they're either going to be eligible for

10  the -- for the early release without a hearing or they

11  will appear at the hearing and that will be at the

12  next docket.  There is -- I think there is six of

13  those over the course of 24 hours.  And so, you know,

14  the way we have the shifts for our lawyers, usually

15  the last set of lawyers have completed all the

16  interviews for the next hearing so that when those

17  lawyers -- the new lawyers show up, that is already

18  completed.  So everyone kind of gets it done for the

19  next set of lawyers.

20     Q.   (By Ms. Stafford) Do you find any hiccups

21  between someone having written something down and

22  the defendant coming and saying where is my person I

23  talked to, I told them very personal information

24  that he didn't write down or anything like that?

25     A.   I don't think I've ever had that problem,

Alex Bunin - 3/19/2019

19

1   no, or the problem -- one -- one of the issues the

2   judges brought up was, well, why won't they say can I

3   have that lawyer I had at the bail hearing.  And I

4   don't think we've ever had that issue.

5        Q.   Okay.

6        A.   Yeah.

7        Q.   And you said that you would identify someone

8   who is presumed eligible for a PR bond.  Who are those

9   people?

10        A.   There's a list that's in their local rule

11  now.  Really what they have are everyone is presumed

12  eligible for a personal bond except if they're

13  carve-out offenses.  So assault family violence would

14  be a carve-out offense, meaning they have to go before

15  the magistrate because that's one of the few -- and

16  we're mostly talking about the misdemeanors, but there

17  are carve-out offenses for felonies that were created,

18  too.  And so of the misdemeanors, there's just a few

19  types of cases.  I think DWI is second and maybe one

20  other thing, but otherwise there's a presumption that

21  they should be released.

22             Now, the district attorney can raise

23  questions about, you know, prior history and

24  everything that -- that could get them to a hearing

25  even if they're normally presumed -- and that

1 criteria, I can't really tell you what that is.

2 You'd have to ask somebody from the district

3 attorney's office why they would flag a case.  But

4 there are -- even of the offenses that are presumed

5 personal bond, they can raise an issue and get it to

6 a hearing before a magistrate.

7     **Q.   And how many people would you think that the**

8 **public defender's office sees a day?**

9     A.   About 200 over 24 hours.

10    **Q.   How long does it typically take from where**

11 **somebody is brought in to when they see an attorney?**

12         MR.  MCCOLLUM:  Objection, form.

13    A.   It's hard to say because I'm not sure how

14 much the new JPC procedure has sped up receiving or

15 slowed it down, but it's probably at least several

16 hours.

17         MS. STAFFORD:  Do you need to take a break?

18         THE WITNESS:  No.  I'm just telling them I

19 can't talk.

20    **Q.  (By Ms. Stafford) So you're saying a new**

21 **process.  What is the new process that you're**

22 **talking about?**

23    A.   So because the facility is designed

24 differently, they all come in a big sally port.

25 All -- all agencies now -- all -- the big change is --

1  and this I don't think has completely gone into effect

2  yet -- is under the old system, HPD, which is the

3  biggest law enforcement agency in Harris County, would

4  take people to a city jail or holding and they would

5  be booked there and then later it would be a chain and

6  they get moved.  And then many of the outlying cities

7  and towns -- and I think we have 70 law enforcement

8  agencies that cover Harris County -- they all have

9  their own methods.  But now under this new joint

10 processing center, they're all going to be brought

11 first after arrest to be booked into this Harris

12 County.  And so they all get brought into the sally

13 port.  They go into a room that they do receiving

14 where they get the basic information.  An officer

15 takes their property.  The -- they're assigned to one

16 of those bands that has a, you know, bar code on it

17 and that -- as they go through each part of the

18 system, the bar code follows them, and ultimately they

19 go to the second floor where this big room is.  And

20 that's where we first get the opportunity talk to

21 them.

22      Q.   And how long does it take from when they

23 talk to an attorney to magistration?  I guess -- are

24 you calling it initial bail hearing?  Does it matter

25 what we refer to it?

1    A.    I'd say, again, several hours.

2    Q.    **So several hours from receiving to seeing an**

3 **attorney and several hours from attorney to**

4 **magistration.  So that is between four and six?**

5    A.    Yeah.  Could be more, but probably not much.

6    Q.    **Okay.  Is there ever a point where somebody**

7 **says you have to call so and so and you can't get**

8 **ahold of them and you wait for the next magistration?**

9    A.    There are people who appear on the docket

10 that for whatever reason, maybe they're in medical or

11 something and we haven't seen them and they may get

12 moved to another docket.  Yeah.

13    Q.    **And in that case it would take longer for**

14 **them to --**

15    A.    Correct.

16    Q.    **-- go through the process?**

17    A.    Yes.

18    Q.    **Is there a set time where you guys have to**

19 **say you have to be magistrated at this point?**

20    A.    Is there a time that we can say that?  I

21 mean, the process assumes that they're going to get

22 there in 24 hours.  Now, that doesn't always happen

23 but that's -- that's what -- that's the assumption

24 everyone works under.

25    Q.    **So what happens in a case where someone**

1  doesn't get magistrated in 24 hours?

2           MR.  MCCOLLUM:  Objection, form.

3       A.   It depends.  I mean, if it's a misdemeanor,

4  then they're supposed to be eligible for a --

5  considered for a personal bond if they weren't

6  already.  If it's a felony, they have up to, I think,

7  48 hours in Harris County because we're such a big

8  county.  So there would -- there would not be that

9  effect.

10      Q.   (By Ms. Stafford) Do you guys keep track

11 of those numbers?

12      A.   We try to keep -- well, until we've

13 interviewed someone, they're not really on our radar.

14 So, no, we don't.  I don't have access to the

15 sheriff's numbers.  So the only way we would be -- we

16 would know about a situation like that is if someone

17 ultimately came to us and, you know, nothing had

18 happened to them for days.  That would stand out,

19 yeah.

20      Q.   So how did this work before 2017?  When was

21 the first time the public defender's office saw a

22 defendant?

23      A.   It would be -- well, in two different ways.

24 So for misdemeanor cases, we were representing persons

25 who had been certified as significantly mentally ill

 1  in all 16 of the misdemeanor courts.  And there was --
 2  there's actually a computer algorism that identifies
 3  them.  And so we get -- there's a printout of that
 4  every morning.  So the morning they're going to court
 5  to appear in the court of jurisdiction, we would know
 6  that that person was going to be our client.  So we
 7  get that every day.  So we would be there that
 8  morning.  Typically it's the morning after they were
 9  arrested.  But, again, because of all these other
10  issues and especially with mentally ill people, there
11  could be reasons why they don't go directly to court
12  quickly.  But that would be the first time, their
13  first appearance in the court of jurisdiction.
14              Same is true for felonies, but
15  that -- the determination of whether we get those
16  cases is a little different.  We're called by the
17  court coordinator.  It's done on a wheel system.
18  But, again, it would -- it would probably be their
19  first appearance in court.
20      Q.   So you're saying first appearance in court,
21  would that be --
22      A.   In the felony district court.
23      Q.   Okay.  A felony district court.  Would they
24  have already been magistrated at that point?
25      A.   Yes.

1      Q.    Now, you say the new system is that

2  everybody comes to this joint processing center; is

3  that right?

4      A.    Yes.

5      Q.    So nobody comes already magistrated?

6      A.    To where?

7      Q.    To the joint processing center.

8      A.    Right.

9      Q.    Okay.   What about someone who came in on a

10  warrant, would they be considered already magistrated?

11     A.    No.

12     Q.    Would their bond have already been set?

13     A.    Possibly, yes.

14     Q.    What do you do in those cases?

15     A.    Well, we may reurge for -- if there's a

16  reason, we might reurge consideration of whatever bond

17  was set.

18     Q.    Okay.   And the magistrate is allowed to hear

19  that?

20     A.    They are allowed, yes.   I know the

21  misdemeanor judges changed their rules recently to

22  make that more clear, that they have full authority.

23     Q.    What do you mean by that?

24     A.    One of the contentions in the O'Donnell

25  suit, which you may know about, is the hearing

1   officers claimed they had -- they were under orders

2   when and when to -- when and when not to issue

3   personal bonds.  And so there was -- the county judges

4   took the position they had full discretion.  And so

5   they have now made that completely clear, that they do

6   have that discretion.

7       Q.   To issue personal --

8       A.   Right.  Regardless of the circumstances,

9   that that is within their discretion.

10      Q.   Okay.  So what if someone comes in from

11  another state on a warrant where their bond is set,

12  are they allowed to give them a PR bond?

13          MR.  MCCOLLUM:  Objection, form.

14      A.   I mean, there's a separate -- I'm trying to

15  remember because there's a separate set of laws that

16  deal with detainers and what -- and what they're

17  allowed to do.  But I think they have the same

18  authority that a county or a district court judge

19  would have in reviewing that.

20      Q.   (By Ms. Stafford) Do you guys have a

21  policy of how long you have to wait to see -- to

22  have a magistration hearing after you see your

23  client?

24      A.   No -- do I have a policy?

25      Q.   Does the public defender's office have a

1  policy?

2       A.   No.  I don't control that.

3       Q.   Okay.  So you don't have any sort of

4  three-hour waiting time before they're allowed to see

5  a magistrate?

6       A.   No.  There's no -- no.

7       Q.   So somebody could come in, see a lawyer and

8  get magistrated within an hour?

9       A.   It's possible.

10      Q.   Okay.

11      A.   But it usually doesn't work that way.

12 Usually we're waiting on other people usually.

13      Q.   Yeah.

14      A.   They're not waiting on us.

15      Q.   What does the public defender do between the

16 time they've met with a defendant and that defendant's

17 magistration?

18      A.   Well, there's plenty of people to interview.

19 So usually you're busy the whole time.  So there's not

20 a lot of dead time.  But if -- you might in some cases

21 call a relative or a parent to get additional

22 information.  You might do a records check about their

23 criminal history to follow up.  You might, you know,

24 review what we call DIMs, which is the -- the --

25 actually the computer filing of the complaint that the

1  district attorney's office uses.

2      Q.   And is that required by the public

3  defender's office?

4      A.   There is no written policy other than to

5  zealously represent your client.  So you do what

6  you -- the best you can under the time constraints and

7  what you have available.

8      Q.   So sometimes it's just not possible to do

9  that stuff?

10     A.   Sometimes.

11     Q.   Sometimes depending on the time, the day,

12  number of defendants?

13          MR.  MCCOLLUM:  Objection, form.

14     A.   We never run out of time to talk to them,

15  but with -- in certain cases we may have more

16  information than others.  And certain defendants are

17  more likely to be released than others and, therefore,

18  we may spend more time rather than a situation where

19  someone clearly is not going to be able to be

20  released.

21     Q.   (By Ms. Stafford) How long does a typical

22  interview last with a defendant?

23     A.   It can last 5 to 15 minutes.

24     Q.   And you said they might meet with pretrial

25  services before or after they meet with the attorney;

1  is that correct?

2       A.   Sometimes we work with pretrial services to

3  be the most efficient.  Their cubicles are right next

4  to where we are.  So they might be interviewing

5  someone, and then we might interview them second; or

6  one of their people are busy, so we may get to someone

7  before they do.

8       Q.   And what does pretrial services do?

9       A.   Well, they do the -- they do a financial --

10 they work a financial affidavit with them, which is

11 what the court relies on.  That's their primary

12 information they get.

13      Q.   Does the public defender's office use that

14 financial affidavit?

15      A.   We do, but we also ask the same -- you know,

16 similar questions.

17      Q.   Does that financial affidavit go to the

18 judge at the initial bail hearing?

19      A.   It does.  It also follows them to the court

20 of jurisdiction because it's also a basis for

21 appointment of counsel.

22      Q.   What does the public defender argue on at an

23 initial bail hearing?

24      A.   Whenever -- either -- if possible,

25 eligibility for a personal bond; but if that is not

1  likely because of the seriousness of the offense, then

2  whatever money amount that we believe they could make.

3        Q.   Now, there is a couple of different kinds of

4  bonds; is that correct?

5        A.   There are.

6        Q.   So there's a PI bond, and that's where

7  someone is released on their personal recognizance; is

8  that correct?

9        A.   Well, there is a personal bond, and that

10  means it's unsecured by money but you are -- you are

11  liable for an amount of money if you don't appear.

12  And that is the primary bond that is used -- unsecured

13  bond that is used in Harris County.  The term "PR

14  bond" is kind of used generically; but it's really not

15  any different than a personal bond, which is what the

16  code of criminal procedures talks about.  People say

17  personal bond, personal recognizance bond.  I think

18  there may be some other term.  But in Texas, it's

19  either a personal bond, a cash bond or a surety bond.

20        Q.   So what happens if somebody is supposed to

21  appear in court on a PR bond and doesn't?

22        A.   Then, you know, the judge could issue a

23  warrant for their arrest.  The district attorney could

24  seek forfeiture.

25        Q.   And so the public defender's office is

1  looking to get PR bonds for most of the defendants; is

2  that correct?

3      A.   Correct.  That would -- that would be -- you

4  know, that would put -- that would be what would be in

5  the client's interest.  And so, yes, the least

6  restrictive way to release them.  It's not always

7  going to be likely but.

8      Q.   Do you know any statistics on that since

9  2017 when the -- when they were represented by public

10 defenders, how many PR bonds there are?

11         MR.  MCCOLLUM:  Objection, form.

12     A.   I don't have a reliable number for you.

13 They have increased quite a bit.

14     Q.   (By Ms. Stafford) Do you know anybody who

15 is doing a study on that?

16     A.   The agency that would be able to come up

17 with that number is Harris County Pretrial Services,

18 but I have yet to see a definitive report.

19     Q.   What about failure to appear rates, do you

20 know anything about those?

21         MR.  MCCOLLUM:  Objection, form.

22     A.   That's disputed, too, because what failure

23 to appear means is not -- there is no term of art for

24 that.

25     Q.   (By Ms. Stafford) Okay.  So what do you

 1  mean is disputed?

 2       A.   Well, failure to appear could be the docket

 3  is called, it's 9:00 o'clock, the person is not there

 4  but they show up at 10:00 o'clock.  You know, is that

 5  failure to appear?  To some judges who -- it may be.

 6  Other judges may say we'll reset it till tomorrow.  So

 7  there is no single definition of failure to appear.

 8       Q.   So it makes it pretty hard to track?

 9       A.   Yes.

10       Q.   And why is the goal of the public defender's

11  office to get PR bonds?

12       A.   Because if we can get our clients released,

13  then we can work with them on the outside.  They can

14  continue to work, go to school, they have -- I don't

15  want to say the leisure, but they have the time to

16  make decisions about their case without the pressure

17  of being incarcerated.

18       Q.   And how does that transition work for

19  someone who is out on a PR bond with -- with a public

20  defender?

21            MR.  MCCOLLUM:  Objection, form.

22       A.   Well, they're not necessary -- those folks

23  are not necessarily going to be our clients.  So what

24  will happen next is when they appear in court, they'll

25  be appointed a lawyer.  It may be us.  Right now we

1  still have only a small percentage of all appointed

2  cases.  So most of the time those people are going to

3  be appointed a private assigned counsel.

4      **Q.   (By Ms. Stafford) You say you have a small**

5  **percentage of all the cases.  Do you know what that**

6  **percent is?**

7      A.   About 8 percent right now.

8      **Q.   And how do they determine whether or not**

9  **they get a public defender versus a private attorney?**

10     A.   So ultimately it's up to the judges; but in

11  the misdemeanor courts, they -- all 16 courts follow

12  that algorithm.  So we get all of those mentally ill

13  or intellectually disabled defendants.  And that is a

14  bit higher than the average.  It's probably closer to

15  15 percent of all those cases.  In the felony courts

16  it's -- again, it's on a wheel; but it is a still up

17  to the courts.  And until recently, some of those

18  courts rarely appointed us.  After the last election,

19  I believe all the judges have now confirmed they're

20  going to appoint our office on a regular basis.  So we

21  expect our appointment rate to go up to about 20

22  percent in the next year.

23     **Q.   The notes that the public defender's officer**

24  **takes in that initial hearing for the defendant, does**

25  **that follow their file?**

1      A.   Right now it does not.  We keep them.  If a

2  lawyer were to contact us -- and we've certainly made

3  it known, everyone knows that we represent them in --

4  then we would provide that to them.  And, you know,

5  all these proceedings are videoed.  And so it is often

6  a practice -- I know it's a practice in our office of

7  obtaining videos of what happened at those

8  proceedings; and some lawyers, private lawyers do,

9  too, and district attorneys do often.

10      **Q.   Do any of the public defenders speak to the**

11  **attorneys that have been appointed to somebody that**

12  **they may have represented at the initial bail hearing?**

13      A.   Unless they contact us, it is unlikely

14  that -- we don't have time.  It's 200 people a day to

15  contact all those lawyers.

16      **Q.   Do you guys have interns that represent any**

17  **indigent clients?**

18      A.   No.

19      **Q.   Do you have interns that do any of the**

20  **initial bail hearings?**

21      A.   Interns?

22      **Q.   Uh-huh.**

23      A.   No.

24      **Q.   Like law students?**

25      A.   No.

1     Q.   I know there's -- some people have law

2  clinics.  I was just curious --

3     A.   Right.  No, we don't.

4     Q.   Do you expect that you have to have more

5  attorneys now that Harris County has said -- Harris

6  County judges have said that they're going to appoint

7  public defenders?

8     A.   Yes.  Our budget year started March 1st.  I

9  was added 61 new positions, which are attorneys,

10  investigators, social workers, administrators.

11     Q.   Since that new election that you just spoke

12  of?

13     A.   Right, which included a change in the

14  commissioners court.

15     Q.   And what was the budget for that?

16     A.   So my budget for this fiscal year starting

17  March 1 is about $21 million.

18     Q.   What was the difference between the 21

19  million and what you had previously?

20     A.   It previously was about 11 million.

21     Q.   Okay.

22     A.   It's almost doubled.

23     Q.   And how is that money funded?

24     A.   Harris County.

25     Q.   Fully?

1    A.    Fully.

2        Q.    **Do you guys apply for any grants?**

3    A.    We do, but grants are typically for special

4    projects and then those projects end and the grants

5    are rarely continued.  So we received a grant last

6    year to -- for a statewide review of DNA in cases

7    where there were multiple sources because there were

8    advances in DNA technology and they found that you

9    need to go back and look at those cases.  So we did

10   that, but that was for a limited time and that is --

11   that will be over next year.  But nothing for our

12   general operating, for our normal caseload.  That's

13   all Harris County.

14       Q.    **What about the Texas Defense Commission, did**

15   **you receive any money from them?**

16   A.    The DNA grant was from them.  I think that

17   was our only grant from them.

18       Q.    **So they didn't provide any grants for the**

19   **initial bail hearing and hiring staff?**

20   A.    No, no.

21       Q.    **Did Harris County hire additional**

22   **magistrates since 2017?**

23   A.    Yes.

24       Q.    **Specifically for these initial bail**

25   **hearings?**

1      A.    Yes, yes.   That's --

2      **Q.   Do you know how many?**

3      A.    That's all they do, yes.

4      **Q.   Okay.**

5      A.    How many?   At least half a dozen, but I

6   think it's more than that.

7      **Q.   So can you walk me through an initial bail**

8   **hearing?**

9      A.    Sure.   The magistrate will address the

10   person by name, ask them to come up.   There's usually

11   a box they stand in before the bench and they ask the

12   district attorney -- well, they do a brief explanation

13   of what the purpose of the hearing is to the

14   defendant.   The three main objectives are that they're

15   going to determine whether there's probable cause, set

16   bail and if -- they're going to ask them if they want

17   an appointed lawyer for the rest of their case.   And

18   so the district attorney will then read the statement

19   of probable cause, and the court will make a finding

20   one way or the other.

21              And then they'll go to bail and there

22   will be a recommendation from the district attorney

23   and a recommendation from the defense attorney and

24   they'll make a decision.   And then they'll -- if

25   they request -- there's also a question of whether

1  or not -- if they're not a citizen, whether they

2  want their counsel contacted.  But then the only

3  other request is do you want to be appointed a

4  lawyer.  They make a notation, and then that follows

5  them to the court of jurisdiction.

6       Q.   What about somebody who doesn't get a PR

7  bond, what happens in those cases?

8       A.   Then some amount of money will be applied to

9  the -- what they would either have to pay outright or

10  a percentage of -- usually 10 percent to a bail

11  bondsman, sometimes with collateral, sometimes a

12  higher percentage.

13       Q.   What about if it's something they still

14  couldn't afford?

15       A.   Then they remain in custody.

16       Q.   Do you guys keep track of those numbers at

17  all?

18       A.   I don't have those numbers.

19       Q.   Well, what -- do you guys keep track of

20  those clients at all?

21       A.   Unless we're appointed to them, no.

22       Q.   So is there an opportunity for another

23  hearing for them if they can't -- still can't afford

24  the bail?

25       A.   Yes.  The misdemeanor courts have an

1  automatic review.  I do not believe it's in the felony

2  courts' local rules.  I believe the attorney, whoever

3  is appointed would need to revisit that with the

4  court.  They could either file a motion for reduction

5  of bail or they could file a habeas corpus.

6      Q.  When is that attorney usually appointed?

7      A.  They're usually there the first day that the

8  person appears in court, which may not be the next day

9  after -- after their magistration but should be fairly

10  soon thereafter.  It should be that week at least.

11      Q.  And you said that's for misdemeanors and

12  felonies?

13      A.  Yes.

14      Q.  If there was a client who said that you

15  absolutely need to talk to somebody before they had

16  their initial bail hearing, would a public defender

17  wait for the next magistration in order to talk to a

18  witness, let's say?

19      A.  Unlikely.  I don't recall that ever

20  happening.  I mean, it's not impossible that they

21  would ask for that to happen; but I would say that's

22  an extremely rare circumstance.

23      Q.  Now, you wrote a declaration in this case;

24  is that correct?

25      A.  Correct.

```
 1              (Exhibit 1 marked.)

 2      Q.    (By Ms. Stafford) Does this look like the

 3   declaration that you wrote for this case?

 4      A.    It is.

 5      Q.    See in paragraphs 6 and 7, do those look

 6   like the opinions you're offering in this case?

 7      A.    Yes.

 8      Q.    So let's take a look at paragraph 8.  And

 9   you state that individual characteristics can

10   highlight either mitigating or aggravating evidence

11   depending on the facts and how they are interpreted.

12      A.    Yes.

13      Q.    Can you give me an example of mitigating

14   circumstances?

15      A.    So --

16            MR.  MCCOLLUM:  Objection, form.

17      A.    If the defendant were -- needed -- in terms

18   of bail?

19      Q.    (By Ms. Stafford) Yes.

20      A.    Okay.  All right.  So, for instance, if the

21   defendant were the primary breadwinner in the home and

22   the family needed them, this might be something to

23   influence the person deciding, the hearing officer; if

24   they would lose their job, if there were certain

25   things in their life that were -- that showed that
```

 1  they are responsible, like they've been in the system

 2  before but they never missed court, something like

 3  that.

 4      Q.   What about aggravating evidence?

 5      A.   Well, we would not raise that.  The

 6  prosecutors would probably point to criminal history,

 7  seriousness of the offense.  Those are aggravating --

 8  the main aggravating issues, and failure -- previous

 9  issues of failing to appear in court.

10      Q.   And how do you guys typically address those?

11      A.   Well, sometimes we can't.  I mean, if it

12  happened, it happened; but usually we're helping

13  balance the mitigating factors against the aggravating

14  factors.

15      Q.   And you -- you just asked me in terms of

16  bail.  What other representation are you talking

17  about, probable cause or?

18      A.   No, no.  Mitigation -- when you're talking

19  about criminal lawyer, you're usually talking about

20  sentencing.

21      Q.   Okay.  And what are the issues at stake that

22  you talk about in this paragraph?

23           MR. MCCOLLUM:  Objection, form.

24      Q.   (By Ms. Stafford) It's on the -- it looks

25  like the fifth sentence down, "defendants are

1  **unfamiliar with the issues at stake."**

2        A.   Okay.  So the key issues for release are

3  whether or not someone is likely to reappear and

4  whether or not they'll commit further offenses.  And

5  what -- what tends to show those things are, again,

6  the type of mitigating circumstances that I was

7  explaining.  What defendants think are important often

8  are the facts of case against them.  And so left to

9  their own devices they'll start talking about the

10 guilt or innocence of -- in the case, which is really

11 not relevant to hearing but can also incriminate them

12 and get them in trouble later.  So it's basically a

13 lack of understanding of the relevance of what's

14 important at the bail hearing.

15       **Q.   Well, what if they receive this type of**

16 **advocacy within 12 hours of being arrested, would you**

17 **find any harm there?**

18       A.   It's not so much the time as it is the first

19 opportunity to make that representation.  So if -- if

20 no decision has been made about their bail, it may

21 take 12 hours to get to magistration.  But they need

22 advocacy at the first possible instance but -- what's

23 important.

24       **Q.   Why -- why is that?**

25       A.   Well, once a decision is made, it's hard to

1   change.

2          Q.    What makes you say that?

3          A.    Statistically I've seen that in Harris

4   County, that the -- when you -- when you argue for

5   review, the percentage of times bail is lowered or

6   reduced to a personal bond is low, single digits.

7          Q.    Where do you get those statistics?

8          A.    They were done in O'Donnell.  I've seen --

9   I've seen -- it's there in the testimony somewhere.

10  My own practical experience is that once a decision

11  has been made, it's hard to get it changed.

12         Q.    Have you seen any statistics in other

13  counties?

14         A.    No.

15         Q.    What about Galveston County?

16         A.    I am not familiar with statistics in

17  Galveston County.

18         Q.    So you don't know what the percentage of

19  bail was lowered from the initial bail hearing to the

20  bail review hearing?

21         A.    I do not.

22         Q.    Can you plead guilty at the initial bail

23  hearing?

24         A.    No.  You can incriminate yourself, but you

25  can't plead guilty.

1      Q.   Do you know what a bail hearing is like in

2  Galveston?

3      A.   Only what I've read from the local rule; but

4  I have not seen one, no.

5      Q.   Is a bail review hearing different than the

6  initial bail review hearing in Harris County?

7      A.   Having not seen one, I don't -- I can't say

8  with certainty.

9      Q.   Okay.  You said you read about it, though?

10     A.   I read the rule, that's what I'm -- I

11  understand that it is reviewed.

12     Q.   Okay.  And that's your only understanding of

13  bail review hearings in Galveston County?

14     A.   Correct.

15     Q.   In paragraph 13 you state that:  "Lawyers

16  can also help get some defendants released from

17  custody in what were already close calls."  What do

18  you mean by that?

19     A.   I mean we're emphasizing mitigation and the

20  magistrate may not be paying attention to the

21  importance of that mitigation.  So having a lawyer

22  frame it properly, especially when you have a

23  prosecutor arguing the other way, can be the basis to

24  get somebody out.

25     Q.   So you're saying that that -- that didn't

1  happen until the bail review hearings in Galveston

2  County.  You don't believe that, though, would be

3  advocating for the defendant?

4      A.   I believe it's much less likely under those

5  circumstances.

6      Q.   Is there anything preventing an attorney to

7  make that argument in the bail review hearing?

8      A.   No, there's nothing preventing them from

9  making the argument.

10     Q.   Now, in paragraph 20 you quote the American

11 Bar Association that has the goal of:  "Individuals

12 charged with a crime and confined in jail are provided

13 prompt, meaningful access to an attorney who works to

14 secure their immediate release and to ensure that any

15 release condition is the least restrictive means to

16 achieve its objective."  Did I read that correctly?

17     A.   Yes, you did.

18     Q.   And where does it say their goal is to

19 provide an attorney at an initial bail hearing?

20     A.   They don't say that.

21     Q.   So if someone is provided an attorney in the

22 bail review hearing, would that meet with the American

23 Bar Association's goal?

24     A.   I think that's inconsistent with prompt.

25     Q.   Why is that?

1     A.   Because it's not -- it is not the first

2 opportunity that this could happen.

3     Q.   **So you think that prompt isn't a time thing.**

4 **You think that's a --**

5     A.   Well, whatever is available under the

6 circumstances.  Again, we talked about how there are

7 many different types of delays that happen.  But we

8 are the first lawyers -- we represent them at the

9 first possible time a decision is made about their

10 bail.

11     Q.   **And then in paragraph 21 you listed the**

12 **report, "Don't I Need a Lawyer?"**

13     A.   Correct.

14     Q.   **Do you know when that was written?**

15     A.   I'm pretty sure it's in the last five years,

16 but I don't remember the date.  It's attached as an

17 exhibit.

18     Q.   **I've got it.  It's Exhibit 2.  It's your**

19 **declaration Exhibit 2.**

20     A.   2015.

21     Q.   **So that is before the decision in O'Donnell?**

22     A.   Before the preliminary -- yes, yes.

23     Q.   **Does this account for having an attorney at**

24 **the initial bail hearing?**

25     A.   I don't know.  I don't remember if it

1    specifically says that.  Again, it talks about a

2    timely manner.

3        Q.   So does it account for defendants receiving

4    bail review hearings?

5        A.   I don't think it addressed bail review

6    hearings.

7        Q.   Does it assume that an arrestee does not see

8    a judicial officer within 24 to 48 hours?

9        A.   No.  It's based on a -- it's a national

10   standard, and the 24 hours is a Texas procedure.

11       Q.   On page 9, it says:  "Part 2, Overview of

12   Pretrial Release and Bail Proceedings."

13       A.   I see that.

14       Q.   And in the fifth sentence it says:  "Jail

15   capacity and the volume of people entering local jails

16   vary."

17            MR.  MCCOLLUM:  I'm sorry.  Could you tell

18   us where the page is?

19            MS. STAFFORD:  The fifth sentence.  I said

20   second paragraph, fifth sentence.

21            MR.  MCCOLLUM:  Second paragraph.  Thank

22   you.

23       Q.   (By Ms. Stafford) Where is starts with:

24   "Jail capacity and the volume of people entering

25   local jails vary, but a defendant in a populated

1  city or county can be expected to be placed in a

2  crowded holding cell and wait 24 to 48 hours prior

3  to being brought before a judicial officer."

4      A.   I see that.

5      Q.   So are they assuming in this that people

6  aren't seen for 24 to 48 hours?

7      A.   They use the word "can."  So I'm assuming

8  they're not saying that that's true in all cases but

9  that it can happen.

10     Q.   So you're saying they're not basing it off

11  24 to 48 hours?

12     A.   Could be more, could be less.  That's a

13  ballpark they're using.

14     Q.   So at an initial bail review hearing -- I'm

15  sorry.  At an initial bail hearing can a public

16  defender challenge the state's evidence that probable

17  cause existed?

18     A.   We do.

19     Q.   And what does that look like?

20          MR.  MCCOLLUM:  Objection to form.

21     A.   There would be some element of the charge

22  that is not met.

23     Q.   (By Ms. Stafford) Okay.  Can you explain

24  to a layperson what that would mean?

25     A.   So they say someone has committed trespass

 1  but they have no facts to establish that they had no

 2  right to be there.

 3      Q.   Okay.  Do they bring witnesses to the

 4  initial hearing?

 5      A.   No.

 6      Q.   Why not?

 7      A.   I think it's mostly to do with efficiency.

 8      Q.   So you think a lot of times a judge takes

 9  the attorney's word when they say they have strong

10  ties to the community?

11      A.   He takes the -- well, they weigh -- it works

12  for both sides.  The prosecutor is simply stating

13  facts that they're not proving by any other means

14  except that a police officer told them that.  The

15  defense lawyer is stating facts that they have gotten

16  either from the defendant or from some other source.

17  So we call it proffering evidence.  So no -- otherwise

18  no evidence is admitted.  The rules of evidence don't

19  apply.  The hearing officer makes the best judgment

20  they can based on proffered facts.

21      Q.   Can a public defender represent an arrested

22  person in a 1517 hearing where their bond has already

23  been set by another magistrate?

24      A.   Yes.

25      Q.   Does Harris County make a weekly report of

1  each arrestee that they represent?

2      A.   Harris County or my office?

3      Q.   I'm sorry.  Public defender's office.

4      A.   No.  We do not report to anyone but our --

5  we have our own internal statistics and case

6  management that we do not share.

7      Q.   And you said your internal statistics and

8  what?

9      A.   Case management.

10     Q.   What do you guys track in your internal

11 statistics?

12     A.   Well, I mean, I could -- I could tell you

13 the total number of people we represented at any time.

14 As to bail, it's typically numbers of people; and then

15 we save whatever notes we have per case, but we don't

16 have a system of tracking individual information about

17 each defendant.  There's just too many of them.

18     Q.   You're saying that would be unworkable for

19 you to track that information?

20     A.   Right.  And it's -- most of that information

21 is recoverable through pretrial services.  So -- and

22 again, the videos are all saved.  So if you needed

23 something about what happened at the hearing, you

24 could get the video.

25     Q.   Do you put the videos with their case notes?

1    A.   We don't save the videos.  Harris County

2  services -- it's called universal services.  Basically

3  the IT department of Harris County holds onto those.

4    Q.   So your statistics, your percentage just

5  counts bodies?

6    A.   That's all I can tell you.

7    Q.   Okay.  So what about names of defendants?

8    A.   We have their names.  I don't have -- in

9  other words, we don't put them into our case

10  management system so that you could do a search by

11  name.  What we could do is track through the -- find

12  them through the county system and identify what

13  docket they were on and then go back and find their

14  information that we've saved.  We've saved

15  cumulatively by docket any notes and information in

16  that case.

17    Q.   Okay.  So how would somebody request that

18  information from you if they were an attorney

19  representing --

20    A.   If they were, they would call and we would

21  be able to -- I would assume that would be within, you

22  know, a short period of time after the initial

23  appearance, days or weeks; and then we could figure

24  out where that is and provide that to them.

25    Q.   Has anybody asked you for those statistics?

1      A.    Statistics are -- I'm trying to think if we

2    were asked.  I know from my own personal knowledge I

3    asked our case management person to tell me so I could

4    figure out how many people we were representing when

5    we went through the budget process.  I wanted to know,

6    you know, what kind of work we were doing.  But I

7    don't think we've ever provided it for a report or

8    outside of our office.

9        Q.   So you don't keep track of who was denied a

10   PR bond in that information?

11       A.    No.

12       Q.   Do you keep track of any conditions that

13   were put on any bonds?

14       A.    No.  That -- again, that exists

15   independently and we could -- we could find that

16   information.

17       Q.   Can somebody reject a public defender?

18       A.    Yes.

19       Q.   Do they just have to fill out paperwork, or

20   how does that work?

21       A.    Well, the initial rule was they had to agree

22   to our representation.  The county courts have changed

23   that rule to be they have to reject our

24   representation.  Again, we have -- there's a

25   difference now between how the felony courts deal with

1  it or not.  But basically unless somebody tells us

2  they don't want us, we continue to help them.

3       Q.  What's the difference in the felony?

4       A.  I think it will change once -- it's just

5  because the lawsuit has pressured the county courts to

6  move more quickly and change their rules.  They've

7  done that, but I believe we're going to have a

8  consistent rule at some point.

9       Q.  So what's the rule now for felony courts?

10      A.  It's still the same -- the original rule,

11 which is they're supposed to -- we're supposed to get

12 their consent.  And it's not written or anything.

13 Usually the magistrate will just ask them.

14      Q.  Has anyone talked to the felony judges about

15 changing that?

16      A.  Those conversations are going on.  I'm not

17 privy to all of them.

18      Q.  So you're saying the PR bond is the norm, or

19 how do you phrase that?  It's the norm for people or?

20      A.  Well, for misdemeanors it is the presumptive

21 recommendation except for the carve-out offenses,

22 which I think there are three or four.  For felonies

23 it's different.  There is some -- there are some that

24 are presumed personal bonds, like what we call state

25 jail felonies for low levels of drugs.  But on the

1  whole there are very -- there are very -- there are

2  many fewer presumptive personal bonds for felonies

3  than there are for misdemeanors.

4       **Q.   Do the judges have a list of those**

5  **presumptive --**

6       A.   Yeah.  If you go to the website for the

7  county, you can find the local rules on those.

8       **Q.   So what does the public defender do in those**

9  **cases?  Do they serve any purpose for those?**

10      A.   Yeah.  Well, there's always something at

11  issue.  The prosecutor may be asking for an extremely

12  high amount of money that -- and we're arguing for an

13  amount of money that they could afford even though

14  it's unlikely a personal bond is going to applied.  So

15  a personal bond is not the be all and end all of what

16  we do.  We may be arguing for conditions that obviate

17  the need for a high money bond.  We may be arguing for

18  less onerous conditions.  There's always something at

19  stake at bail unless they meet the few situations

20  where the district attorney can file a motion and say

21  this person is not eligible for bail.

22      **Q.   Have you seen any news articles about**

23  **failure rates of PR bonds in Harris County?**

24      A.   Nothing based on -- I mean, there are --

25  there were discussions in the news by both sides about

1    what failure to appear rates are, but there's no

2    agreement of what they are.  And so there are no

3    reliable statistics about what they are.

4         **Q.   So if someone said failure to appear rates**

5    **have increased since, you know, the presumption of PR**

6    **bonds, you would have to look at the underlying data?**

7         A.   I think so.  And one of the big

8    misunderstandings about that was -- so, for instance,

9    all of our homeless, mentally ill clients under the

10   system where they did not get out before on personal

11   bonds, typically those cases, they would either be

12   restored on their medication and be -- and their case

13   dismissed or maybe they were allowed to plead guilty

14   and get time served.  I mean, very quick resolutions

15   of those cases.  But they'd be back, you know, in a

16   couple of weeks because our system has a population

17   that just recurs.

18             And so under a new system where most

19   people get out, yes, they might, quote, fail to

20   appear; but it's the same problem.  They have mental

21   health issues, they have homelessness issues and so

22   they're popping back in our system but -- you may be

23   counting them as failures to appear, but they're

24   coming back.  So it's -- but under most

25   circumstances, if you take that population out of

56

1  the mix, I don't think the failure to appear rate

2  has increased at all.

3      Q.   And where do you get that information?

4      A.   Just generally what I've heard from pretrial

5  services.

6      Q.   And they track that information?

7      A.   Yes, they can get you accurate numbers on

8  that.

9      Q.   Do you know if they release that sort of

10 information to the public, like in annual report or

11 anything?

12     A.   They do an annual report, yes.

13     Q.   Have you looked at those reports?

14     A.   I don't know the last time they've issued

15 one, no.

16     Q.   Do you know if they've issued one since

17 there have been public defenders at the initial bail

18 hearings?

19     A.   I'm not sure.  I'm not sure if they have,

20 but they should have by now.  It's been more than a

21 year.  Of course, a number of things happened.  It

22 wasn't just the addition of public defenders.  We have

23 a risk assessment tool.  There was -- you know,

24 because of the lawsuit, there was pressure to release

25 more people.  So a number of factors played into it

1  beyond the representation.

2      Q.   Do you know what the sheriff's office thinks

3  about this bail reform?

4      A.   They would like to get more people out of

5  jail.  So they support it.

6      Q.   So you haven't received any pushback from

7  law enforcement on the bail reform?

8      A.   No.

9      Q.   Have you heard anything in the news about

10  someone on a PR bond committing an armed robbery?

11      A.   That happened before and after.  You cannot

12  predict with 100 percent what someone will do when

13  they're released.

14      Q.   Have you heard anything from the community

15  about this bail reform?

16      A.   I've heard -- no, not a lot from the

17  community.  I don't think they have a sense of day to

18  day how much has changed or how much it's affected

19  them.

20           MS. STAFFORD:  Let's take a quick break.

21                (Recess taken)

22      Q.   (By Ms. Stafford) How many times can a

23  public defender visit a defendant in the holding

24  area?

25      A.   As often as they can, want to.

1      Q.    There's no limit --

2      A.    No.

3      Q.    -- on the amount of time?

4      A.    No.

5      Q.    How does the public defender make an

6  argument that someone should be released on a PR bond

7  if they've had multiple offenses?

8      A.    Well, if they're low-level offenses, that's

9  probably still in the ballpark.

10     Q.    What about multiple failures to appear?

11     A.    Then it's less likely it will succeed, but

12 it may -- there may be explanations for the other ones

13 and they may be old.  This could be a 50-year-old man

14 who failed to appear when he was a teenager.  So there

15 are circumstances that would explain that.

16     Q.    Paragraph 30 of your report.  And you're

17 talking about reviewing the rules for Galveston County

18 that calls for bail review hearings; is that correct?

19     A.    Correct.

20     Q.    And then at the very bottom you say:

21 "Regardless of how quickly this occurs, possibly in

22 less than 24 hours the initial bail setting prejudices

23 defendants and the bail review procedures do not fix

24 that prejudice."  Can you explain that sentence to me?

25     A.    The sentence reflects my belief that once

1  bail has been set, it is an uphill battle to change

2  that in the defendant's favor.

3      Q.   So the prejudice you're speaking about is

4  the amount of money set on the bond?

5      A.   Or anything that will keep them

6  incarcerated, yes; but typically it is money that

7  keeps them in jail, yes.

8      Q.   Okay.  And -- but anything else?

9      A.   I think I'm thinking mostly about money at

10  that point, yeah.

11      Q.   So you can't think of anything else but the

12  money?

13      A.   That's usually the reason, yes.

14      Q.   But you don't have any statistics of -- on

15  that?

16      A.   Not in regard to Galveston, no.

17      Q.   What do you base that on?

18      A.   My own experience and statistics in Harris

19  County.

20      Q.   Is Harris County bigger than Galveston

21  County?

22      A.   Yes.

23      Q.   Have you ever been to Galveston County?

24      A.   Yes.

25      Q.   Have you ever represented anyone in

1   Galveston County?

2        A.    In Federal court, not state courts.

3        Q.    So you don't know whether or not bail has

4   increased or decreased in a bail review hearing in

5   Galveston County?

6              MR.  MCCOLLUM:  Objection, form.

7        A.    I don't have personal knowledge, no.

8        Q.    (By Ms. Stafford) And then in paragraph 31

9   you said:  "Harris County tried a similar review of

10  bail; and it was apparent that once an initial order

11  for bail was entered, changing it later typically

12  only resulted in higher bail."

13       A.    Right.

14       Q.    Where do you get that information?

15       A.    From my lawyers who represent people in

16  those courts.

17       Q.    Any statistics on that?

18       A.    I can't give you numbers, no.

19       Q.    So it's from personal experience and

20  experience of other public defenders?

21       A.    Yes, correct.

22       Q.    When did you guys try that similar review of

23  bail?

24       A.    As I said, it still exists in misdemeanor

25  courts, although it's much less necessary now because

1  so many are released initially.  In felony courts it's

2  really up to the lawyer to bring it to the court's

3  attention.

4      **Q.   And you say that still exists in the**

5  **misdemeanor courts.  Is that the -- when an attorney**

6  **files the lower bail -- notice of lower bail, or how**

7  **does that work?**

8      A.   It's automatic unless they waive it.

9      **Q.   Okay.**

10     A.   And it's often waived.

11     **Q.   When you're saying it's automatic, who**

12  **represents those defendants in that?**

13     A.   The lawyer that will be appointed for their

14  entire case.

15     **Q.   Okay.  And then you say:  "When I reviewed**

16  **the results, the total changes were less than**

17  **5 percent of the cases."**

18     A.   Right.

19     **Q.   What results did you review?**

20     A.   That was a study that was done during

21  O'Donnell.  I don't know who -- I can't remember who

22  did it.

23     **Q.   So you don't -- I see you don't have a**

24  **article cited there?**

25     A.   No.

1      Q.   Okay.   The next sentence says:   "It is basic

2   human psychology that once something is decided, it's

3   easier to let it stand than change it."

4      A.   Yes.

5      Q.   Are you a psychologist?

6      A.   I do not have training.

7      Q.   So what is your basis for that statement?

8      A.   Experience.

9      Q.   Experience, but not human psychology?

10      A.   Judicial psych.

11      Q.   That's a little different, right?

12           Why do you think it would be fairly

13   simple for Galveston County to implement this

14   system?

15      A.   Because it's basically what you're doing

16   with the bail review, if you would just move that up

17   to the initial appearance and have the lawyer there.

18      Q.   Do you know how often they have hearings in

19   Galveston County?

20      A.   I do not.

21      Q.   So you're saying they would move to a

22   24-hour system?

23      A.   If they're holding court 24 hours, yes.

24      Q.   Currently it's -- they have one in the

25   morning and one in the evening?

1       A.   Right.  And if they were to do that, then

2   they would need a lawyer once in the morning and once

3   in the evening.

4       **Q.   So you're saying it's workable if you're**

5   **having a hearing in the morning and the evening?**

6       A.   Well, you only need lawyers for whenever

7   you're going to have appearances.  So, yeah.  I mean,

8   they would need to be there in advance of the

9   appearances to meet the defendants and...

10      **Q.   How far in advance?**

11      A.   It wouldn't necessarily be long.  As long as

12  the defendant was available for the meeting and the

13  information like the pretrial report or anything were

14  available, it would be within minutes, half hour.

15              That is similar to what I did in

16  Federal courts.  The magistrates -- Federal

17  magistrates would often have a certain time every

18  day that they do their docket.  It usually would be

19  like 2:00 in the afternoon.  But the marshals might

20  bring someone in at 1:00 o'clock, and I'd have to

21  interview them.  Or they could bring them in early

22  in the morning.  So a lot of what we do is dependent

23  on how the system is moving.  We're reactive to

24  whatever the system provides.

25      **Q.   Do you think there should be a requirement**

1    that an attorney gets a certain amount of hours before

2    a hearing to meet with their defendant?

3        A.   No.   There doesn't need to be a rule.

4        Q.   Why not?

5        A.   Because as long as you've had time to talk

6    to them, that is sufficient.   I mean, you're not

7    bringing -- you're not doing an investigation.   These

8    hearings are not based on an investigation, they're

9    not based on subpoenaing witnesses, they're not based

10   on accumulating additional evidence.   They are

11   proffers.   So we do the best we can with what

12   information is available.

13       Q.   So you think the Harris County system is one

14   size fits all?

15       A.   It's not one size fits all in that --

16   because we have so many people and so many -- that is

17   24 hours a day that that is a much bigger, faster

18   system than most counties in Texas.   But because

19   smaller counties will have less people to deal with,

20   they need less resources to make this work.

21       Q.   Do you agree that there is a constitutional

22   floor for what is provided by the law in the bail

23   system?

24       A.   There is a constitutional floor for

25   everything in criminal procedure and criminal law,

1  yes.

2       Q.   And is Harris County providing more than

3  what is constitutionally required?

4       A.   I believe they're providing exactly what the

5  Constitution requires.

6       Q.   And you -- it says earlier in your

7  declaration that you're a member of the Texas Indigent

8  Defense Commission; is that correct?

9       A.   Yes.

10      Q.   And what do you do with them?

11      A.   Well, we meet quarterly.  We implement

12 policy about how counties provide indigent defense.

13 We distribute grant funds in two ways.  One is a

14 proportion of the size of the county and their

15 criminal appointments.  And then the others are

16 discretionary grants, which are like the ones that

17 describe the DNA grant that Harris County got.  So any

18 county can apply for a grant for a specific purpose,

19 and we decide whether or not they get them.

20      Q.   And you're part of that review process?

21      A.   Yes.

22      Q.   Did anyone from the Texas Indigent Defense

23 Commission hook you up with the Texas ACLU attorneys?

24      A.   No.

25      Q.   So the phone call from Trisha was just

 1  completely out of the blue?

 2      A.   Yeah.  I mean, as I said, she had reached

 3  out to me before on other issues but not bail.

 4           MS. STAFFORD:  I think that's all I have.

 5  Angie, do you have anything?

 6           MS. OLALDE:  Just one quick question.

 7                     EXAMINATION

 8  BY MS. OLALDE:

 9      Q.   Mr. -- is it Mr. Bunin?

10      A.   You got it right.

11      Q.   Thank you.  I was hoping to pronounce it

12  right.  My name is Angela Olalde, and I'm an attorney

13  for the Galveston Criminal District Attorney.

14      A.   Okay.

15      Q.   Very quick.  Looking at your affidavit,

16  there is a spot in paragraph 26.

17      A.   Okay.

18      Q.   In the last sentence you say that basically

19  having defense counsel at the initial appearance is

20  well worth the cost and effort.  Did I read that --

21  did I summarize that correctly?

22      A.   Yes.

23      Q.   Can you tell me what -- so when you say well

24  worth the cost and effort, can you state why or the

25  basis for that statement, what you mean by that?

1        A.   Because the number of people that can be

2   justifiably released and safely released because of

3   the additional -- the addition of advocacy will reduce

4   the cost of incarcerating them.  It will help

5   generally to reduce recidivism based on the study that

6   they -- unnecessarily keeping people in jail will

7   cause them to come back into the system.  It will help

8   them keep their jobs, help them stay in school.  So

9   all those things benefit the community at large.  And

10  so those are all benefits you get when you have a

11  system that releases everyone that should be released.

12       **Q.   Is there anything else that you can think of**

13  **that's important to the statement that it is well**

14  **worth the cost and effort that you haven't just told**

15  **me?**

16       A.   I'm sure there are all kinds of collateral

17  benefits that I can't think of, but those are the main

18  ones.

19       **Q.   Yeah.  Because if it were important, you**

20  **would remember and you would tell me now, right?**

21            MR.  MCCOLLUM:  Objection to form.

22       A.   There are -- I mean, I could -- I could

23  think of other things.  So one of the benefits is that

24  a defendant who is released can assist in their own

25  defense, and that makes the system fairer.  Another

1  benefit is that they can, you know, assist their

2  family, provide for their loved ones.  It's -- again,

3  it's -- when people are unjustifiably and

4  unnecessarily kept in custody, there are costs to

5  society and costs to those defendants.  And these

6  things are remedied when everyone who can get out,

7  should get out and no one should stay in just because

8  they're poor.

9      **Q.  (By Ms. Olalde) And the reduction in**

10  **recidivism that you cited is based on studies that**

11  **are quoted in your affidavit; is that correct?**

12      A.  Yes.  That's the one that I can think of

13  most readily, yes.

14      **Q.  But you're not basing them only on**

15  **statistics that you have compiled in your --**

16      A.  I'm not a social researcher, no.

17          MS. OLALDE:  No further questions at this

18  time.  Thank you, Mr. Bunin.

19          THE WITNESS:  You're welcome.

20          MR.  MCCOLLUM:  Nothing.

21              (Deposition concluded 11:40 a.m.)

22

23

24

25

69

 1                    CHANGES AND SIGNATURE

 2    WITNESS NAME: ALEXANDER BUNIN

 3    DATE OF DEPOSITION:  March 19, 2019

 4    PAGE LINE   CHANGE                   REASON

 5    _____

 6    _____

 7    _____

 8    _____

 9    _____

10    _____

11    _____

12    _____

13    _____

14    _____

15    _____

16    _____

17    _____

18    _____

19    _____

20    _____

21    _____

22    _____

23    _____

24    _____

25    _____

Alex Bunin - 3/19/2019

70

1

2        I,_____, do hereby certify that I

3   have read the foregoing pages, and that the same is a

4   correct transcription of the answers given by me to the

5   questions therein propounded, except for the corrections

6   or changes in form or substance, if any, noted in the

7   attached Errata Sheet.

8

9        _____

10        WITNESS SIGNATURE DATE

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                IN THE UNITED STATES DISTRICT COURT
                 FOR THE SOUTHERN DISTRICT OF TEXAS
 2                        GALVESTON DIVISION

 3   AARON BOOTH, et al.,          )
          Plaintiff,               )
 4                                 )    Civil Action
     vs.                           )  No. 3:18-CV-00104
 5                                 )
     GALVESTON COUNTY, TEXAS, et al)
 6        Defendants               )

 7              REPORTER'S CERTIFICATION FOR THE

 8          VIDEOTAPED DEPOSITION OF ALEXANDER BUNIN

 9                       MARCH 19, 2019

10        I, Jill M. Vaughan, Certified Shorthand Reporter in

11   and for the State of Texas, hereby certify pursuant to

12   the Federal Rules and/or agreement of the parties present

13   to the following:

14        That the witness, ALEXANDER BUNIN, was duly sworn by

15   the officer and that the transcript of the oral

16   deposition is a true record of the testimony given by the

17   witness;

18        That the deposition transcript was duly submitted on

19   _____ to the witness or to the attorney for

20   the witness for examination, signature, and return to

21   Integrity Legal Support Solutions by _____.

22        I further certify that I am neither counsel for,

23   related to, nor employed by any of the parties in the

24   action in which this proceeding was taken, and further

25   that I am not financially or otherwise interested in the
```

72

1    outcome of this action.

2         Certified to by me on this 27th day of

3    March, 2019.

4    _____

5                   Jill M. Vaughan, CSR, RPR
                     CSR No.  6192
6                    Expiration date: 12-31-19
                     Integrity Legal Support Solutions
7                    Firm No. 528
                     3100 West Slaughter Lane
8                    Suite 101
                     Austin, TX 78748
9                    512-320-8690

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25